**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | | |
|---|---|---|
| DIAMOND TOOLS TECHNOLOGY LLC<br><br>        Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>        Defendant. | | Court No. 20-00060 |

**COMPLAINT**

Plaintiff Diamond Tools Technology LLC ("DTT USA" or "Plaintiff"), by and through the undersigned counsel, White & Case LLP, alleges and states as follows:

**ADMINISTRATIVE DECISIONS TO BE REVIEWED**

1.     Plaintiff contests (a) the September 17, 2019, affirmative final determination as to Enforce and Protect Act ("EAPA") "evasion" issued by U.S. Customs and Border Protection's ("CBP") Trade Remedy & Law Enforcement Directorate ("TRLED") in EAPA Case Number 7184 under 19 U.S.C. § 1517(c) ("EAPA Fin. Det."); and (b) the January 29, 2020, decision under 19 U.S.C. § 1517(f) issued by CBP's Office of Regulations & Rulings ("OR&R") in administrative appeal number H306962 affirming TRLED's September 17, 2019, final determination ("EAPA Admin. Appeal Dec.").

**JURISDICTION**

2.     The U.S. Court of International Trade has jurisdiction over DTT USA's action pursuant to 19 U.S.C. § 1517(g)(1) and 28 U.S.C. § 1581(c).

**STANDING OF PLAINTIFF**

3.      Plaintiff is the U.S. importer of record of the merchandise subject to CBP's EAPA determinations, and was adversely affected or aggrieved by CBP's actions within the meaning of 5 U.S.C. § 702.  Under 19 U.S.C. § 1517(g)(1), Plaintiff therefore may seek judicial review of both TRLED's "determination" under 19 U.S.C. § 1517(c) and OR&R's "review" under 19 U.S.C. § 1517(f), and has standing pursuant to 28 U.S.C. § 2631(i).

**TIMELINESS OF THIS ACTION**

4.      On January 29, 2020, OR&R sent Plaintiff an email transmitting "the Final Administrative Determination for EAPA Case No. 7184" (also dated January 29, 2020).  The thirtieth business day after January 29, 2020 (excluding six Saturdays, six Sundays, and President's Day, a federal holiday) falls on March 12, 2020.  Plaintiff is therefore timely filing its Summons, Complaint, Information Statement, and any applicable filing fees within the deadline set by 19 U.S.C. § 1517(g)(1) (*i.e.*, not later than 30 business days after CBP completes an administrative review under 19 U.S.C. § 1517(f)).

**PROCEDURAL HISTORY AND BACKGROUND**

5.      ***The AD Order's Original Scope and Unchanged Country-of-Origin Rule:***    On November 4, 2009, the U.S. Department of Commerce ("DOC") issued an antidumping ("AD") duty order on imports of diamond sawblades and parts thereof from the People's Republic of China ("China").  *Diamond Sawblades and Parts Thereof from the People's Republic of China*, 74 Fed. Reg. 57145 (Nov. 4, 2009) ("The Order").

6.      Diamond sawblades are circular cutting tools composed of two main components:  a "core" and "segments."  The inner "core" is a disk, generally of steel plate or sheet, cut to the

2

diameter of the sawblade, with a hole in the center to secure the blade to a saw and with slots on the core's outer edge to accommodate segments.  The outer ring "segments," which constitute the sawblade's cutting edge, are generally small blocks of synthetic diamond crystals and metal powders.

7.     The Order defines "parts thereof" to mean China-origin cores and China-origin segments when separately imported into the United States.  Thus, when originally issued, The Order covered (a) China-origin sawblades imported into the United States, (b) China-origin cores separately imported into the United States, and (c) China-origin segments separately imported into the United States.

