Slip Op. 21-151

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| DIAMOND TOOLS TECHNOLOGY LLC, | |
| Plaintiff, | |
| v. | **Before: Timothy M. Reif, Judge** |
| UNITED STATES, | **Court No. 20-00060** |
| Defendant, | **PUBLIC VERSION** |
| and | |
| DIAMOND SAWBLADES MANUFACTURERS' COALITION, | |
| Defendant-Intervenor. | |

## <u>OPINION AND ORDER</u>

[The court sustains in part and remands in part Customs' Final Determination and Final Administrative Decision.]

Dated: <u>October 29, 2021</u>

<u>Jay C. Campbell</u>, White & Case LLP, of Washington, D.C., argued for Plaintiff Diamond Tools Technology LLC.  With him on the brief were <u>Walter J. Spak</u>, <u>Dean A. Barclay</u>, <u>Ron Kendler</u>, and <u>Allison J.G. Kepkay</u>.

<u>Stephen C. Tosini</u>, Senior Trial Counsel*, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for Defendant United States. With him on the brief were <u>Jeffery Bossert Clark</u>, Acting Assistant Attorney General, <u>Jeanne E. Davidson</u>, Director, and <u>Patricia M. McCarthy</u>, Assistant Director.  Of counsel on the brief was <u>Tamari J. Lagvilava</u>, Attorney, Office of the Chief Counsel, U.S. Customs and Border Protection.

<u>Maureen E. Thorson,</u> Wiley Rein LLP, of Washington D.C., argued for Defendant-Intervenor Diamond Sawblades Manufacturers' Coalition.  With her on the brief were <u>Daniel B. Pickard</u>, <u>Stephanie M. Bell</u>, and <u>Derick G. Holt</u>.

Court No. 20-00060                                                        Page 2

Reif, Judge:  The action before the court is a motion for judgment on the agency

record pursuant to Rule 56.2 of the U.S. Court of International Trade ("USCIT" or "the

Court") filed by plaintiff Diamond Tools Technology LLC ("DTT USA" or "plaintiff").  Pl.'s

Mot. for J. on the Agency R. ("Pl. Br."), ECF No. 48.  DTT USA challenges: (1) the

affirmative final determination of evasion of the antidumping duty order on certain

diamond sawblades and parts thereof from the People's Republic of China ("China")

issued by U.S. Customs and Border Protection ("Customs"), TRLED Final

Determination (Sept. 17, 2019) ("Final Determination"), CR 199, PR 220; and, (2)

Customs' Office of Regulations and Rulings ("OR&R) final administrative determination

affirming Customs' Final Determination.  REG AND RULINGS Final Administrative

Determination for Diamond Tools (Jan. 29, 2020) ("OR&R Final Administrative

Determination"), PR 232.[1]  Customs issued its Final Determination and Final

Administrative Determination pursuant to its authority under the Enforce and Protect Act

("EAPA"), 19 U.S.C. § 1517 (2018).[2]

---

[1] The U.S. Customs and Border Protection's Trade Remedy & Law Enforcement
Directorate ("TRLED") conducted the EAPA investigation, and the U.S. Customs and
Border Protection's Office of Regulations & Rulings ("OR&R") handled the
administrative appeal of TRLED's final affirmative evasion determination.

[2] All citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code,
and all references to the U.S. Code are to the 2018 edition unless otherwise specified.
EAPA was enacted as part of the Trade Facilitation and Trade Enforcement Act of
2015, Pub. L. No. 114-125, § 421, 130 Stat. 122, 161 (2016).

**PUBLIC VERSION**

Court No. 20-00060                                                                                   Page 3

DTT USA challenges Customs' Final Determination on four grounds.  DTT USA

argues that: (1) Customs' suspension of liquidation on entries that pre-dated December

1, 2017, is a retroactive application of Commerce's circumvention determination and not

in accordance with law; (2) Customs' evasion determination related to DTT USA's

entries before December 1, 2017, was arbitrary, capricious and an abuse of discretion,

and otherwise not in accordance with law; (3) Customs' conduct during the EAPA

proceeding deprived DTT USA of its due process rights; and, (4) Customs' imposition of

interim measures is not in accordance with law because Customs failed to make a

"reasonable suspicion" determination by the statutory deadline.  *See* Pl. Br. at 19-36.

Defendant United States ("the Government" or "defendant") and defendant-

intervenor Diamond Sawblades Manufacturers' Coalition ("DSMC") maintain that

Customs conducted its investigation lawfully, and that the affirmative evasion

determination is supported by substantial evidence and is not an abuse of discretion,

and is not arbitrary, capricious, or otherwise not in accordance with law.  Def.'s Resp. in

Opp'n to Pl.'s Mot. for J. on the Agency R. ("Def. Br."), ECF No. 51; Def.-Intervenor's

Resp. in Opp'n to Pl.'s Mot. for J. on the Agency R. ("Def.-Intervenor Br."), ECF No. 52.

For the following reasons, the court sustains in part and remands in part Customs' Final

Determination and Final Administrative Decision.

**BACKGROUND**

DTT USA is an importer of diamond sawblades, a circular cutting tool composed

of two main components: a "core" and "segments."  Pl. Br. at 5.  On November 4, 2009,

**PUBLIC VERSION**

Court No. 20-00060                                                              Page 4

Commerce issued an antidumping duty order on imports of diamond sawblades and parts thereof from China. *Diamond Sawblades and Parts Thereof from the People's Republic of China and the Republic of Korea*, 74 Fed. Reg. 57,145 (Dep't Commerce Nov. 4, 2009) (antidumping duty order) (the "2009 Order"). On February 24, 2017, DSMC, a group of U.S. producers of diamond sawblades, filed an EAPA allegation that DTT USA was evading the 2009 Order. DSMC Allegation and Attachments A-C (Feb. 24, 2017), CR 1-4, PR 1-4. DSMC alleged that DTT USA, in coordination with DTT Thailand,[3] was transshipping Chinese diamond sawblades through Thailand and presenting these transshipped sawblades to Customs as non-subject goods. *Id*.

On March 1, 2017, Customs acknowledged receipt of DSMC's allegation. *See* TRLED Notice of Initiation of Investigation (7184) (June 27, 2017) ("Initiation Notice") at 2, CR 24, PR 26. On March 22, 2017, Customs initiated an investigation under the EAPA in response to DSMC's allegation. *Id*. Customs' investigation covered entries from March 1, 2016, one year before receipt of the EAPA allegation, through the pendency of the EAPA investigation.[4] *Id*. On March 24, 2017, Customs issued to DTT USA a request for information ("RFI"), seeking data related to the entry of DTT USA's

---

[3] DTT Thailand is an affiliate of DTT USA based in Thailand that produces diamond sawblades by laser welding Chinese-origin cores and segments together. Reply Br. of Pl. Diamond Tools Tech. LLC ("Pl. Reply Br.") at 1, ECF No. 54.

[4] Customs' regulations provide that entries covered by an EAPA investigation include "entries of allegedly covered merchandise made within one year before the receipt of an allegation . . . ." 19 C.F.R. § 165.2. Customs acknowledged receipt of DSMC's EAPA allegation on March 1, 2017, and, therefore, entries covered by the investigation are those entered on or after March 1, 2016. Initiation Notice at 2.

**PUBLIC VERSION**

sawblades.  *Id*. at 4.  Customs issued follow-up questions on April 25 and May 4, 2017.

*Id*. at 4-5.  Customs further investigated DTT Thailand's operations by visiting the

facilities in Thailand on June 21, 2017.  *Id*. at 5.  After Customs' visit to DTT Thailand's

facilities, Customs concluded that the company "does not have sufficient capacity to

produce to the amount needed to export to the [United States]."  CBP Site Visit Report

and Pictures (June 22, 2017), CR 22, PR 51.  Based on the findings from its visit,

Customs found that there was "reasonable suspicion" of evasion.  *See* TRLED Notice of

Interim Measures (7184) (June 27, 2017) ("Notice of Interim Measures") at 2-3, CR 25,

PR 27; TRLED Interim Measures E-mail (June 23, 2017), CR 23.

On June 23, 2017, Customs imposed interim measures.  TRLED Interim

Measures E-mail (June 23, 2017), CR 23; *see* Public Oral Argument Tr. at 65:23-65:25,

ECF No. 63.  On June 27, 2017, seven days after the statutory deadline, Customs sent

to DTT USA a (1) notice of initiation under 19 C.F.R. § 165.15(d)(1), informing DTT USA

that Customs had commenced an EAPA investigation of DTT USA on March 22, 2017,

and (2) a notice of the imposition of interim measures under 19 C.F.R. § 165.24(c).

Initiation Notice; Notice of Interim Measures.

As interim measures, Customs determined:

> Entries under this investigation that entered the United
> States as not subject to antidumping duties, will be rate-
> adjusted to reflect that they are subject to the antidumping
> duty order on diamond sawblades from China and cash
> deposits are owed.  Additionally, "live entry" is required for all
> future imports for DTT, meaning that all entry documents
> and duties are required to be provided before cargo is
> released by [Customs] into the U.S. commerce.  [Customs]

PUBLIC VERSION

> will reject any entry summaries and require a refile for those
> that are within the entry summary reject period; suspend the
> liquidation for any entry that has entered on or after March
> 22, 2017, the date of initiation of this investigation; as well as
> extend the period for liquidation for all unliquidated entries
> that entered before that date.  For any entries that have
> liquidated and for which [Customs'] reliquidation authority
> has not yet lapsed, [Customs] will reliquidate those entries
> accordingly.  [Customs] will also be evaluating DTT's
> continuous bond to determine its sufficiency, among other
> measures, as needed.

*See* Notice of Interim Measures at 3 (internal citations omitted).

After Customs imposed the interim measures, Customs issued an additional RFI

to DTT USA and DTT Thailand.  TRLED EAPA 7184 Scope Referral and Attachments

(Nov. 21, 2017) ("Covered Merchandise Referral"), CR 188-190, PR 184-187.  In

response to the RFI, DTT Thailand explained that the company manufactured diamond

sawblades onsite at its facility in Thailand; however, some of the cores and segments

used were sourced from China.  *Id*.  Customs determined that the 2009 Order — issued

by Commerce — did not address expressly whether "covered merchandise" included

diamond sawblades that resulted from the joining of subject components in Thailand.

*Id*.  Accordingly, Customs concluded that it was "unable to determine whether the

merchandise at issue [diamond sawblade components sourced from China and joined

in Thailand] is covered merchandise."  *Id*.  On November 21, 2017, pursuant to 19

U.S.C. § 1517(b)(4)(A), Customs referred the matter to Commerce "as to whether the

diamond sawblades laser welded in Thailand by DTT Thailand from: (1) cores from

Thailand and segments from China, (2) segments and cores that are both produced in

**PUBLIC VERSION**

China, and/or (3) cores from China and segments from Thailand are within the scope of the AD order on diamond sawblades from China." *Id.*; *see* Commerce Response to EAPA Referral (July 10, 2019) ("Commerce Response to EAPA Referral") at 4, PR 209.

On August 9, 2017, in addition to its EAPA allegation, DSMC requested separately that Commerce issue a ruling that imports made in Thailand from cores and segments from China circumvent the 2009 Order. Pl. Br. at 10. On December 1, 2017, Commerce initiated a circumvention inquiry pursuant to 19 U.S.C. § 1677j(b) ("Section 1677j(b)"). Commerce DSBs Anti-Circ Final Issues and Decision Memo (7184) (July 10, 2019) at 2, PR 208. Section 1677(b) allows Commerce to include in the scope of an order merchandise that is subject to an antidumping ("AD") or countervailing duty ("CVD") order that is completed or assembled in a third country. On March 5, 2018, Commerce published a notice of the Covered Merchandise Referral in the Federal Register. Commerce Response to EAPA Referral at 1. On July 2, 2018, Commerce "aligned" the Covered Merchandise Referral with its "concurrent anti-circumvention inquiry." *Id.* In July 2019,[5] Commerce in its final determination of circumvention found that diamond sawblades made with Chinese cores and segments were circumventing the 2009 Order. *See* Commerce Response to EAPA Referral at 2; Commerce DSBs Anti-Circ Final Issues and Decision Memo (July 10, 2019), PR 208; Commerce DSBs Anti-Circ Final FR Notice (July 16, 2019), PR 210.

---

[5] Commerce published its affirmative final determination of circumvention in the Federal Register on July 16, 2019. *See* Commerce Scope Referral Memo (7184) (July 23, 2019), PR 211.