8.     In its final determination of the original AD investigation, DOC determined that a diamond sawblade's "country of origin should be determined by the location of where the segments are joined to the core."  *Diamond Sawblades and Parts Thereof from the People's Republic of China*, 71 Fed. Reg. 29303 (May 22, 2006) (final LTFV determ.), accompanying "Issues and Decision" memorandum at 17 ("Country-of-Origin Determination").  This court affirmed DOC's country-of-origin determination in *Advanced Tech. & Materials Co. v. United States*, 2011 Ct. Intl. Trade LEXIS 136, *1 at *9-*15 (Oct. 12, 2011); *see also Diamond Sawblades Mfrs. Coal. v. United States*, 2013 Ct. Intl. Trade LEXIS 137, *1 at *40-*45 (Oct. 11, 2013) (affirming DOC's determination that the country of origin is where segments are joined to the core).  Consequently, Chinese cores and segments joined in a third country were outside the scope of The Order.

9.     ***EAPA Allegation, Initiation, and Interim Measures:***  On February 24, 2017, pursuant to 19 U.S.C. § 1517 and 19 C.F.R. § 165.11, Diamond Sawblades Manufacturers Coalition

AMERICAS 102416900 v1

("DSMC"), a group of U.S. producers of diamond sawblades, filed with TRLED a petition requesting an EAPA investigation of DTT USA.  DSMC alleged transshipment only, claiming that DTT USA, working through Diamond Tools Technology (Thailand) Co., Ltd. ("DTT Thailand"), was importing **China-origin** diamond sawblades subject to The Order that were produced by Wuhan Wanbang Laser Diamond Tools Co. Ltd. ("Wanbang"), an affiliated manufacturer in China.  DSMC also claimed that DTT USA was falsely declaring and "simply relabel{ing}" the goods to have been manufactured in Thailand, thereby "evading" The Order. DSMC, EAPA Allegation, Public Version at 1, 3, 4, and 5 (undated but acknowledged by CBP as properly filed on March 1, 2017).

10.    On March 22, 2017, TRLED determined that DSMC's allegation "reasonably suggest{ed}" an EAPA "evasion" had occurred, and initiated an EAPA investigation, Case Number 7184, pursuant to 19 U.S.C. § 1517(b)(1) and 19 C.F.R. § 165.15.

11.    Without yet informing DTT USA, DTT Thailand, or Wanbang of the EAPA investigation's initiation, CBP issued to DTT USA a Request for Information ("RFI") on March 24, 2017, and asked follow-up questions on April 25 and May 4, 2017.  On April 24, April 25, May 15, and June 1, 2017, DTT USA responded, submitting to CBP over 300 pages of relevant documentation, including photographs.  Subsequently, CBP visited DTT Thailand on June 21, 2017, and prepared a report about the visit dated June 22, 2017.

12.    On June 27, 2017, TRLED sent to DTT USA (a) a notice of initiation under 19 C.F.R. § 165.15(d)(1), informing Plaintiff for the first time that CBP had commenced an EAPA investigation of DTT USA on March 22, 2017; and (b) a notice of the imposition of "interim measures" under 19 C.F.R. § 165.24(a), citing CBP's "reasonable suspicion" that DTT USA had

4

entered merchandise into the United States through EAPA "evasion."  Both notices from CBP mentioned only the alleged transshipment of falsely labeled, China-origin sawblades.

13.    The statute requires CBP to decide whether to impose interim measures "{n}ot later than 90 calendar days after initiating an {EAPA} investigation . . . ."  19 U.S.C. § 1517(e).  Here, the 90th calendar day after initiation (March 22, 2017) fell on June 20, 2017.  As TRLED conceded, however, "CBP did not reach an affirmative determination as to a reasonable suspicion of evasion by June 20, 2017, and therefore, did not begin interim measures on that date."  CBP, Notice of Initiation of an Investigation of Diamond Tools Technology (EAPA Case Number 7184) (June 27, 2017) at 1. Consequently, CBP failed to meet the statutory deadline for imposition of interim measures.  *See id.* at 3-4 ("On June 20, 2017, CBP did not being {sic} interim measures because TRLED was unable to verify discrepancies on the record, and as a result, make a determination as to whether there was a reasonable suspicion that the importer entered covered merchandise into the customs territory of the United States through evasion, within the time constraints specified in 19 U.S.C. § 1517(e).").