**PUBLIC VERSION**

Court No. 20-00060                                                                                           Page 8

On July 10, 2019, Commerce also responded to Customs' referral request.  In its response, Commerce informed Customs that Commerce "reached an affirmative circumvention finding for diamond sawblades made with Chinese cores and Chinese segments such that the diamond sawblades are covered merchandise."  Commerce Response to EAPA Referral at 5.  Specifically, Commerce found that, based on its circumvention determination, "diamond sawblades made in Thailand by Diamond Tools using Chinese cores and Chinese segments are subject to the AD order but diamond sawblades made in Thailand by Diamond Tools using either Thai cores or Thai segments are not subject to the AD order."  *Id*. at 6.

On August 5, 2019, following Commerce's response to the EAPA referral, DTT USA filed with Customs written submissions asserting that the company did not evade the 2009 Order through its entries of diamond sawblades that were imported before December 1, 2017.  DTT Legal Argument (7184) (Aug. 5, 2019), CR 198, PR 212. DTT USA argued that Commerce's regulation, 19 C.F.R. § 351.225(l)(3), "limit[s] the application of an affirmative anti-circumvention determination to imports of the affected merchandise entered on or after the date of the inquiry's initiation."  *Id*. at 27-28.  DTT USA noted that Commerce initiated its circumvention inquiry on December 1, 2017, and, therefore, any entries of diamond sawblades manufactured in Thailand with Chinese cores and segments made prior to December 1, 2017, were not "covered merchandise" within the scope of the 2009 Order.  *Id*. at 28-32.

On September 17, 2019, Customs issued its final affirmative evasion

determination.  Customs stated that "[b]ased on Commerce's response to the covered

merchandise referral, we find that DTT's entries of diamond sawblades joined in

Thailand were subject to the AD order on diamond sawblades."  Final Determination at

8.  Customs further explained: "Because Commerce did not place any temporal

limitation or provide liquidation instructions to [Customs] with respect to entries covered

by the EAPA investigation, we find that Commerce's response to the covered

merchandise referral applies to all entries covered by the EAPA investigation, including

those made prior to the initiation of [sic] anti-circumvention investigation."  *Id*.  In light of

its evasion determination, Customs determined that the agency would:

> [C]ontinue to suspend or extend liquidation, as applicable,
> until instructed to liquidate entries subject to the
> investigation.  For future entries of diamond sawblades from
> Thailand involving DTT Thailand, [Customs] will continue to
> require live entry, where the importer must post the
> applicable cash deposits prior to the release of merchandise
> into U.S. commerce.  Finally, [Customs] will continue to
> evaluate the importer's continuous bonds in accordance with
> [Customs'] policies, and will continue to require single
> transaction bonds as appropriate.

*Id.* at 10.

On October 30, 2019, pursuant to 19 U.S.C. § 1517(f)(1), DTT USA filed an

appeal with OR&R for *de novo* review of Customs' Final Determination.  DTT EAPA

7184 Appeal for Admin. Review (Oct. 30, 2019), CR 200, PR 222.  On January 29,

2020, OR&R issued its decision, sustaining the Final Determination.  OR&R Final

Administrative Determination.

**PUBLIC VERSION**

## STANDARD OF REVIEW

The court has jurisdiction pursuant to section 517(g) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1517(g), and 28 U.S.C. § 1581(c).

The EAPA requires that the court determine whether a determination issued pursuant to 19 U.S.C. § 1517(c) or an administrative review pursuant to 19 U.S.C. § 1517(f) was conducted "in accordance with those subsections" by examining whether Customs "fully complied with all procedures under subsections (c) and (f)" and "whether any determination, finding, or conclusion is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  19 U.S.C. § 1517(g)(2)(A)-(B).  "The court's review of Customs' determination as to evasion may encompass interim decisions subsumed into the final determination."  *Vietnam Firewood Company Limited v. United States*, 44 CIT __, __, 466 F. Supp. 3d 1273, 1284 (2020).

## LEGAL FRAMEWORK

The EAPA statute, codified as 19 U.S.C. § 1517, directs Customs to investigate allegations of evasion of antidumping and countervailing duties.  Customs must initiate an investigation within 15 business days of receiving an allegation that "reasonably suggests that covered merchandise has been entered into the customs territory of the United States through evasion."  19 U.S.C. § 1517(b)(1).  The statute defines "evasion" as:

> [E]ntering covered merchandise into the customs territory of the United States by means of any document or electronically transmitted data or information, written or oral statement, or act that is material and false, or any omission

> that is material, and that results in any cash deposit or other
> security or any amount of applicable antidumping or
> countervailing duties being reduced or not being applied with
> respect to the merchandise.

19 U.S.C. § 1517(a)(5)(A).

The statute defines "covered merchandise" as merchandise that is subject to an

AD or CVD order.  19 U.S.C. § 1517(a)(3)(A)-(B).

The statute directs Customs to make its final determination within 300 calendar

days after the initiation of the investigation.  19 U.S.C. § 1517(c)(1)(A).[6]  Customs'

determination must be "based on substantial evidence."  *Id*.  Within 30 business days of

Customs' final determination, "a person determined to have entered such covered

merchandise through evasion or an interested party that filed an allegation . . . with

respect to such covered merchandise may file an appeal with [Customs] for de novo

review of the determination."  19 U.S.C. § 1517(f)(1).

## DISCUSSION

**I.      Whether Customs' Failure to Meet the Statutory Deadline Nullifies the
           Interim Measures**

**A.      Positions of Parties**

Plaintiff challenges Customs' imposition of interim measures, arguing that

Customs failed to comply with mandatory statutory procedures under 19 U.S.C. §

---

[6] Customs may extend the deadline to make a final determination by 60 days if it determines that "the investigation is extraordinarily complicated because of (I) the number and complexity of the transactions to be investigated; (II) the novelty of the issues presented; or (III) the number of entities to be investigated" and "additional time is necessary to make a determination . . . ."  19 U.S.C. § 1517(c)(1)(B).

1517(e), requiring that Customs determine whether to impose interim measures within

90 calendar days of initiating an EAPA investigation.  Pl. Br. at 35-36.  Plaintiff argues

that 19 U.S.C. § 1517(g)(2)(A) requires that the Court review whether Customs "fully

complied with all procedures under subsections (c) . . . and (f) . . . ."  *Id*. at 35 (citing 19

U.S.C. § 1517(g)(2)(A)).  Plaintiff asserts that Customs failed to comply fully with all

procedural requirements for the imposition of interim measures under 19 U.S.C. §

1517(e).  *Id*. at 35.  Plaintiff asserts that "[b]ecause [Customs] failed to make a

'reasonable suspicion' decision within the statutory deadline, [Customs'] imposition of

interim measures was not made in accordance with law and must be overturned."  *Id*. at

36.

        The Government does not contest that Customs failed to make a reasonable

suspicion determination within 90 days.  Def. Br. at 5.  The Government notes, however,

that Customs explained that it failed to meet the statutory deadline because there were

discrepancies in the record.  *Id*. at 5-6. The Government argues that Customs' failure to

comply with the deadline is immaterial because DTT USA was not substantially

prejudiced by the delay.  *Id*. at 21.  The Government further asserts that the 90-day

deadline is "merely directory" because Congress did not establish consequences for a

failure to make an internal determination of reasonable suspicion within 90 days.  *Id.*

Defendant-Intervenor DSMC makes an additional argument that the EAPA cannot limit

Customs' pre-existing authority to impose interim measures when it suspects that

PUBLIC VERSION

imports have been, or are being, entered without payment of appropriate duties.  Def.-Intervenor Br. at 20.

### B.      Legal Framework

19 U.S.C. § 1517(e) states: "Not later than 90 calendar days after initiating an investigation . . . [Customs] shall decide based on the investigation if there is a reasonable suspicion that such covered merchandise was entered into the customs territory of the United States through evasion . . . ."  19 U.S.C. § 1517(e).  If there is such reasonable suspicion of evasion, Customs shall impose interim measures consisting of:

> (1) suspend[ing] the liquidation of each unliquidated entry of such covered merchandise that entered on or after the date of the initiation of the investigation; (2) . . . extend[ing] the period for liquidating each unliquidated entry of such covered merchandise that entered before the date of the initiation of the investigation; and (3) . . . tak[ing] such additional measures as [Customs] determines necessary to protect the revenue of the United States . . . .

*Id.*

In the event of an affirmative final determination of evasion, the statute directs Customs to continue the measures put in place as a part of the imposition of interim measures.  19 U.S.C. § 1517(d).

### C.      Analysis

#### 1.      Whether the Statutory Deadline is Mandatory

The Government and DSMC argue that the 90-day deadline is merely precatory because Congress did not provide any consequences stemming from a failure to reach

**PUBLIC VERSION**

an internal reasonable suspicion determination after 90 days.  Def. Br. at 22; Def.-
Intervenor Br. at 19-20.  DSMC further argues that the EAPA's legislative history
demonstrates that "the statute's purpose is to augment [Customs'] authority to enforce
antidumping and countervailing duty orders and provide U.S. industries with effective
trade remedies."  Def.-Intervenor Br. at 20.  In response, DTT USA asserts that the 90-
day deadline is mandatory and argues that the consequence prescribed by the statute
is that Customs cannot impose interim measures past the deadline.  Reply Br. of Pl.
Diamond Tools Tech. LLC ("Pl. Reply Br.") at 21, ECF No. 54.  DTT USA cites the
standard of review in the EAPA and the legislative history as support for its argument
that Customs' compliance with the 90-day deadline for the imposition of interim
measures is mandatory.  *Id*. at 21-22.  For the following reasons, the court concludes
that the deadline is precatory, not mandatory.

### a.     "Shall" Alone Does Not Limit Agency Power

The statute states that "not later than 90 calendar days . . . the Commissioner
*shall* decide . . . if there is a reasonable suspicion that such covered merchandise was
entered into the customs territory of the United States through evasion . . . ."  19 U.S.C.
§ 1517(e) (emphasis supplied).

The Supreme Court has directed that a statute "needs more than a mandatory
'shall' before the grant of power can sensibly be read to expire when the job is
supposed to be done."  *Barnhart v. Peabody Coal Co.,* 537 U.S. 149, 160 (2003); *see
also Brock v. Pierce County*, 476 U.S. 253, 262 (1986).  In *Brock*, a statutory deadline

Court No. 20-00060 Page 15

provided that the Secretary of Labor "'*shall*' issue a final determination as to the misuse

of CETA funds by a grant recipient within 120 days after receiving a complaint alleging

such misuse." *Brock*, 476 U.S. at 255 (emphasis supplied). The Supreme Court held

that "the mere use of the word 'shall' . . . standing alone, is not enough to remove the

Secretary's power to act after 120 days." *Id*. at 262; *see Barnhart*, 537 U.S at 158

(upholding its previous interpretation in *Brock*, the Supreme Court explained that "[not]

since *Brock*, has this Court ever construed a provision that the Government 'shall' act

within a specified time, without more, as a jurisdictional limit precluding action later.").

Accordingly, the word "shall" is not sufficient by itself to eliminate Customs' power to act

after 90 days.

Moreover, the Supreme Court has held that "if a statute does not specify a

consequence for noncompliance with statutory timing provisions, the federal courts will

not in the ordinary course impose their own coercive sanction." *United States v. James

Daniel Good Real Prop.*, 510 U.S. 43, 63 (1993). The Federal Circuit has applied

consistently Supreme Court precedent, finding that in the absence of a consequence,

"timing provisions are at best precatory rather than mandatory." *Liesegang v. Secretary

of Veteran Affairs*, 312 F.3d 1368, 1377 (Fed. Cir. 2002). This Court has also

recognized that where a statute does not specify a consequence for noncompliance

with a statutory deadline, the agency is "under no clear duty to issue the final results

within the statutory timeframe." *Husqvarna Constr. Prods. N. Am. v. United States*, 36

CIT 1618, 1625 (2012); *see also Jiangsu Zhongji Lamination Materials Co., (HK) Ltd. v.*

*United States*, 43 CIT __, __, 396 F. Supp. 3d 1334, 1355-1356 (affirming Commerce's issuance of its preliminary determination after the statutory deadline because 19 U.S.C. § 1673b "prescribes no consequence for failure to comply with the deadlines it imposes and must therefore be read as merely directory . . . .").