14.    As interim measures, CBP decided, among other actions, to (a) rate-adjust any entries made by DTT USA on or after March 1, 2016, "to reflect that they are subject to the antidumping duty order on diamond sawblades from China and cash deposits are owed"; (b) require "live entry" for DTT USA's future imports ("meaning that all entry documents and duties are required to be provided before cargo is released by CBP into the U.S. commerce"); (c) "suspend the liquidation for any entry that has entered on or after March 22, 2017, the date of initiation of this investigation"; and (d) "reliquidate" already liquidated entries (before conclusion of the EAPA investigation).

5

15.     While the EAPA investigation was ongoing, CBP also treated DTT USA's import entries as if they were already subject to an affirmative final determination of "evasion."  ***First***, CBP required DTT USA, as preconditions for importing goods, (a) to amend entry summaries to falsely declare diamond sawblades produced in Thailand (applying DOC's Country-of-Origin Determination) as China-origin and subject to The Order; and (b) to deposit cash at the China countrywide AD rate of 82.05% (instead of at the alleged producer's, Wanbang's, individual AD rate of 6.19%).  ***Second***, CBP instructed DTT USA, as a precondition to CBP's not doubling the amount of any AD duties owed, to file Certificates of Non-Reimbursement pursuant to 19 C.F.R. § 351.402(f)(2), containing the same false information described above.  ***Third***, CBP required DTT USA, as a precondition to avoiding seizure or additional marking duties pursuant to 19 U.S.C. § 1304(i), falsely to mark as China-origin the sawblades imported into the United States that DTT Thailand had actually produced in Thailand (in accordance with DOC's Country-of-Origin Determination).  ***Fourth***, during the first half of 2018, CBP ***liquidated*** – as if subject to The Order – approximately 20 entries of Thailand-origin sawblades that DTT USA had imported in 2017.

16.     ***DSMC's Circumvention Allegation:***  Separately, on August 9, 2017, DSMC requested that DOC issue a ruling that imports of diamond sawblades ***made in Thailand*** from cores and segments produced in China circumvent The Order.  DSMC, *Request for a Circumvention Ruling* (A-570-900) (Aug. 9, 2017).  Notably, DSMC did not argue that the country of origin for such diamond sawblades was China, making them already subject to The Order.  Rather, citing the anti-circumvention statute, 19 U.S.C. § 1677j(b), DSMC alleged that certain diamond sawblades – made from Chinese cores and segments – that are completed or assembled in a third

country, Thailand, were circumventing The Order.  In doing so, Petitioner acknowledged that "the anti-circumvention provision allows the Department to reach merchandise that would otherwise be outside the scope of the order" (because it was produced in Thailand).  *See id.* at 11-12.

17.    ***EAPA Document Production:***   On September 11, 2017, TRLED issued new, EAPA-related RFIs to DTT USA and DTT Thailand – to which the companies timely responded on October 5, 2017.  Overall, DTT USA and DTT Thailand submitted approximately 11,000 pages of requested documents and information.  In addition, on October 10, 2017, DTT USA and DTT Thailand voluntarily filed nearly 10,000 pages of relevant documents pursuant to 19 C.F.R. § 165.23(b) and 165.23(c)(2).   In their submissions to CBP, DTT USA and DTT Thailand demonstrated that, at its plant in Thailand, DTT Thailand joins (through laser welding) cores to segments to produce diamond sawblades, and also performs other finishing operations.   In addition, DTT USA's and DTT Thailand's submissions corrected inaccuracies in CBP's report regarding the June 21, 2017, visit to DTT Thailand—as well as inaccuracies in CBP's notices of initiation and imposition of interim measures (dated June 27, 2017).  On March 6, 2018, TRLED sent another, supplemental RFI to DTT USA, which sought supporting documentation for five entry lines that CBP intended to probe more deeply during an EAPA verification visit to Thailand.  DTT USA filed timely proprietary and public responses on March 13, 2018.