 The Federal Circuit has clarified the type of statutory language that constitutes a consequence.  In *Hitachi*, the Federal Circuit examined 19 U.S.C. § 1515(a) and determined that Congress did not impose expressly any consequences for Customs' failure to act within the two-year statutory deadline.  *Hitachi Home Elecs. (Am.), Inc. v. United States*, 661 F.3d 1343 (Fed. Cir. 2011).  The relevant statutory language states: "[T]he appropriate customs officer, within two years from the date a protest was filed in accordance with section 1514 of this title, *shall* review the protest and *shall allow or deny* such protest in whole or in part."  *Id.* at 1348 (quoting 19 U.S.C. § 1515(a)) (emphasis supplied).  The Federal Circuit noted the use of the word "shall" in the statute; however, in light of Supreme Court decisions, the Federal Circuit determined that the word "shall" alone "is not enough to impose a specific penalty for noncompliance."  *Id.* (referencing, in an earlier section, provisions that the government "shall" act in *Brock*, 476 U.S. at 266; *Barnhart*, 537 U.S. at 158; *Regions Hosp. v. Shalala*, 522 U.S. 448, 459 n.3 (1998); *United States v. Montalvo-Murillo*, 495 U.S. 711 (1990)).

 The Federal Circuit in *Hitachi* also compared 19 U.S.C. § 1515(a) with 19 U.S.C. § 1515(b), which the Federal Circuit determined imposed an explicit consequence.

Court No. 20-00060                                                                Page 17

*Hitachi*, 661 F.3d at 1349.  19 U.S.C. § 1515(b) states that "a protest which *has not been allowed or denied* in whole or in part within thirty days following the date of mailing . . . of a request for accelerated disposition shall be *deemed denied* on the thirtieth day following mailing of such request."  *Id.* (quoting 19 U.S.C. § 1515(b)) (emphasis supplied).  The Federal Circuit explained that the mention of a specific time limit of thirty days along with the specific consequence of deemed denial in section 1515(b), compared to section 1515(a), which did not include such language, was indicative of congressional intent to not impose a consequence in the subsection under examination. *Id.*

    There is no explicit language in 19 U.S.C. § 1517(e) that specifies a consequence for Customs' non-compliance with the 90-day statutory deadline.  The statute provides that Customs "shall" make a reasonable suspicion determination on the 90th day; however, as established by the Supreme Court, Federal Circuit and the USCIT, "shall" by itself is not sufficient to impose a consequence of noncompliance with a statutory timeline.

### b.    Standard of Review

    DTT USA acknowledges that the USCIT has, at times, interpreted "shall" as precatory; however, DTT USA distinguishes 19 U.S.C. § 1517 from prior cases because the EAPA statute "expressly require[s] . . . judicial review of 'full[ ] compl[iance] with all procedures.'"  Pl. Reply Br. at 21, n.4 (citing 19 U.S.C. 1517(g)(2)(A)) (alterations in original).  DTT USA asserts that 19 U.S.C. § 1517(g)(2)(A) requires that the court

**PUBLIC VERSION**

examine whether "[Customs] fully complied with all procedures under subsections (c)

and (f)." *Id*. at 21.  DTT USA argues that "[n]o other section in Title 19 of the U.S. Code

prescribing a 'substantial evidence,' 'arbitrary,' 'capricious,' 'abuse of discretion,' or 'not

in accordance with law' standard of review calls also for judicial review of 'full[ ]

compli[iance] with all procedures.'" *Id*.  (alterations in original).  DTT USA maintains that

this language in the EAPA suggests that the 90-day deadline is mandatory.  *Id*.

The court finds DTT USA's argument unpersuasive because the standard of

review in 19 U.S.C. § 1517(g)(2)(A) ("Section 1517(g)(2)(A)") is not relevant to the 90-

day deadline for the imposition of interim measures.  Section 1517(g)(2)(A) provides

that: "In determining whether a determination under subsection(c) or review under

subsection (f) is conducted in accordance with those subsections, the [USCIT] shall

examine . . . whether the Commissioner fully complied with all procedures under

subsections (c) and (f)."  19 U.S.C. § 1517(g)(2)(A).  The 90-day deadline, however, is

set forth in subsection (e) addressing interim measures, not in subsections (c) or (f).  19

U.S.C. § 1517(e).

DTT USA does not cite to any case in which this Court has read expansively the

standard of review in Section (g)(2)(A) to apply to the procedural requirements in

subsection (e) or any language in the legislative history that would point to such intent.

Pl. Reply. Br. at 21.  To the contrary, the plain language of the statute — in particular,

the explicit mention of subsections (c) and (f) — indicates that Congress' intent was to

exclude other subsections.  *See* 19 U.S.C. § 1517(g)(2)(A); *see also* Public Oral

**PUBLIC VERSION**

Court No. 20-00060                                                                    Page 19

Argument Tr. at 71:9-71:22.  Accordingly, the court finds that the standard of review

applies only to subsections (c) and (f) and is irrelevant to the interpretation of the 90-day

deadline for the imposition of interim measures in subsection (e).

> ### c.   The legislative history supports the precatory nature of the deadline in section § 1517(e)

DTT USA argues that the legislative history of the statute demonstrates that 19

U.S.C. § 1517(e) was designed to ensure that "the relevant agency 'conducts these

investigations subject to strict deadlines.'"  Pl. Reply Br. at 22 (citing to H.R. Rep. No.

114-114, pt. 1, at 86 (2015)).  In fact, the text from which DTT USA draws this short

quotation, reads in full: "This provision ensures that the Department of Commerce

conducts these investigations subject to strict deadlines *so that delay in collecting

antidumping and countervailing duties on evading imports is limited*."[7]  H.R. Rep. No.

114-114, pt. 1, at 86 (emphasis supplied).

DTT USA also argues that Congress wanted to "avoid prejudicing importers with

drawn-out investigations."  Pl. Reply Br. at 22.  DTT USA points to language in the

legislative history on the "importance of striking this critical balance between trade

facilitation, trade enforcement, and security."  *Id*. (citing to H.R. Rep. No. 114-114, pt. 1,

---

[7] In an earlier version of the legislation, it was proposed that the U.S. Department of Commerce was better suited to conduct administrative investigations of evasion.  H.R. Rep. No. 114-114, pt. 1, at 86.  It was ultimately decided that Customs would make a determination within 90 calendar days of initiation of an evasion investigation as to whether there was reasonable suspicion that entries of covered merchandise were entered through evasion.  H.R. Rep. No. 114-376, at 189 (2015); *see also* S. Rep. No. 114-45, at 35 (2015).

**PUBLIC VERSION**

Court No. 20-00060                                                                                      Page 20

at 51).  In response, at oral argument DSMC argued that the "intent [of the statute] is

clearly that investigations occur quickly to protect the domestic industry from unfair

trade," and asserted that "the domestic industry shouldn't be unprotected because

[Customs] missed an internal deadline by a day."  Public Oral Argument Tr.  76:20-

76:23.

The legislative history includes the language on the "importance of striking this

critical balance between trade facilitation, trade enforcement, and security" in the

background for the overall bill; however, the relevant paragraph states in full that

"[Customs] cannot lose sight of its function as an international trade agency with the

responsibility to facilitate trade *to help U.S. companies compete globally*."  H.R. Rep.

No. 114-114, pt. 1, at 51 (emphasis supplied).  Trade facilitation can, in this context, be

understood to mean on behalf of U.S. companies, and there is no specific indication that

Congress aimed to avoid prejudicing importers with drawn-out investigations.  *See* Pl.

Reply Br. at 22.

In examining congressional intent, the Supreme Court in *Brock* observed from

the legislative history that the deadline was "clearly intended to spur the Secretary to

action, not to limit the scope of his authority."  *Brock*, 476 U.S. at 265.  The legislative

history for the EAPA provision indicates that Congress included the deadlines, as in

*Brock*, to spur the agency into action to identify evasion rather than to cut off its power

to act past the deadline.

PUBLIC VERSION

The Supreme Court in *Brock* also noted that issuing a final determination within a 120-day deadline was "subject to factors beyond [the Secretary's] control" and "[t]here is less reason, therefore, to believe that Congress intended such drastic consequences to follow from the Secretary's failure to meet the 120-day deadline." *Id*. at 261.  Similarly, in this case, Customs indicated that the reason for its failure to meet the 90-day deadline was due to "significant discrepancies pertaining to production, employees, equipment, and production capacity between DTT's CF 28 response and DSMC's allegation."  Initiation Notice at 5.  Customs noted that, "as a result of the limited amount of time between the receipt of the discrepant information and the deadline for determination as to interim measures, [Customs] did not have sufficient time to schedule the site visit prior to [the] June 20, 2017, deadline.  For this reason, [Customs] did not determine to begin interim measures on June 20th, 2017, and conducted its site visit for [sic] June 21, 2017, of DTT Thailand's facility."  *Id*.  As in *Brock*, it is unlikely that Congress intended to preclude Customs from imposing interim measures as a result of Customs' failure to meet the deadline given these circumstances.

## 2. Substantial Prejudice

The Government and DSMC argue that Customs' failure to comply with the deadline is immaterial also because DTT USA was not substantially prejudiced by the delay.  The Government asserts that parties seeking to overturn an administrative determination on procedural grounds must show actual substantial prejudice by reason of the alleged procedural error.  Def. Br. at 21 (citing *Am. Farm Lines v. Black Ball*

**PUBLIC VERSION**

*Freight Serv.,* 397 U.S. 532, 539 (1970); *PAM, S.p.A. v. United States*, 463 F.3d 1345,

1349 (Fed. Cir. 2006); *Dixon Ticonderoga Co. v. United States*, 468 F.3d 1353, 1355

(Fed. Cir. 2006)).  The Government points to the Federal Circuit, which has explained

that a "notice defect [may be] cured by a subsequent notice given in time for the person

to act on the matter."  *Id*. (alteration in original) (citing *Suntec Indus. Co. v. United*

*States*, 857 F.3d 1363, 1369 (Fed. Cir. 2017)).  The Government argues that DTT USA

possesses a right to notice of interim measures only after 90 calendar days plus five

business days.  *Id*. at 21-22.  The Government notes that DTT USA received actual

notice within the regulatory deadline, and as such DTT USA was not affected in any

way by Customs having missed an internal deadline by four days.  *Id*.[8]

DTT USA does not contest that it must show substantial prejudice.  Pl. Reply. Br.

at 22-23.  Rather, DTT USA argues that notice is "beside the point," and asserts that it

was substantially prejudiced by Customs' imposition of interim measures past the

statutory deadline which subjected DTT USA to suspension of liquidation and a cash

deposit rate of 82.05%, among other measures.  *Id*. at 23.

Customs' adherence to the 90-day deadline is not mandatory; however, "the

court still must determine the consequence, if any, of Customs' procedural error" by

examining whether plaintiff suffered substantial prejudice.  *U.S. v. Great American Ins.*

---

[8] Customs imposed the interim measures on June 23, 2017, three business days after the statutory deadline.  TRLED Interim Measures E-mail (June 23, 2017), CR 23; *see* Public Oral Argument Tr. at 65:23-65:24.  Customs provided DTT USA with notice of the interim measures on June 27, 2017, five business days after the statutory deadline. Notice of Interim Measures.

**PUBLIC VERSION**

*Co. of NY*, 35 CIT 1130, 1144, 791 F. Supp. 2d 1337, 1354 (2011); *see U.S. v.*

*American Home Assurance. Co.,* Slip Op. 11-57, 2011 WL 1882635, *5-*6 (CIT May 17,

2011); *Guandong Chems. Imp. & Exp. Corp. v. United States*, 30 CIT 85, 90, 414 F.

Supp. 2d 1300, 1306 (2006) ("If, as is often the case, no law or regulation specifies the

consequence of non-compliance with a regulation, the court must determine what

remedy, if any, should be imposed.").  "Procedural errors by Customs are harmless

unless the errors are 'prejudicial to the party seeking to have the action declared

invalid.'"  *Am. Nat'l. Fire Ins. Co. v. U.S.,* 30 CIT 931, 942, 441 F. Supp. 2d 1275, 1287

(quoting *Sea-Land Serv., Inc. v. United States*, 14 CIT 253, 257, 735 F. Supp. 1059,

1063).

       It is well established that DTT USA as the complaining party must demonstrate

that it suffered substantial prejudice.  The Federal Circuit has held that the "simple

failure of an agency to follow a procedural requirement does not void subsequent

agency action," and that plaintiff "must establish that it was substantially prejudiced by

Customs' noncompliance."  *Dixon,* 468 F.3d at 1355.  This Court has also upheld the

principle that "errors as to procedural rules void subsequent agency action only if they

cause the challenging party 'substantial prejudice.'"  *Hartford Fire Ins. Co. v. United*

*States*, 41 CIT __, __, 254 F. Supp. 3d 1333, 1351 (2017) (citation omitted); *see also*

*JBF RAK LLC v. United States*, 38 CIT __, __, 991 F. Supp. 2d 1343, 1350 (2014)

(holding that the burden is on the complaining party to demonstrate that it was

substantially prejudiced by an agency's "supposed violation of its regulatory deadlines").