18.    ***CBP's EAPA Scope Referral:***   On November 21, 2017, CBP asked DOC to determine, in accordance with 19 U.S.C. § 1517(b)(4), whether DTT USA's imports of diamond sawblades laser-welded in Thailand by DTT Thailand from cores and/or segments produced in China are "covered merchandise" within the meaning of 19 U.S.C. § 1517(a)(3).   CBP, Scope Referral

Request for Merchandise under EAPA Investigation 7184 (Nov. 21, 2017) ("EAPA Scope Referral Req."). In the letter to DOC, CBP explained it  was "unable to determine whether the merchandise at issue is covered merchandise."  *Id.* at 2. To overcome this inability, CBP inquired only whether DOC's prior Country-of-Origin Determination – holding that the country of origin is where the core and segments are joined – applied "if the joining is done in a third country." *Id.*

19.     ***DOC's Initiation of an Anti-Circumvention Inquiry:***  In response to DSMC's request of August 9, 2017, DOC initiated an anti-circumvention inquiry on December 1, 2017. *Diamond Sawblades and Parts Thereof from the People's Republic of China*, 82 Fed. Reg. 57709, 57710 (Dec. 7, 2017) (notice of initiation of anti-circumvention inquiry). In doing so, DOC noted that the inquiry "covers diamond sawblades exported from Thailand to the United States that are produced by Diamond Tools from cores and segments of PRC origin." *Id.* at 57710. DOC initiated the anti-circumvention inquiry pursuant to 19 U.S.C. § 1677j(b), which permits DOC to ***expand*** the scope of an order to include merchandise completed or assembled ***in a third country***. Consequently, DOC implicitly acknowledged that, by virtue of the joining of cores and segments in Thailand, the country of origin for DTT USA's imports was Thailand, not China. Moreover, in accordance with 19 C.F.R. § 351.225(l)(1), DOC noted it would suspend liquidation upon making an affirmative preliminary determination of circumvention (if applicable), and that any such suspension would apply only to entries made on or after December 1, 2017, the initiation date of the anti-circumvention inquiry. *See id.* at 57714.

20.     ***DOC's Acknowledgement of CBP's EAPA Scope Referral:***  DOC published notice of CBP's EAPA Scope Referral on March 5, 2018 – more than three months after receipt (on

AMERICAS 102416900 v1

November 21, 2017).  *Diamond Sawblades and Parts Thereof from the People's Republic of China*, 83 Fed. Reg. 9280 (Mar. 5, 2018) (notice of covered merchandise referral).  In the notice, DOC did not respond to CBP's question regarding the country of origin when joining of the core and segments takes place in a third country.  Instead, DOC noted that its previously initiated anti-circumvention inquiry raised "potentially overlapping issues."  *Id.* at 9281.

21.     ***CBP's EAPA Verification:***  From April 17 through 20, 2018, TRLED conducted an EAPA site verification visit of DTT Thailand.  During the four-day visit, CBP's team of seven officials used thorough auditing and sampling techniques, and had free and open access to DTT Thailand's documents, factory, and employees.  Approximately nine months later, on December 18, 2018, DTT Thailand and DTT USA received CBP's verification report (but only a public version).  CBP, "PUBLIC VERSION:  Detailed Summary of Analysis Enforce and Protect Act (EAPA) Case Number 7184" (undated, but emailed to DTT USA on Dec. 18, 2018) ("2018 EAPA Verif'n Rep.").  Contrary to the basis for CBP's imposition of interim measures (*i.e.*, transshipment through Thailand of diamond sawblades produced in China), CBP confirmed that DTT Thailand's manufacturing facility had the capability and capacity to produce diamond sawblades in the quantity claimed by DTT Thailand.  *See id.* at 2-3.  Further, CBP did not find any evidence of transshipment from China through Thailand; nor did CBP find any inconsistencies in the voluminous information reported by DTT Thailand in the EAPA investigation.  *See id.*