**PUBLIC VERSION**

DTT USA has failed to demonstrate that it suffered substantial prejudice from Customs' failure to meet the 90-day statutory deadline.  DTT USA argues that the "untimely imposition of interim measures," including the suspension of liquidation and the cash deposit rate of 82.05%, "came at a huge cost to DTT USA."  Public Oral Argument Tr. at 67:20-68:7; *see* Pl. Reply Br. at 22-23.  DTT USA's argument focuses on the injury, if any, caused by the imposition of interim measures themselves, not the injury, if any, caused by Customs' delay in making a "reasonable suspicion" determination of evasion.

The Federal Circuit dismissed a similar argument in *Intercargo* in which the plaintiff challenged Customs' notice of extension of liquidation.  In that case, Customs' notice lacked the requisite statutory reason for obtaining additional time for the liquidations and plaintiff argued that "the prejudice flowing from this circumstance is the ultimate prejudice."  *Intercargo Ins. Co. v. United States*, 83 F.3d 391, 396 (Fed. Cir. 1996).  The Federal Circuit determined that plaintiff did not demonstrate that it had suffered substantial prejudice and explained that "[p]rejudice, as used in this setting, means injury to an interest that the statute, regulation, or rule in question was designed to protect."  *Id*.  The Federal Circuit determined that plaintiff had not been "deprived of its opportunity to challenge the extensions in court on the ground that they were not obtained for a statutorily valid reason," and, as such, that there was "no apparent prejudice to Intercargo of the type that would be required to justify terminating the government's right to assess import duties that may properly be due."  *Id.*  Similarly,

**PUBLIC VERSION**

Court No. 20-00060                                                                                              Page 25

here, DTT USA has not shown substantial prejudice because DTT USA fails to point to

an injury from Customs' *delay* in making a reasonable suspicion determination and fails

to demonstrate that any such injury is to an interest that the statutory deadline was

designed to protect.

      Moreover, while Customs missed the statutory deadline to make a "reasonable

suspicion" determination, the agency met the deadline to provide DTT USA with notice

of the imposition of the interim measures.  Customs' regulation provides that if Customs

makes a reasonable determination, Customs "will issue notification of this decision to

the parties to the investigation *within five business days after taking interim measures*."

19 C.F.R. § 165.24(c) (emphasis supplied).  Customs provided DTT USA with notice of

the interim measures on June 27, 2017, five business days after the 90-day statutory

deadline.  DTT USA asserts that notice is "beside the point"; nevertheless, DTT USA

fails to demonstrate how Customs' delay in meeting an internal agency deadline by

three days and subsequently providing DTT USA with timely notice substantially

prejudiced the company.  Customs' failure to meet the statutory deadline had no effect

on DTT USA's notice of the interim measures, nor did it impact DTT USA's right to

**PUBLIC VERSION**

challenge the interim measures.[9]  *See Intercargo*, 83 F.3d at 396.  Accordingly, the

court determines that DTT USA has failed to make a showing of substantial prejudice.

### 3.    Customs' Pre-Existing Authority for Interim Measures

In addition to the arguments raised by the Government, DSMC puts forward a

third argument, asserting that the EAPA cannot reasonably be read to limit Customs'

pre-existing authority to impose measures when it suspects that goods have entered or

are entering the United States without payment of appropriate duties.  Def.-Intervenor

Br. at 20.  DTT USA responds that the EAPA alone authorizes Customs to suspend

liquidation based on "reasonable suspicion of evasion," and that Customs did not have

independent authority outside of the EAPA statute.  Pl. Reply Br. at 23-24.

The court does not need to address this argument because, as discussed above,

the statutory deadline is directory, not mandatory, and DTT USA has failed to

demonstrate that the delay caused substantial prejudice.  Accordingly, Customs has the

authority to issue the interim measures under the EAPA past the 90-day deadline.

## II.    Whether Customs Violated DTT USA's Due Process Rights

---

[9] At oral argument, the Government also noted that Customs imposed the interim measures after the statutory deadline because Customs was not able to visit DTT Thailand's facility until one day after the deadline because "DTT responded to [Customs'] last request for information over two weeks late on June 1st."  Public Oral Argument Tr. at 65:14-65:22.  DTT USA did not dispute the Government's statement at oral argument.  *See id*. at 65-66.  The Supreme Court has held that it "is always within the discretion of a court or an administrative agency to relax or modify its procedural rules adopted for the orderly transaction of business before it when in a given case the ends of justice require it" and "[t]he action of either in such a case is not reviewable except upon a showing of substantial prejudice to the complaining party."  *American Farm Lines v. Black Ball Freight Serv.,* 397 U.S. 532, 539 (1970) (citation omitted).

PUBLIC VERSION

### A.    Positions of Parties

Plaintiff argues that Customs' conduct during the investigation deprived DTT USA of its due process rights to be heard and to defend itself.  Plaintiff asserts that (1) Customs imposed interim measures without notice and without giving DTT USA the opportunity to comment beforehand and (2) Customs denied DTT USA the opportunity to review or comment on proprietary evidence during the EAPA proceeding.  Pl. Br. at 33-34.

With regard to the interim measures, plaintiff asserts that Customs imposed the interim measures without notice to DTT USA.  Plaintiff notes that Customs did not inform DTT USA of its EAPA investigation until after the imposition of interim measures — 97 days after Customs initiated the investigation.  *Id*. at 34.  As such, DTT USA argues that any opportunities DTT USA was given to comment occurred either *after* the imposition of the interim measures or *without notice* of the EAPA allegation.  Pl. Reply Br. at 17.  DTT USA argues that due process considerations establish that importers have a due process right to notice and an opportunity to be heard *before* the imposition of duties on "prior imports."  *Id*. (citing *Nereida Trading Co. v. United States*, 34 CIT 241, 247, 683 F. Supp. 2d 1348, 1354-1355 (2010)).

The Government argues that "[a] company does not have a constitutionally-protected interest in any rate of duty, an importation, or even engaging in international trade."  Def. Br. at 19.  Accordingly, the Government and DSMC maintain that DTT USA has not established any protected property right, and, therefore, DTT USA cannot have

**PUBLIC VERSION**

Court No. 20-00060                                                                                   Page 28

a due process right to a "particular form of procedures."  *Id*. (citing *Cook v. United States*, 536 F.2d 365, 369 (Ct. Cl. 1976)).  The Government argues that 19 U.S.C. § 1517(e) directs Customs to impose interim measures upon finding "reasonable suspicion" of evasion and argues that "the statute does not provide importers with any pre-initiation right to comment on" Customs' measures.  *Id*. 18-19.  DSMC notes that Customs' notice of interim measures was in accordance with Customs' regulations.  Def.-Intervenor Br. at 17.  DSMC further argues that DTT USA's due process argument is not credible because DTT USA had both notice and opportunity to comment before the imposition of interim measures.  *Id*. at 17-18.  DSMC asserts that by responding to Customs' RFI, submitting documentation and subjecting itself to an onsite visit from Customs at its Thailand operations, DTT USA had "constructive notice" of the EAPA investigation and opportunity to comment before the official notice of the investigation and imposition of the interim measures.  Confidential Oral Argument Tr. at 9:17-10:10, ECF No. 64; *see* Def.-Intervenor Br. at 17-18.

    With regard to the proprietary information, plaintiff asserts that it was denied access to proprietary information used in Customs' investigation, including the proprietary versions of Customs' 2018 EAPA Verification Report, Notice of Initiation, Notice of Interim Measures, and EAPA final determination.  Pl. Br. at 34-35; Pl. Reply Br. at 19.  Plaintiff argues that Customs' EAPA regulations, 19 C.F.R. § 165.0-165.47, "do not provide any mechanism through which parties' counsel can review and comment on proprietary evidence during an EAPA proceeding."  Pl. Br. at 34.  As such,

Court No. 20-00060                                                                        Page 29

by denying access to such information, Customs deprived DTT USA of the opportunity

to review, evaluate and comment on the proprietary evidence and defend itself.  *Id*. at

34-35.  DTT USA argues that its right to judicial review does not cure the fact that it was

denied access to proprietary information that could have enabled DTT USA to present a

stronger defense at the administrative level.  Pl. Reply Br. at 20.

  The Government argues that the disclosure of confidential information could

"prejudice any parallel proceedings" and "endanger the sources of this information."

Def. Br. at 20.  The Government notes that in the AD context the Court has allowed

Commerce to withhold from interested parties a "Chinese Informant's business

documents", determining that Commerce may restrict access to information if there is a

"clear and compelling need to withhold" the information.  *Id*. (citing *Max Fortune Indus.*

*Ltd. v. United States*, 36 CIT 964, 973, 853 F. Supp. 2d 1258, 1266) (2012)).  DSMC

adds that DTT USA did not explain how it was prejudiced by the lack of access to the

withheld information and further notes that DTT USA did not raise the issue of withheld

confidential documents during the EAPA investigation.  Def.-Intervenor Br. at 16.

  The Government further argues that any due process issues at the administrative

level can be cured by DTT USA's right to judicial review because counsel are able to

access the entire record under the protective order.  Def. Br. at 20.

  **B.**  **Analysis**

  The Fifth Amendment prohibits the deprivation of life, liberty or property without

due process of law.  U.S. CONST. amend. V.  In any due process inquiry, the Court

**PUBLIC VERSION**

Court No. 20-00060 Page 30

must first determine whether a protected interest exists. *Nereida Trading Co.,* 34 CIT at

248, 683 F. Supp. 2d at 1354-55 (citing *Int'l Trading Co. v. United States*, 24 CIT 596,

609, 110 F. Supp. 2d 977, 989 (2000)). If such a protected interest does exist, the

Court must then determine what procedures are necessary to protect that interest. *Id*.

There is a "longstanding recognition that importers lack a protected interest in the

*future* importation of goods at a particular tariff rate." *Id*. at 1355 (citing *Norwegian*

*Nitrogen Prods. v. United States,* 288 U.S. 294, 297, 318-319 (1933)) (emphasis

supplied). However, this Court has distinguished between an importer's interest in the

*future* importation of goods at a particular tariff rate and an importer's interest in the rate

on goods *already* imported. In *Nereida Trading,* the court assumed that plaintiff

importer had "a protected interest in the proper assessment of tariffs on goods already

imported." *Id*. In *Royal Brush Manufacturing v. United States*, 44 CIT __, __, 483 F.

Supp. 3d 1294, 1305 (2020), the court accepted the assumption that an importer has a

protected interest in a proper assessment and considering what process is due

in a case involving an investigation under the EAPA.

1. **Interim Measures**

Plaintiff challenges Customs' imposition of interim measures on the basis that

Customs deprived DTT USA of its due process rights; however, plaintiff has failed to

demonstrate that a protected interest exists. Plaintiff asserts that *Nereida Trading* and

*Transcom, Inc. v. U.S.*, 24 CIT 1253, 121 F. Supp. 2d 690 (2000), establish that "the

government must provide procedural due process — including both notice and an

**PUBLIC VERSION**

opportunity to be heard — before, not after, the government makes a determination and imposes duty measures, even interim ones." Pl. Reply Br. at 17. The facts of neither case are apposite to the present case.

In *Nereida*, the court examined whether Customs' presumption of reimbursement and subsequent liquidation of entries and application of a double-duty margin deprived the importer of due process. *Nereida Trading Co.*, 34 CIT at 247-249, 683 F. Supp. 2d at 1354-1356. In *Transcom*, the court examined a due process claim alleging that Commerce failed to provide a U.S. importer and its exporters notice prior to issuing a final determination requiring that the importer pay additional duties. *Transcom*, 121 F. Supp. 2d at 707-709.

Neither case addressed due process claims in the context of interim measures. Interim measures are temporary. Under the EAPA statute, Customs can extend interim measures only upon a final determination of evasion. *See* 19 U.S.C. § 1517(d). If Customs finds in its final determination that no evasion exists, any measures taken in the interim, such as a suspension of liquidation or collection of cash deposits, will be lifted and any additional duties or cash deposits paid will be reimbursed to the importer with interest. *See* 19 C.F.R. § 165.27(c); 19 C.F.R. § 24.36.