22.     ***DOC's Anti-Circumvention Inquiry and Determinations:***  On November 9, 2018, DOC issued its preliminary determination in the anti-circumvention inquiry, finding that diamond sawblades joined by DTT Thailand using (a) China-origin cores and China-origin segments, (b)

China-origin cores and Thailand-origin segments, *and* (c) China-origin segments and Thailand-origin cores were circumventing The Order, and that it was appropriate to "include" such merchandise within The Order on a prospective basis.  *Diamond Sawblades and Parts Thereof from the People's Republic of China*, 83 Fed. Reg. 57425, 57426 (Nov. 15, 2018) (prelim. circumvention determ.).  Consequently, DOC did not continue the pre-existing, EAPA-related suspension of liquidation imposed by CBP as interim measures; rather, in accordance with 19 C.F.R. § 351.225(l)(2), DOC instructed CBP to suspend the liquidation of unliquidated entries only if made "on or after December 1, 2017, the date of initiation of this anticircumvention inquiry."  *Id.* at 57426.

23.     On July 11, 2019, over 19 months after initiation, DOC issued the final determination in the anti-circumvention inquiry.  *Diamond Sawblades and Parts Thereof from the People's Republic of China*, 84 Fed. Reg. 33920, 33920-21 (July 16, 2019) (final circumvention determ.). In its final determination, DOC found it "appropriate *to include*" within the scope of The Order only "diamond sawblades made with Chinese cores *and* Chinese segments joined in Thailand by Diamond Tools" (*not* "diamond sawblades made with *Chinese cores and Thai segments* or *Chinese segments and Thai cores* that are joined in Thailand by Diamond Tools").  *Id.* at 33920 (emphasis added).  DOC also reiterated that its affirmative circumvention determination applied only to DTT USA's imports entered on or after December 1, 2017, citing 19 C.F.R. § 351.225(l)(3).  *See id.* at 33921.  DOC did not continue the pre-existing, EAPA-related suspension of liquidation by CBP.

24.     Moreover, DOC noted that, "{i}n this anti-circumvention inquiry, there is no question that the place of the joining of Chinese cores and Chinese segments is Thailand."  *Diamond*

*Sawblades and Parts Thereof from the People's Republic of China*, 84 Fed. Reg. 33920, 33920-21 (July 16, 2019) (final circumvention determ.), accompanying Issues and Decision Memorandum at 13.  Furthermore, in its instructions to CBP, DOC used a ***Thailand*** case number ("A-549-994") and the country-of-origin descriptor "produced in ***Thailand***."  DOC, Message 9197307 at ¶¶ 3, 4a, 4b, and 4c (July 16, 2019) (emphasis added).

25.     ***DOC's Response to CBP's EAPA Scope Referral:***  On July 10, 2019, more than 19 months after receipt of CBP's EAPA Scope Referral, DOC issued its response.  Ignoring CBP's country-of-origin question, DOC explained:

> ***Based on the results of our anti-circumvention inquiry***, we have determined that diamond sawblades ***made in Thailand*** by Diamond Tools with Chinese cores and Chinese segments are covered merchandise subject to the AD order on diamond sawblades from China, whereas diamond sawblades made with either Thai cores or Thai segments are not.

DOC, "Diamond Sawblades and Parts Thereof from the People's Republic of China: Notification of the Final Determination of the Anti-Circumvention Inquiry in Response to the Covered Merchandise Referral" (July 10, 2019) at 5 ("DOC Response to EAPA Referral") (emphasis added).  Consequently, DOC continued to recognize that the country of origin for DTT USA's imported merchandise was Thailand, not China.