DTT USA argues that the Government and DSMC "mischaracterize DTT USA's protected interest as a negative EAPA final determination"; however, DTT USA itself fails to state with any particularity that a legitimate property interest exists in the specific context of interim measures. Pl. Reply Br. at 18. The court does not exclude the

possibility that a protected interest may exist; rather, DTT USA has failed to establish

what any such interest may be in this specific context and the court declines to do

counsel's work.  *See Home Prods. Int'l, Inc. v. United States*, 36 CIT 665, 673, 837 F.

Supp. 2d 1294, 1301 (2012) ("[I]ssues adverted to in a perfunctory manner,

unaccompanied by some effort at developed argumentation, are deemed waived.  It is

not enough merely to mention a possible argument in the most skeletal way, leaving the

court to do counsel's work, create the ossature for the argument, and put flesh on its

bones.") (quoting *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990)).

### 2.    Proprietary Information

Plaintiff argues that during the EAPA investigation DTT USA's counsel was

denied access to proprietary information compiled by Customs, "including the

proprietary version of DSMC's *EAPA Allegation* and the proprietary version of

[Customs'] 2018 EAPA Verification Report."  Pl. Br. at 34.  Plaintiff further argues that

Customs' regulations, 19 C.F.R. §§ 165.0-165.47, "do not provide any mechanism

through which parties' counsel can review and comment on proprietary evidence during

an EAPA proceeding," and, therefore, Customs "deprived DTT USA of the opportunity

to review, evaluate, and comment on proprietary evidence and, consequently, a fair

opportunity to defend itself."  *Id.* at 34-35.

The Court has recently addressed a company's due process rights in relation to a

company's access to proprietary information during an EAPA investigation.  In *Royal

Brush*, the court examined whether Customs denied plaintiff, Royal Brush, due process

**PUBLIC VERSION**

during the EAPA proceeding by failing to disclose confidential information on which

Customs relied in its determination.  The court noted that Royal Brush "alerted Customs

to its concerns regarding the extent of the redactions to various documents and Royal

Brush's corresponding inability to fully defend its position."  *Royal Brush,* 44 CIT at __,

483 F. Supp. 3d at 1306.  Specifically, the court explained that, during the EAPA

proceeding, Royal Brush expressed its due process concerns in detail at least three

times.[10]  *Id*.  Customs did not respond to Royal Brush's request for disclosure of certain

information nor did Customs address Royal Brush's due process concerns in its final

determination, or in its review of the final determination.  Accordingly, the court

concluded that Customs "'failed to consider an important aspect of the problem,'

resulting in a determination that is arbitrary and capricious."  *Id*. (quoting *SKF USA Inc.*

*v. United States*, 630 F. 3d 1365, 1374 (Fed. Cir. 2011)).

        The court in *Royal Brush* further explained that "Customs' procedures must

afford adequate opportunity for importers to respond to the evidence used against

them."  *Id*.  The court noted that Customs' regulation, 19 C.F.R. § 165.4, addresses the

procedures for confidential documents.  *Id.*  These procedures include instructions for

---

[10] The court explained that during the EAPA proceeding, Royal Brush "argu[ed] that due process required [Customs] to provide copies of the photographs of the Philippine Shipper's facility attached to the Attaché Report to Royal Brush or to the Philippine Shipper before verification, and there was no reason to withhold the photographs from the Philippine Shipper since the photographs pertained to that company's business information."  *Royal Brush*, 44 CIT at __, 483 F. Supp. 3d at 1306 (citation omitted). Royal Brush further argued, on two separate occasions, that it "had been denied procedural due process based on [Customs'] treatment of confidential information in the Allegation, Attaché Report, and Verification Report."  *Id.* (citation omitted).

**PUBLIC VERSION**

interested parties to request that submissions receive confidential treatment and the

requirement that submitters of such confidential information submit a public version of

the document, "contain[ing] a summary of the bracketed information in sufficient detail

to permit a reasonable understanding of the substance of the information."  19 C.F.R. §

165.4(a)(2).  The court noted that the lack of public summaries accompanying Customs'

Attaché Report and Verification Report was "particularly concerning" because Customs

relied on the reports in its determination.  *Royal Brush*, 44 CIT at __, 483 F. Supp. 3d at

1307.  As such, the court concluded that Customs failed to afford Royal Brush "the

opportunity to be heard at a meaningful time and in a meaningful manner," and

remanded the final determination back to Customs.  *Id*. (citing *Mathews v. Eldridge,* 424

U.S. 319, 333 (1976)).

        In contrast, in respect of this EAPA investigation DTT USA does not challenge

that Customs complied with its regulations to provide public summaries of proprietary

information.  Moreover, during the proceeding, DTT USA did not raise specific concerns

— including due process concerns — with respect to the summaries, ask for disclosure

of proprietary information or ask for more detailed public summaries.[11]  To the contrary,

DTT USA appears to have expressed satisfaction with its access to, for example,

---

[11] At oral argument, DTT USA explained that counsel e-mailed and called Customs on
December 27, 2018, to request access to the proprietary versions of Customs'
verification report; however, these e-mails are not on the record and DTT USA
conceded that the only notation about lack of access to confidential information on the
record is contained in the footnote of its brief submitted on August 5, 2019.  Confidential
Oral Tr. 17:17-17:25.

**PUBLIC VERSION**

Customs' verification report.  In particular, in DTT USA's brief submitted to Customs on

August 5, 2019, DTT USA explained that "[t]he purpose of [Customs'] April 2018 site

visit to DTT Thailand and the conclusion of [Customs'] resulting verification report are

unambiguous."  DTT Legal Argument (Aug. 5, 2019) at 10, CR 198; PR 212.  In the

corresponding footnote, DTT USA stated:

> Redactions from the public version of [Customs'] verification
> report on the April 2018 site visit have prevented DTT
> Thailand from knowing certain details in [Customs']
> description and interpretation of DTT Thailand's proprietary
> data.  Our argument's summary quotes the report's public
> portions only and assumes that, to the maximum extent
> possible, [Customs'] summaries have provided "sufficient
> detail to permit a reasonable understanding of the substance
> of the information."

*Id*. at n.5 (citing 19 C.F.R. § 165.4(a)(2)).

DTT USA's language does not suggest that Customs denied DTT USA "a

meaningful opportunity to participate in the administrative proceeding."  *Royal Brush*, 44

CIT at __, 483 F. Supp. 3d at 1307.  Specifically, DTT USA did not take issue with

Customs' public summary, or ask Customs to disclose proprietary information.  In fact,

DTT USA itself described the public version of the verification report as "unambiguous"

and was able to describe subsequently the purpose of Customs' verification visit.  DTT

Legal Argument (Aug. 5, 2019) at 10-11, CR 198, PR 212.

Additionally, DTT USA seems to argue that due process requires that DTT USA

have access to proprietary information during EAPA proceedings.  The court in *Royal

Brush* dismissed this argument.  Notwithstanding its remand to Customs to address the

lack of public summaries, the court explained: "To be clear, the court does not hold that
Royal Brush is entitled to receive business confidential information.  Congress has not
mandated that Royal Brush be afforded such access and Royal Brush has not shown
that due process requires it."  *Royal Brush*, 44 CIT at __, 483 F. Supp. 3d at 1308.

Similarly, DTT USA has not demonstrated that due process requires that it
receive access to proprietary information during the EAPA investigation.  Moreover,
DTT USA has failed to demonstrate how access to the proprietary information would
have aided the company during the administrative proceeding.

Customs complied with its regulation concerning public summarization of
confidential information.  As such, the court finds that Customs did not violate DTT
USA's due process rights.

## III.   Customs' treatment of entries that pre-dated December 1, 2017

DTT USA challenges Customs' inclusion in the Final Determination of entries
made before December 1, 2017.  DTT USA argues that Commerce's finding — in
response to Customs' scope referral request — that DTT USA's Thai imports are
"covered merchandise" under the 2009 Order is applicable only to entries made on or
after December 1, 2017.  As such, DTT USA challenges on two grounds Customs'
treatment of pre-December 2017 entries of diamond sawblades.  First, DTT USA
asserts that entries made before December 1, 2017, were not "covered merchandise,"
and, therefore, DTT USA contends that Customs' determination that DTT USA entered
"covered merchandise" through evasion before December 1, 2017, was arbitrary,

**PUBLIC VERSION**

capricious, an abuse of discretion, and otherwise not in accordance with law.  *Id*. at 25-

33.  Second, DTT USA argues that by continuing to extend the suspension of liquidation

on entries made before December 1, 2017,[12] Customs "retroactively applied"

Commerce's final circumvention determination, and, therefore, Customs' Final

Determination was unlawful and an abuse of discretion.  Pl. Br. at 19-24.

     **A.**    **Positions of Parties**

    DTT USA argues that Customs' Final Determination applies Commerce's

affirmative circumvention determination retroactively, and, as such, is an abuse of

discretion and otherwise not in accordance with law.  Pl. Br. at 19-29.

    Plaintiff challenges Customs' Final Determination on the grounds that entries

made before December 1, 2017, do not meet the evasion requirements of EAPA.

Specifically, (1) the entries were not "covered merchandise," (2) DTT USA did not

import the entries by means of "material and false" statements or "material omissions,"

and (3) DTT USA did not avoid "applicable" payment of cash deposits.  Pl. Br. at 25-33.

---

[12] In its final determination of evasion, Customs stated: "[Customs] will continue to suspend or extend liquidation, as applicable, until instructed to liquidate entries subject to the investigation.  For future entries of diamond sawblades from Thailand involving DTT Thailand, [Customs] will continue to require live entry, where the importer must post the applicable cash deposits prior to the release of merchandise into U.S. commerce.  Finally, [Customs] will continue to evaluate the importer's continuous bonds in accordance with [Customs'] policies, and will continue to require single transaction bonds as appropriate.  None of the above actions preclude [sic] [Customs] or other agencies from pursuing additional enforcement actions or penalties."  Final Determination at 10.

Court No. 20-00060                                                                          Page 38

DTT USA argues that, as a result of Commerce's circumvention inquiry, Commerce "expanded" the 2009 Order covering diamond sawblades from China to include certain sawblades manufactured by DTT Thailand in Thailand.  *Id*. at 21.  DTT USA argues that in response to Customs' EAPA referral, Commerce informed Customs that, in accordance with 19 C.F.R. § 351.225(l)(3), Commerce's affirmative final determination applied only to merchandise that entered on or after December 1, 2017 — the initiation date of Commerce's circumvention inquiry.[13]  *Id*. at 26.  Plaintiff asserts that the "legal effect of Commerce's affirmative final circumvention determination was that DTT USA's entries were *not* 'subject to' the [2009] Order — and thus were not 'covered merchandise' — until December 1, 2017."  *Id*. at 27 (emphasis in original).  As such, DTT USA disputes Customs' finding in the EAPA Final Determination that Commerce's response to the covered merchandise referral applied to all entries covered by the EAPA investigation, including entries made prior to the initiation of Commerce's circumvention inquiry.  *Id*. at 22 (citing Final Determination at 8).

DTT USA further argues that because its imports that entered before December 1, 2017, were not "covered merchandise," DTT USA declared correctly that those imports were of Thai origin.  *Id*. at 29.  DTT USA argues that before Commerce reached its affirmative final circumvention determination, DTT USA "reasonably relied" on

---

[13] Commerce's regulation states that when Commerce makes a final scope determination it will "instruct the Customs Service to suspend liquidation and to require a cash deposit of estimated duties, at the applicable rate, for each unliquidated entry of the product entered, or withdrawn from warehouse, for consumption *on or after the date of initiation of the scope inquiry*."  19 C.F.R. § 351.225(l)(3) (emphasis supplied).

Commerce's prior country-of-origin determination, and, therefore, DTT USA did not import its diamond sawblades by means of material and false statements or omissions. *Id*. at 31-32.  Plaintiff also argues that Customs' determination that DTT USA avoided payment of applicable cash deposits is based on Customs' "unlawful interpretation" of "covered merchandise" and finding that DTT USA entered merchandise by means of material and false statements and omissions.  *Id*. at 33.  DTT USA argues that Customs' conclusion is an abuse of discretion and not in accordance with law.  *Id*.