26.     Moreover, noting that the EAPA (19 U.S.C. § 1517(b)(4)) directs DOC to determine only whether the merchandise described in CBP's EAPA Scope Referral ***is*** "covered merchandise," DOC declined to comment on the temporal aspect of its decision or on CBP's independent authority to suspend liquidation for purposes of EAPA.  *See id.*  Nevertheless, DOC stated:

> That said, in the context of the anti-circumvention inquiry, Commerce is following 19 CFR § 351.225(l)(3) in informing CBP that we have reached an affirmative final circumvention finding for diamond sawblades made with Chinese cores and Chinese segments, going back to the initiation date of Commerce's anti-circumvention inquiry {(December 1, 2017)}.

11

*Id.*

27.     ***TRLED's EAPA Final Determination as to "Evasion":*** Shortly before DOC completed its 19-month-long EAPA scope referral proceeding, CBP replaced substantially all persons in TRLED assigned to EAPA Case Number 7184—compromising CBP's understanding of record documents and recollection of the 2018 verification visit to DTT Thailand.

28.     On September 17, 2019, TRLED issued an affirmative final determination in the EAPA investigation. *See* EAPA Fin. Det. Despite DOC's determination that its affirmative anti-circumvention finding was limited to DTT USA's imports as of December 1, 2017, TRLED concluded that DTT USA's imports were "covered merchandise" even before that date. *See id.* at 6-8. Consequently, TRLED concluded, "DTT made false statements to CBP when it claimed its entries as type 01 entries {(not subject to The Order)}." *Id.* at 8. Further, despite DOC's recognition that Thailand was the country of origin, TRLED claimed that DTT made false statements "by importing ***Chinese-origin*** diamond sawblades and claiming that merchandise was Thai-origin on entry documents." *Id.* at 9 (emphasis added). CBP concluded that "DTT consequently avoided the payment of the applicable AD/CVD cash deposits or security." *Id.*

29.     DTT USA filed a timely appeal for administrative review on October 30, 2019.

30.     ***OR&R's Administrative Review of TRLED's EAPA Final Determination:*** On January 29, 2020, OR&R issued its decision on DTT USA's administrative appeal of TRLED's final EAPA determination. OR&R defined the key issue as "whether the subject entries made prior to December 1, 2017 are covered merchandise." EAPA Admin. Appeal Dec. at 7. Answering this question in the affirmative, OR&R reasoned that the EAPA gives CBP independent statutory authority to suspend liquidation and collect AD/CVD cash deposits as part of "interim

12

measures," and that CBP had "properly exercised its EAPA authority and made protection of the revenue and domestic industry possible through the imposition of interim measures." *Id.* at 7-8.

## STATEMENT OF CLAIMS

### COUNT 1:  DOC'S UNLAWFUL RETROACTIVE APPLICATION OF DOC'S ANTI-CIRCUMVENTION DETERMINATION

31.     Plaintiff hereby restates and incorporates Paragraphs 5 through 30 by reference.

32.     CBP's decision to apply DOC's anti-circumvention determination retroactively was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.  Only DOC has the authority to expand the scope of an AD or CVD order to cover merchandise completed or assembled in a third country (*i.e.*, a country other than the subject country to which the AD/CVD order applies).  19 U.S.C. § 1677j(b).  Here, in accordance with 19 U.S.C. § 1677j(b), DOC expanded the AD order covering diamond sawblades *from China* to include certain sawblades manufactured by DTT Thailand *in Thailand*, and instructed CBP that, as required by 19 C.F.R. § 351.225(l), its anti-circumvention determination applied only to such merchandise entered *on or after* December 1, 2017.  Consequently, CBP acted without legal authority when it determined to apply DOC's anti-circumvention determination retroactively to DTT USA's imports entered *before* December 1, 2017.