Finally, DTT USA argues that the Federal Circuit's decision in *Sunpreme v. United States*, 946 F.3d 1300 (Fed. Cir. 2020) is not relevant to this case.  Pl. Reply Br. at 7.  DTT USA asserts that the Federal Circuit in *Sunpreme* held that under 19 U.S.C. § 1500(c) Customs has the authority to suspend liquidation of goods "when it determines that the goods fall within the scope of an ambiguous [AD] or [CVD] order." *Id.* at 23 (citing *Sunpreme*, 946 F.3d at 1321).  DTT USA maintains, however, that Customs lacks the statutory authority to expand the scope of the 2009 Order to include diamond sawblades manufactured and exported by DTT Thailand before December 1, 2017.  DTT USA asserts that "[o]nly Commerce has the authority to *expand* the scope of an [AD] or [CVD] order to cover merchandise completed or assembled in a third country (*i.e.*, a country other than the subject country to which the AD/CVD order applies)."  Pl. Br. at 1 (citing 19 U.S.C. § 1677j(b)) (emphasis in original); *see* Pl. Reply. Br. at 6.  DTT USA asserts that in Commerce's response to Customs' referral request, Commerce "acknowledged that Thailand *was* the country of origin — and,

**PUBLIC VERSION**

consequently, that DTT USA's imports were *outside* the scope of the [2009] Order . . . ." Pl. Reply Br. at 7 (emphasis in original).  Therefore, DTT USA argues that Commerce, in the context of a circumvention inquiry made pursuant to 19 U.S.C. § 1677j, expanded the scope of the 2009 Order to include only those sawblades manufactured in Thailand using Chinese cores and segments imported after December 1, 2017.  *Id.* at 7-8.

The Government and DSMC acknowledge that the EAPA statute addresses circumstances in which Customs cannot by itself determine whether goods subject to an EAPA allegation are covered by an AD or CVD order, and, in such cases, is directed to refer this question to Commerce in a scope referral request.  Def. Br. at 16; Def.-Intervenor Br. at 12 (citing 19 U.S.C. § 1517(b)(4)).  The Government maintains, however, that Commerce, within the context of an EAPA referral request, is limited to a "binary 'covered' or 'not covered' response to any [Customs] referral."  Def. Br. at 16. The Government argues that the EAPA does not provide Commerce with an additional requirement "to respond with 'covered' or 'not covered' *and* a separate determination as to the date that the referral merchandise became 'covered'."  *Id.* (emphasis in original). The Government and DSMC note that Commerce did, in fact, confirm to Customs that certain Thai-origin goods are "covered merchandise" under the 2009 Order and did not set a temporal limitation on its covered merchandise response.[14]  *Id.*  As such, DSMC

---

[14] The Government notes that in response to Customs' referral, Commerce explained that "[t]he Covered Merchandise Referral does not identify any temporal limitation, but merely describes the merchandise subject to the referral."  Def. Br. at 16 (citing Commerce Response to EAPA Referral at 5).

**PUBLIC VERSION**

maintains that Customs did not act "unlawfully in taking Commerce at its word."  Def.-Intervenor at 12.

The Government does not address directly DTT USA's challenge to Customs' finding that DTT USA entered covered merchandise *by means of material and false statement or material omission* and avoided payment of applicable cash deposits. DSMC does address DTT USA's challenge and argues that Commerce's response to the referral stated that DTT USA's sawblades constituted "covered merchandise," and, as such, DSMC asserts that DTT USA's remaining arguments about material statements and omissions and applicable duties are without merit.  Def.-Intervenor Br. at 15.

The Government asserts that DTT USA's argument — that Customs' suspension of liquidation is restricted to entries after December 1, 2017 — is based on Commerce's circumvention regulation, 19 C.F.R. § 351.225(l).  Def. Br. at 17.  The Government and DSMC argue that Commerce's regulation cannot be read to "supersede" Customs' independent authority to suspend liquidation under the EAPA.  *Id.*; *see* Def.-Intervenor Br. at 13.  The Government notes that the EAPA grants Customs authority to impose interim measures.  Def. Br. at 15-16 (citing 19 U.S.C. § 1517(e)).  The Government further explains that after a final affirmative determination of evasion, the statute directs Customs to suspend liquidation on unliquidated entries of such merchandise "on or after the date of the initiation of the investigation," or to pre-initiation entries.  Def. Br. at 16 (citing 19 U.S.C. § 1517(d)(1)(A)(i) and (B)(i)).  Similarly, DSMC asserts that the EAPA

**PUBLIC VERSION**

establishes that Customs' initiation of an EAPA investigation "defines the universe of

entries to which interim measures and any final affirmative EAPA determination will be

applied . . . [n]othing in the statute subordinates the universe of relevant entries to

Commerce's determination in separate proceedings, inclusive of anticircumvention

proceedings."  Def.-Intervenor Br. at 12 (citing 19 U.S.C. § 1517(d)-(e)).[15]  Accordingly,

---

[15] It appears that 19 U.S.C. § 1517(d)(1)(B)(ii) ("subsection (d)(1)(B)(ii)") contains a drafting error.  Subsection (d)(1) provides (in relevant part) that:

> If the Commissioner makes a determination under
> subsection (c) that covered merchandise was entered into
> the customs territory of the United States through evasion,
> the Commissioner shall—
> . . .
> (B) pursuant to the Commissioner's authority under section
> 1504(b) of this title—
>
> (i) extend the period for liquidating unliquidated entries of
> such covered merchandise that are subject to the
> determination and that entered before the date of the
> initiation of the investigation; or
>
> (ii) if the Commissioner has already extended the period for
> liquidating such entries pursuant to *subsection (e)(1),*
> continue to extend the period for liquidating such entries;

19 U.S.C. § 1517(d)(1)(B) (emphasis supplied).

19 U.S.C. § 1517(e) addresses Customs' authority to impose interim measures:

> [I]f the Commissioner decides there is such a reasonable
> suspicion, the Commissioner shall—
>
> (1) suspend the liquidation of each unliquidated entry of such
> covered merchandise that entered on or after the date of the
> initiation of the investigation; (footnote continued)

**PUBLIC VERSION**

the Government and DSMC assert that it is the EAPA, not Commerce's regulation, that

governs the "temporal reach" of Customs' imposition of measures in an EAPA

investigation.  *Id.* at 13; Def. Br. 16.

Finally, the Government and DSMC argue that the Federal Circuit in *Sunpreme*

established that Customs has authority beyond the EAPA to suspend liquidation when

Customs concludes that an importer is entering covered merchandise.  Def. Br. at 17;

Def.-Intervenor Br. at 13-14.  The Government and DSMC note that *Sunpreme* was pre-

EAPA; however, they argue that the Federal Circuit addressed specifically a scenario in

which Customs determines that imports are subject to suspension of liquidation prior to

the initiation of a scope inquiry by Commerce, including in the context of a

circumvention inquiry.  Def. Br. at 17-18; Def.-Intervenor Br. at 13-14.  The Government

and DSMC further argue that the Federal Circuit in *Sunpreme* determined that if

Customs' suspension of liquidation predates Commerce's initiation of a scope inquiry,

then Customs' determination must be upheld unless Commerce orders Customs to lift

---

> (2) pursuant to the Commissioner's authority under section
> 1504(b) of this title, *extend the period for liquidating each*
> *unliquidated entry of such covered merchandise* that entered
> before the date of the initiation of the investigation;

19 U.S.C. § 1517(e)(1)-(2) (emphasis supplied).

Contrary to the language in subsection (d)(1)(B)(ii), subsection (e)(1) does not give
Customs the authority to extend as interim measures the period for liquidating entries
made prior to the initiation of the investigation.  The authority to extend as interim
measures the period for liquidation is provided for under subsection (e)(2).

**PUBLIC VERSION**

Court No. 20-00060                                                              Page 44

the measures.  Def. Br. at 18; Def.-Intervenor Br. at 14 (citing *Sunpreme*, 946 F.3d at

1317-1319).  DSMC argues that DTT USA failed to identify any instruction by

Commerce to lift the pre-existing suspension of liquidation imposed by Customs.  Def.-

Intervenor Br. at 14-15.

      **B.**    **Analysis**

      The parties raise two issues with respect to Customs' Final Determination: (1)

Customs' finding of evasion; and, (2) Customs' suspension of liquidation for entries

made before December 1, 2017.  Central to both issues is the question of whether the

entries of DTT USA were "covered merchandise" before December 1, 2017.  As such,

the court notes that Customs' evasion finding and suspension of liquidation are

inherently linked, and, at times, overlap.  Based on the following reasons, the court

concludes that entries made before December 1, 2017, are "covered merchandise";

however, Customs has failed to demonstrate, how, if at all, DTT USA entered the

covered merchandise by means of material and false statement or material omission.

Accordingly, the court declines to address whether Customs' final determination to

"*continue* to suspend or *extend* liquidation" on pre-December 2017 entries was lawful.

Final Determination at 10 (emphasis supplied).

      **1.**    **Whether Customs' evasion determination was reasonable and
in accordance with law**

      A determination of evasion requires three elements: (1) entering covered

merchandise into the United States; (2) by means of any document or data or

information, written or oral statement, or act that is material and false, or any omission

**PUBLIC VERSION**

that is material; and (3) that results in any applicable cash deposit or other security

being reduced or not applied to the merchandise.  *See* 19 U.S.C. § 1517(a)(5)(A).

### i.  Covered Merchandise

Customs' evasion determination that DTT USA's entries made prior to December

1, 2017, are "covered merchandise" is based on its finding that Commerce's response

to the "covered merchandise" referral applies to all of DTT USA's entries covered by the

EAPA investigation, including entries made prior to the initiation of Commerce's

circumvention investigation.  Final Determination at 8.

The EAPA statute provides that if Customs receives an EAPA allegation and "is

unable to determine whether the merchandise at issue is covered merchandise,

[Customs] shall . . . refer the matter to the administering authority to determine whether

the merchandise is covered merchandise pursuant to the authority of the administering

authority under subtitle IV."  19 U.S.C. § 1517(b)(4)(A)(i).[16]  The statute further provides

that "[a]fter receiving a referral . . . with respect to merchandise, the administering

authority shall determine whether the merchandise is covered merchandise and

promptly transmit that determination to [Customs]."  19 U.S.C. § 1517(b)(4)(B).

Customs during its EAPA investigation found that it was unable to determine

whether diamond sawblades assembled by DTT Thailand in Thailand were "covered

merchandise," and referred that question to Commerce pursuant to 19 U.S.C. §

---

[16] The administering authority refers to the U.S. Department of Commerce.  19 U.S.C. §
1517(a)(1); *see* 19 U.S.C. § 1677(1).

**PUBLIC VERSION**

1517(b)(4)(A)(i).  Covered Merchandise Referral.  After receiving Customs' request,

Commerce "aligned [the] covered merchandise referral segment with the concurrent

anti-circumvention inquiry."  Commerce Response to EAPA Referral at 1.  In its

response to Customs, Commerce found that, based on the results of its circumvention

inquiry, "diamond sawblades made in Thailand by Diamond Tools using Chinese cores

and Chinese segments are subject to the AD Order . . . ."  *Id*. at 6.

Customs subsequently issued its Final Determination finding that, based on

Commerce's response to the covered merchandise referral, DTT USA's entries of

diamond sawblades joined in Thailand were subject to the 2009 Order.  Final

Determination at 8.  Customs also determined that, due to Commerce's lack of

liquidation instructions and temporal limitation on its "covered merchandise" response,

Commerce's "covered merchandise" determination applied to all entries covered by the

EAPA investigation, including entries made prior to December 1, 2017.[17]  *Id*.

In its Final Administrative Determination on DTT USA's administrative appeal of

the Final Determination, Customs[18] upheld the Final Determination, stating:

> Commerce made an affirmative determination with regard to
> the covered merchandise referral and transmitted [sic] same
> to [Customs] pursuant to Commerce's obligations under the
> EAPA statute.  There is no temporal limitation on this

---

[17] Customs stated: "Because Commerce did not place any temporal limitation or provide
liquidation instructions to [Customs] with respect to entries covered by the EAPA
investigation, we find that Commerce's response to the covered merchandise referral
applies to all entries covered by the EAPA investigation, including those made prior to
the initiation of [sic] anti-circumvention investigation."  Final Determination at 8.

[18] *See supra* note 1.

**PUBLIC VERSION**

> determination and to find such a limitation would create a
> result contrary to that intended by the Federal Circuit's *en
> banc* holding in *Sunpreme*.  Therefore, we find that all
> entries that have been suspended or extended as a result of
> this EAPA investigation, *regardless of the date of entry*, are
> covered merchandise.

OR&R Final Administrative Determination at 9 (emphasis supplied).