### COUNT 2:  "COVERED MERCHANDISE" ERROR

33.     Plaintiff hereby restates and incorporates Paragraphs 5 through 32 by reference.

34.     CBP's determination that DTT USA's imports of Thailand-origin merchandise entered before December 1, 2017, were "covered merchandise" was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.  The EAPA defines "covered merchandise" as "merchandise that is subject to" an AD or CVD order.  19 U.S.C. § 1517(a)(3).  Only DOC

AMERICAS 102416900 v1

has the authority to expand the scope of an order to include merchandise originating in a third country.   19 U.S.C. § 1677j(b).   Here, in response to CBP's EAPA Scope Referral, DOC determined that diamond sawblades made *in Thailand* by DTT Thailand with Chinese cores and Chinese segments are "covered merchandise" based upon DOC's final affirmative circumvention determination, and that its circumvention determination applied to DTT USA's imports entered as of December 1, 2017.  Consequently, as a matter of law, DTT USA's imports entered before December 1, 2017, were *not* "subject to" The Order and, thus, are not "covered merchandise."

### COUNT 3:  "MATERIAL FALSE STATEMENT OR MATERIAL OMISSION" ERROR

35.     Plaintiff hereby restates and incorporates Paragraphs 5 through 34 by reference.

36.     CBP's finding that DTT USA entered merchandise by means of "material and false" statements or "material" omissions was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.   CBP based its finding that DTT USA entered merchandise by means of "material and false" statements or "material" omissions on an unlawful interpretation of "covered merchandise" (see "Count 2" above).  The Order did not "cover" the goods *at the time of entry*.  Because DTT USA's imports entered before December 1, 2017, are not "covered merchandise" under the EAPA, DTT USA did not make false statements (or material omissions) when it entered the merchandise.  Rather, at the time of entry, DTT USA correctly declared that its imports were "type 01" entries (*i.e.*, not subject to an AD or CVD order) for which Thailand was the country of origin.

### COUNT 4:  "REDUCTION OF APPLICABLE DUTIES" ERROR

37.     Plaintiff hereby restates and incorporates Paragraphs 5 through 36 by reference.

14

38.     CBP's conclusion that DTT USA avoided the payment of "applicable" AD cash deposits was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.  CBP based its determination that DTT USA avoided the payment of "applicable" AD cash deposits on an unlawful interpretation of "covered merchandise" (see "Count 2" above) and an erroneous finding that DTT USA entered merchandise by means of "material and false" statements or "material" omissions (see "Count 3" above).

## COUNT 5:  UNLAWFUL APPLICATION OF INTERIM MEASURES

39.     Plaintiff hereby restates and incorporates Paragraphs 5 through 38 by reference.

40.     CBP acted contrary to law when it failed to rescind interim measures despite its inability to determine whether DTT USA's imports were "covered merchandise."  The statute permits interim measures only "with respect to covered merchandise."  19 U.S.C. § 1517(e).  CBP may impose interim measures only "if there is a reasonable suspicion that *such covered merchandise* entered" into the United States through evasion.  *Id.* (emphasis added).  In violation of the statute, CBP continued the interim measures imposed against DTT USA even after the agency had concluded it was unable to determine whether DTT USA's imports were, in fact, "covered merchandise" and had referred the matter to DOC under 19 U.S.C. § 1517(e)(b)(4)(A).

41.     CBP also acted arbitrarily and capriciously, abused its discretion, and failed to apply "interim measures" in accordance with the statute by:  (a) applying the 82.05% "all others" cash deposit rate rather than the 6.19% AD rate applicable to the Chinese manufacturer alleged (Wanbang); (b) prematurely calling for liquidations or reliquidations (and not just suspensions of liquidation) while the EAPA investigation was still ongoing; and (c) demanding that DTT USA submit false amended entry summaries, non-reimbursement certificates, and product labeling—

15

thereby potentially subjecting DTT USA to 19 U.S.C. § 1592 and other penalties.   CBP's unlawful continuance of interim measures effectively ground DTT USA's import operations to a halt, severely damaging the company's business.