In sum, Customs interpreted the referral provision in the statute as limiting

Commerce's response to scope referrals to either an affirmative determination, *i.e.,* the

merchandise is covered, or a negative determination, *i.e.,* the merchandise is not

covered.  Accordingly, in Customs' view, the covered merchandise determination is not

bound by Commerce's circumvention timeline, and DTT USA's entries made prior to

December 1, 2017, are covered merchandise.

The statute provides that when Customs is unable to determine whether

merchandise subject to an EAPA investigation is "covered merchandise," Customs must

"refer the matter to [Commerce] to determine whether the merchandise is covered

merchandise."  Commerce must then "determine whether the merchandise is covered

merchandise and promptly transmit that determination to [Customs]."  19 U.S.C. §

1517(b)(4)(A)-(B).  The statute is not clear as to whether Customs, having referred a

"covered merchandise" matter to Commerce, is consequently bound by the timeline

created by Commerce's initiation of a circumvention inquiry in a separate proceeding,

the results of which are used as a basis of Commerce's affirmative "covered

merchandise" response to Customs.  Conversely, the statute does not *preclude*

**PUBLIC VERSION**

Court No. 20-00060                                                                                  Page 48

Customs from utilizing its authority under the EAPA, which is independent of

Commerce's authority under the AD/CVD provisions of U.S. law.

Moreover, since the EAPA's enactment in 2015, only a handful of EAPA

determinations has reached the Court and the present case is the first to involve a

review of the statute's referral provision.  As such, the interaction between Customs'

EAPA investigations and Commerce's scope inquiries, specifically a circumvention

inquiry, is a novel one for which the statute provides no clear guidance.  The court,

therefore, finds it appropriate to examine whether Customs' interpretation of the referral

provision, 19 U.S.C. § 1517(b)(4)(A)-(B), is entitled to deference.

When reviewing an agency's interpretation of a statute, the court must first

determine "whether Congress has directly spoken to the precise question at issue."

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842

(1984).  If the court concludes that the statute does address the precise question, the

court "'must give effect' to Congress's unambiguous intent."  *Gazelle v. Shulkin*, 868

F.3d 1006, 1010 (Fed. Cir. 2017) (citing *Chevron*, 467 U.S. at 842-843).  If, however,

"the statute is silent or ambiguous with respect to the specific issue, the question for the

court is whether the agency's answer is based on a permissible construction of the

statute." *Chevron*, 467 U.S. at 843.

As already noted, when Customs is unable to determine whether merchandise

subject to an EAPA investigation is "covered merchandise" under the relevant AD or

CVD order, the statute directs Customs to refer the matter to Commerce.  *See* 19

**PUBLIC VERSION**

U.S.C. § 1517(b)(4)(A).  The statute then directs Commerce to determine whether the

subject merchandise is "covered merchandise" and promptly inform Customs of its

determination.  *See* 19 U.S.C. § 1517(b)(4)(B).  The text of the EAPA, however, is silent

as to whether Commerce in using its findings from a separate circumvention inquiry to

make its "covered merchandise" determination under the EAPA consequently imposes

a temporal limitation on its "covered merchandise" response to Customs.

Turning to the legislative history, the Conference Committee on the Trade

Facilitation and Trade Enforcement Act of 2015 ("Conference Report"),[19] contained the

final versions of the proposed bill and added the referral provision.  Specifically, the

Conference Report states:

> If the Commissioner is unable to determine whether the
> merchandise at issue is covered merchandise, the
> Commissioner shall refer the matter to the Department of
> Commerce to determine whether the merchandise is
> covered merchandise.  The Department of Commerce is to
> make this determination pursuant to its applicable statutory
> and regulatory authority, and the determination shall be
> subject to judicial review under 19 U.S.C. 1516a(a)(2).  *The*
> *Conferees intend that such determinations include whether*
> *the merchandise at issue is subject merchandise under 19*
> *U.S.C. 1677j.*  The time required for the Department of
> Commerce to determine whether the merchandise at issue is
> covered merchandise shall not be counted in calculating any
> deadlines under the procedures created by this section.

Conf. Rep. No. 114-376, at 190 (2015) (emphasis supplied).

---

[19] A Conference Committee was convened to resolve the remaining conflicts between
amendments from the U.S. House of Representatives and the U.S. Senate.  Conf. Rep.
No. 114-376, at 182-93 (2015).

**PUBLIC VERSION**

The Conference Report demonstrates that Congress intended for Customs to be able to access Commerce's circumvention inquiries through the referral provision.  The Conference Report does not describe, however, how these two proceedings should interface, and, more specifically, whether circumvention inquiries used as a basis for Commerce's "covered merchandise" determination in an EAPA proceeding would consequently bind Customs to Commerce's timelines from a separate circumvention proceeding.  The legislative history is, therefore, ambiguous.

With regard to *Chevron* step two, the court determines that Customs has put forth a reasonable interpretation of the referral provision, 19 U.S.C. § 1517(b)(4)(A)-(B). In its Final Determination, Customs acknowledged that Commerce chose to use its "concurrent anti-circumvention inquiry" to make its "covered merchandise" determination due to the circumvention inquiry's "potentially overlapping issues."[20]  Final Determination at 7 (footnote omitted).  Customs explained that Commerce's circumvention inquiry was a "distinct" administrative proceeding that had no bearing on Customs' independent statutory authority with respect to entries subject to an EAPA investigation.  *Id.*  Accordingly, Customs interpreted the covered merchandise referral as "only instruct[ing] Commerce to transmit its determination of whether the merchandise described in the Covered Merchandise Referral is 'covered merchandise.'"

---

[20] Customs noted that "five of the six issues in the anti-circumvention investigation were unrelated to the EAPA investigation; the only issue that overlapped with the EAPA investigation was the one issue that pertained to the scope of the order."  Final Determination at 7.

**PUBLIC VERSION**

*Id*. (quoting Commerce Response to EAPA Referral at 5).  Based on its interpretation of

the statute, Customs determined DTT USA's entries made prior to December 1, 2017,

were "covered merchandise."

      The EAPA statute empowers Customs to investigate allegations of evasion and

determine whether entries under an investigation are "covered merchandise."  Customs'

statutory authority notwithstanding, when Customs is unable to determine whether

certain imports are "covered merchandise," Customs is directed to refer the matter to

Commerce.  19 U.S.C. § 1517(b)(4)(A)-(B).  Nevertheless, Commerce's role in an

EAPA investigation is limited to the extent that the statute provides for Commerce

simply to determine whether merchandise is covered by an applicable AD or CVD order

and "promptly transmit" its determination to Customs, which can then take any

appropriate action.  *Id.*  As such, Commerce's decision to base its covered merchandise

determination in response to Customs' EAPA referral request on Commerce's results

from a separate parallel circumvention proceeding neither expands Commerce's

authority under the EAPA statute, nor does Commerce's action diminish Customs'

authority under the EAPA to apply Commerce's affirmative covered merchandise

determination to all entries covered by the EAPA investigation.

      To read the scope referral request as suggested by DTT USA would not only

potentially disincentivize Customs from making scope referral requests where

appropriate — *e.g.,* where there is third country assembly — but would also contravene

Congress' expressed intent for the statute.  The purpose of the EAPA was to empower

the U.S. Government and its agencies with the tools to identify proactively and thwart

evasion at earlier stages to improve enforcement of U.S. trade laws, including by

ensuring full collection of AD and CVD duties and, thereby, preventing a loss in

revenue.[21]   To require that Customs be bound by Commerce's later circumvention

timeline would restrict Customs' authority to find that DTT USA's pre-December 2017

entries were "covered merchandise," thereby limiting Customs' enforcement authority

under the EAPA with regard to those entries.   Such an outcome would be contrary to

the congressional intent underlying the EAPA statute and Customs' ability to exercise its

statutory authority.   Accordingly, the court upholds as a permissible construction of the

statute Customs' interpretation of the referral provision to find that DTT USA's entries

prior to December 1, 2017, are "covered merchandise."

---

[21] In 2015, the Committee on Ways and Means in the U.S. House of Representatives
released a report on the Trade Facilitation and Trade Enforcement Act of 2015.  H.R.
Rep. No. 114-114, pt. 1 (2015).  This report demonstrates that Congress intended for
the EAPA to provide a specific timeline for evasion investigations.  *Id.*  Sander M. Levin,
Ranking Member of the Committee, included the following statement in the Additional
Views section:

> There appears to be growing consensus that ENFORCE is
> the appropriate way to address allegations of evasion.  Prior
> efforts to require Customs to enforce these allegations by
> using existing statutory provisions (e.g., Section 516 of the
> Tariff Act of 1930) have failed by not requiring Customs to
> act on a petition within a fixed period of time.  The longer
> Customs takes, the more entries are liquidated — that is,
> they become final, and any additional duties owing are
> foregone.

*Id.* at 381.  *See also* S. Rep. No. 114-45 at 12 (2015).

**PUBLIC VERSION**

ii.    **Material and False Statement or Material Omission**

Turning next to the second statutory requirement, the court determines that Customs' determination does not satisfy this requirement that DTT USA entered covered merchandise by means of a material and false statement or a material omission.  *See* 19 U.S.C. § 1517(a)(5)(A).

Customs in its Final Determination stated that Commerce in its Covered Merchandise Referral Response confirmed that Chinese-origin cores and segments joined in Thailand are within the scope of the 2009 Order, and as such "DTT evaded the [2009 Order] by not entering diamond sawblade imports from Thailand as type 03 entries and posting the appropriate cash deposits."  Final Determination at 8.

It is noteworthy that prior to the 2009 Order, Commerce issued a final less than fair value determination for diamond sawblades from China in its original antidumping

**PUBLIC VERSION**

investigation.[22]   *Diamond Sawblades and Parts Thereof from the People's Republic of China*, 71 Fed. Reg. 29,303 (May 22, 2006) ("2006 Final LTFV Determination") and accompanying Issues and Decisions Memorandum ("2006 IDM").  In the 2006 IDM, Commerce found that "country of origin should be determined by the location of where the segments are joined to the core."   2006 IDM at Comment 4.  Commerce explained in detail that:

> [T]he Department has determined that it is the attachment of cores to segments that gives finished diamond sawblades their essential quality, not the manufacture of diamond segments.  Even though there is a significant capital investment also associated with manufacturing diamond segments, given the fact that the attachment process imparts the essential quality of the diamond sawblade, coupled with the substantial capital investment and technical expertise that is required for the attachment process, we continue to find that the country of origin is determined by the location where segments and cores are attached to create finished diamond sawblades.

---

[22] In December 2005, Commerce initiated an antidumping duty investigation of diamond sawblades and parts thereof from China.  *See Advanced Technology & Materials Co., Ltd. v. United States*, 35 CIT 1099, 1101 (2011).  Commerce issued its final determination on May 22, 2006, finding that subject merchandise was being sold in the United States for less than fair value.  *See id*.  In July 2006, the U.S. International Trade Commission ("the Commission") issued a final determination finding that the domestic industry was not materially injured or threatened with material injury.  *See id*. at 1102.  The diamond sawblades investigation was subsequently terminated and no antidumping order was issued.  *See id*.  In response, DSMC challenged the Commission's negative determination before this Court.  *See Diamond Sawblades Manufacturers Coalition v. United States,* 32 CIT 134 (2008).  The court remanded the Commission's final determination for reconsideration, and, upon remand, the Commission issued an affirmative determination.  *See Advanced Technology,* 35 CIT at 1102.  Following an unsuccessful challenge in the Federal Circuit to the Commission's remand determination, Commerce issued the antidumping duty order on November 4, 2009.  *See id*.

**PUBLIC VERSION**

*Id*.[23]

Commerce's 2006 IDM notwithstanding, Customs in its Final Determination maintained that DTT USA entered covered merchandise by means of a material and false statement or a material omission.  Final Determination at 8-9.  Customs based its finding on two factors.  First, Customs noted that DTT Thailand, in importing diamond sawblades into the United States, did not distinguish between Chinese-origin cores and segments joined in Thailand and Thai-origin cores and segments joined in Thailand.  *Id*. at 9.  Customs found that:

> These imports lacked clear documentation or labelling that distinguished their country of origin, and the evidence on the record shows that the covered and uncovered merchandise were comingled.  This comingling of covered and uncovered merchandise created the opportunity for DTT to evade duties through the lack of differentiation.  Therefore, we determine that all merchandise that does not identify the country-of-origin of its cores and segments is covered merchandise and that DTT Thailand evaded the AD order by importing Chinese-origin diamond sawblades and claiming that merchandise was Thai-origin on entry documents.

*Id*.