### COUNT 6:  FATAL PROCEDURAL ERRORS

42.   Plaintiff hereby restates and incorporates Paragraphs 5 through 41 by reference.

43.   CBP did not fully comply with all procedures that the EAPA statute sets forth.  19 U.S.C. § 1517(g)(2)(A).   Contrary to 19 U.S.C. § 1517(c)(1)(A), CBP failed to make its final determination within "300 calendar days" after CBP had initiated the EAPA investigation – even after accounting for the 596 calendar days of tolling while DOC considered CBP's EAPA scope referral.  DOC initiated the EAPA investigation on March 22, 2017, and issued its scope referral to DOC on November 21, 2017, a period of 244 days.  After receiving DOC's response to the EAPA scope referral on July 10, 2019, CBP took an additional 69 days before notifying DTT USA and DSMC of TRLED's final EAPA determination on September 17, 2019.  In addition, contrary to 19 U.S.C. § 1517(e), TRLED made its "reasonable suspicion" finding to support the imposition of interim measures "later than 90 calendar days" after CBP had initiated the EAPA investigation.

### COUNT 7:  DUE PROCESS VIOLATIONS

44.   Plaintiff hereby restates and incorporates Paragraphs 5 through 43 by reference.

45.   CBP's regulations, and application of those regulations, denied procedural due process protections owed to DTT USA.  Following 19 C.F.R. § 165.24(c), CBP did not notify DTT USA of the imposition of interim measures until five business days after the agency had imposed interim measures.  Consequently, CBP denied DTT USA a fair opportunity to be heard until after

AMERICAS 102416900 v1

CBP had already—without benefit even of the DOC's interpretation of The Order's scope—suspended liquidation of DTT USA's imports entered as of the date of initiation of the EAPA investigation, and demanded AD cash deposits at the 82.05% "all others" rate (rather than at the AD rate applicable to the alleged Chinese manufacturer, Wanbang).  Furthermore, CBP denied DTT USA's counsel an opportunity to review and comment on the proprietary version of DSMC's EAPA allegations against DTT Thailand, as well as the proprietary portions of evidence—including information submitted by DTT USA and DTT Thailand—on which CBP based its initiation of the EAPA investigation, its imposition of EAPA interim measures, and its final determination as to EAPA "evasion."

## PRAYER FOR RELIEF AND JUDGMENT

WHEREFORE, Plaintiff respectfully requests that the Court:

(A)     Enter judgment in favor of Plaintiff;

(B)     Hold and declare that CBP's retroactive application of DOC's anti-circumvention determination was unlawful;

(C)     Hold and declare that CBP's determination that DTT USA's imports of Thailand-origin merchandise entered before December 1, 2017, were "covered merchandise" was not in accordance with law;

(D)     Hold and declare that CBP's finding that DTT USA entered merchandise by means of "material and false" statements or "material" omissions was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law;

AMERICAS 102416900 v1

(E)     Hold and declare that CBP's other "evasion" determinations were arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and unsupported by substantial evidence;

(F)     Hold and declare that CBP's failure to rescind interim measures, despite its inability to determine whether DTT USA's imports were "covered merchandise," was unlawful;

(G)     Hold and declare that CBP failed fully to comply with all procedures that the EAPA statute sets forth in connection with CBP's decisions;

(H)     Hold and declare that CBP's regulations, and application of those regulations, denied procedural due process protections owed to DTT USA;

(I)     Award Plaintiff a judgment for costs, including reasonable attorney fees, in accordance with the Equal Access to Justice Act, 28 U.S.C. § 2412; and

(J)     Grant Plaintiff such additional relief as the Court may deem just and proper.

Respectfully submitted,


  /S/ Jay C. Campbell
Walter J. Spak
Jay C. Campbell
Dean A. Barclay
Ron Kendler
Allison J.G. Kepkay
WHITE AND CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

Date:  March 12, 2020

18