Second, Customs found that: "it is the responsibility of the importer and manufacturer to ensure that imports into the customs territory of the United States comply with the law and to seek clarity concerning the compliance of any merchandise potentially subject to an AD/CVD order."  *Id*.  Customs noted that DTT USA "had ample

---

[23] Commerce's country of origin determination was affirmed by this Court.  *See Advanced Tech. & Materials. Co., Ltd. v. United States,* 35 CIT 1380, 1386 (2011).

**PUBLIC VERSION**

opportunity to request a scope ruling [on diamond sawblades made of Chinese-origin cores and segments] from Commerce or to seek clarity from [Customs] during the years before this EAPA investigation." *Id.*  The court will address each point in turn.

To start, as discussed previously, a determination of evasion requires a finding that covered merchandise has entered the United States by "means of any document or electronically transmitted data or information, written or oral statement, or act that is material and *false*, or any *omission* that is material."  19 U.S.C. § 1517(a)(5)(A) (emphasis supplied).  "False" is defined as: ""Untrue . . . Deceitful . . . Not genuine; inauthentic . . . What is false can be so by intent, by accident, or by mistake . . . Wrong; erroneous . . . ."  *False,* BLACK'S LAW DICTIONARY (11th ed. 2019).  An "omission" is defined as: "A failure to do something; esp., a neglect of *duty* . . . [t]he act of leaving something out . . . [t]he state of having been left out or of not having been done . . . [s]omething that is left out, left undone, or otherwise *neglected*."  *Omission*, BLACK'S LAW DICTIONARY (11th ed. 2019) (emphasis supplied).

The court is not convinced that DTT USA's failure to distinguish the country of origin of the cores and segments joined in Thailand constitutes a material and false statement or a material omission.  Customs found that DTT USA's failure to label its diamond sawblades as "Chinese-origin diamond sawblades" constitutes a false statement or act or a material omission.  Final Determination at 8-9.  Customs' conclusion appears to hinge either on (1) the presumption that entering covered merchandise without so declaring it is *per se* false or an omission, or (2) the legal

**PUBLIC VERSION**

conclusion that DTT USA was under an obligation to notify Customs of the Chinese

origin of some of its cores and segments.  Such a presumption or such a legal

conclusion would ignore that Commerce's 2006 IDM stated explicitly that the country of

origin of diamond sawblades is to be determined by the country of assembly of the

cores and segments.  *See* 2006 IDM at Comment 4.  Given Commerce's clearly stated

conclusion, DTT USA did not make a material and false statement by importing the

diamond sawblades as Thai-origin because such a statement was not "erroneous",

"untrue" or "deceitful."  DTT USA's imports were made of Chinese cores and segments

assembled in *Thailand*.  As such, by importing the diamond sawblades as Thai-origin,

DTT USA complied fully with Commerce's clear directive that the country of origin be

determined by the country in which the cores and segments are joined.

Moreover, Commerce's 2006 IDM could not have been any *more* clear, stating:

"neither the cores nor the segments alone constitute the essential component of the

product under investigation".  2006 IDM at Comment 4.  Commerce *expressly* found

that "*the essential quality of the product is not imparted until the cores and segments

are attached to create a finished diamond sawblade.*"  *Id.* (emphasis supplied).  In light

of Commerce's 2006 IDM, the court is unable to conclude that DTT USA had a "duty" to

disclose that its diamond sawblades assembled in Thailand consisted of Chinese-origin

cores and segments, nor that any disclosure or action by DTT USA was "neglected."

Accordingly, the court determines that Customs has failed to establish that DTT USA's

actions constitute a material omission.

**PUBLIC VERSION**

Similarly, Customs found that DTT USA's decision not to seek a clarification from Customs or Commerce as to whether the diamond sawblades made of Chinese-origin cores and segments were covered by the 2009 Order "indicates that . . . DTT Thailand set up their Thai operations to join Chinese-origin cores and segments that were labelled as Thai-origin, in order to avoid payment of AD/CVD duties on Chinese-origin diamond sawblades."  Final Determination at 9.  Customs has not explained how DTT USA's failure to seek such a clarification constitutes a material and false statement or act, or a material omission.  Neither the 2006 IDM nor the 2009 Order prohibited DTT USA from manufacturing Chinese-origin cores and segments in Thailand and labelling the finished diamond sawblades as Thai-origin.  To the contrary, the way in which DTT USA labeled its imports was expressly contemplated and sanctioned by Commerce's 2006 IDM.

In fact, Commerce in its 2006 IDM addressed directly the issue of third-country assembly.  The petitioner in the administrative proceeding had urged Commerce not to base its country-of-origin determination on the assembly/attachment process.  Commerce acknowledged that the petitioner had argued that "the Department's proposed country of origin methodology poses significant circumvention concerns."[24]

---

[24] In outlining the petitioner's concerns, Commerce stated: (footnote continued)

**PUBLIC VERSION**

2006 IDM at Comment 4.  Commerce, however, expressly rejected the petitioner's concerns and proffered approach and, instead, adopted an assembly-based country-of-origin standard, adding: "[i]n any event, the Department retains that statutory authority to address circumvention concerns as appropriate."  *Id*.

It is beyond the scope of this proceeding for the court to assess the reasons that Commerce chose to adopt an assembly-based rule-of-origin standard notwithstanding arguments presented to it that presaged the very circumvention issues that in fact arose.  What is not beyond the scope of this proceeding — indeed, lies at its heart — is whether, considering Commerce's determination, DTT USA had an obligation to seek a

---

Petitioner argues that the Department's proposed country of origin methodology poses significant circumvention concerns.  Petitioner argues that if the Department's country of origin analysis remains unchanged in the final determination, Korean and Chinese manufacturers may move joining operations to third countries in an attempt to avoid antidumping duties, particularly since many of these entities are sophisticated multinational corporations that already have substantial experience manufacturing across borders.

Petitioner maintains that the Department's preliminary determination to treat the location where segments and cores are joined as the country of origin of the finished diamond sawblade is contrary to Department precedent and wholly unsupported by an understanding of the essential character of a diamond sawblade and the manufacturing processes involved in its production.

2006 IDM at Comment 4.

**PUBLIC VERSION**

clarification from Commerce or Customs prior to importing the merchandise that is the subject of this proceeding.

As mentioned, Commerce in its 2006 IDM stated that country of origin be determined "by the location where segments and cores are attached to create finished diamond sawblades."  2006 IDM at Comment 4.  In making this statement, Commerce created a clear standard with respect to which affected companies, including DTT USA, were to operate.

Customs in its Final Determination and Final Administrative Decision failed to reference any authority that would create an obligation on DTT USA to seek a scope determination from Commerce or to seek a clarification from Customs as to the scope of the 2009 Order.  Final Determination at 8-9; OR&R Final Administrative Determination at 9-10.  Accordingly, DTT USA acted in accordance with Commerce's 2006 IDM and Customs has failed to demonstrate how, if at all, DTT USA's actions constitute a material and false statement or act, or a material omission.

Customs in the Final Determination stated that "[b]ecause EAPA does not have a knowledge requirement for evasion as defined under 19 CFR 165.1, there is no requirement that the importer know of the material or false statement and, thus, [Customs] does not need to determine any level of culpability only that evasion occurred with entry."  Final Determination at 8.  Similarly, citing 19 C.F.R. § 165.1 and 19 U.S.C. § 1517(a)(5), Customs in the Final Administrative Determination found that "a finding of evasion does not require an intentional or purposeful attempt by an importer to avoid

**PUBLIC VERSION**

duties."  OR&R Final Administrative Determination at 9.  19 C.F.R. § 165.1 defines

evasion as "the entry of covered merchandise in the customs territory of the United

States for consumption by means of any document or electronic transmitted data or

information, written or oral statement, or act that is material and false, or any omission

that is material, and that results in any cash deposit or other security or any amount of

applicable antidumping or countervailing duties being reduced or not being applied with

respect to the covered merchandise."  19 C.F.R. § 165.1.

Customs' statements are insufficient as a matter of law in at least three respects.

First, Customs' comment that it "does not need to determine any level of culpability only

that evasion occurred with entry" is unclear at best and potentially tautological.  Second,

even if Customs' statement were readily comprehensible, neither the text of the EAPA

statute nor 19 C.F.R. 165.1 supports Customs' statement that it does not need to

establish "any level of culpability."  *See* 19 U.S.C. § 1517(a)(5)(A); 19 C.F.R. § 165.1.

Third, the plain language of Customs' decision does not address the issue of material

*omission*, or material and false statement or act, which is covered both by the statute

and Customs' regulations.

In addition, it is notable that the potential consequences of an evasion finding by

Customs extend far beyond application of the pertinent antidumping duties and include

"such additional enforcement measures as the Commissioner determines appropriate,"

including referring the record to U.S. Immigration and Customs Enforcement for civil or

criminal investigation or initiating proceedings under 19 U.S.C. § 1592 (penalties for

**PUBLIC VERSION**

Court No. 20-00060                                                                                      Page 62

fraud, gross negligence and negligence) and 19 U.S.C. § 1595a (aiding unlawful importation).  19 U.S.C. § 1517 (d)(1)(E).  The fact that there may be additional consequences to an importer from a finding of evasion punctuates the need for Customs to provide a well-buttressed and well-reasoned explanation of its conclusion.

### iii.     Avoiding Applicable Payment of Cash Deposits

As Customs failed to establish that DTT USA entered merchandise by means of a material and false statement or an omission that is material, the court will not turn to the third requirement — paying applicable cash deposits.

Accordingly, the court remands the determination of evasion to Customs for reconsideration to make a finding consistent with this opinion as to whether DTT USA made any material and false statement or act, or material omission.

### 2.     Whether Customs lawfully suspended and extended liquidation of entries that predated December 1, 2017

Plaintiff argues that because Commerce's "covered merchandise" response is based on the results of its circumvention inquiry, any imposition of measures by Customs on DTT USA's entries made before December 1, 2017 — the date of the initiation of the circumvention inquiry — is a "retroactive application of Commerce's affirmative circumvention determination."  Pl. Br. at 19-24.

As the court is remanding, in part, Customs' Final Determination as to evasion, the court declines to address whether the effect of Customs' determination, *i.e.*, Customs' authority to suspend or continue to extend the suspension of liquidation upon an affirmative determination of evasion, is lawful.

**PUBLIC VERSION**

Court No. 20-00060                                                    Page 63

**CONCLUSION AND ORDER**

In the 2020 miniseries, *The Queen's Gambit*, teenage chess prodigy Beth Harmon (portrayed by Anya Taylor-Joy) attends her first professional chess tournament, the Kentucky State Championship.  Unknown and underestimated by the local chess community, Beth surprises everyone at the event by making it to the final match against reigning state champion, Harry Beltik (portrayed by Harry Melling).  During the tense showdown, Beth, flustered in part by Harry's arrogance and seemingly superior chess skills, momentarily steps away from the match to collect herself.  Beth eventually returns to the match with clarity and a strategy to win.  As the game progresses further, it becomes clear that, despite Harry's best efforts, Beth's win is inevitable.  Knowing how the rest of the match will play out, Beth asks Harry: "Do you see it now?  Or should we finish this on the board?"[25]

\* \* \*

In view of the foregoing: (1) the court concludes that Customs did not violate DTT USA's due process rights and sustains Customs' imposition of interim measures;  (2) the court concludes that Customs' finding that DTT USA's entries that pre-dated December 1, 2017, are "covered merchandise" is in accordance with law; and (3) the court remands in part to Customs the Final Determination and Final Administrative Decision.

---

[25] *The Queen's Gambit*: *Exchanges*, NETFLIX (October 23, 2020); https://www.netflix.com/title/80234304

**PUBLIC VERSION**

Court No. 20-00060                                                                                          Page 64

Based on the foregoing reasons, it is hereby

**ORDERED** that Customs' Final Determination of evasion and Final

Administrative Decision are remanded in part to Customs for reconsideration to make a

finding consistent with this opinion as to whether DTT USA made any material and false

statement or act, or material omission; it is further

**ORDERED** that Customs shall file its remand redetermination within 90 days

following the date of this Opinion and Order; it is further

**ORDERED** that, within 14 days of the date of filing of Customs' remand

redetermination, Customs must file an index and copies of any new administrative

record documents; it is further

**ORDERED** that, if applicable, the parties shall file a proposed scheduling order

with page limits for comments on the remand results no later than seven days after

Customs files its remand results with the court.


                                                            /s/ Timothy M. Reif   ,
                                                            Timothy M. Reif, Judge


Dated:  October 29, 2021
            New York, New York