**FINAL REMAND REDETERMINATION**
*Diamond Tools Technology LLC v. United States*
Court No. 20-00060, Slip Op. 21-151 (Court of Int'l Trade, October 29, 2021)
EAPA Case No. 7184

**I.     SUMMARY**

U.S. Customs and Border Protection (CBP) has prepared this final remand redetermination pursuant to the remand order and opinion issued by the U.S. Court of International Trade (the Court) on October 29, 2020 in *Diamond Tools Technology LLC v. United States*, ___ F. Supp. 3d ___, Slip Op. 21-151 (Ct. Int'l Trade 2021) (hereinafter, Remand Order).  This remand concerns CBP's affirmative determination of evasion of the antidumping duty (AD) order on diamond sawblades from the People's Republic of China (China) against Diamond Tools Technology LLC (DTT) pursuant to the Enforce and Protect Act (EAPA).[1] The Court sustained in part and remanded in part CBP's determination as to evasion (September 17 determination) and the administrative review determination.  Specifically, the Court ordered CBP to reconsider whether DTT made any material and false statement or act, or material omission when it imported the subject diamond sawblades into the United States and to issue a new determination consistent with the Court's Remand Order.[2]

As explained below, CBP continues to find that DTT made material false statements, or acts, or material omissions with respect to its entries of diamond sawblades imported prior to December 1, 2017.

---

[1] Notice of Final Determination as to Evasion, September 17, 2019, Confidential Record Document (C.R.) No. 199, (hereinafter, September 17 Determination); Final Administrative Review Determination, Public Record Document (P.R.) No. 232, (hereinafter, Admin. Review); *see also* Diamond Sawblades and Parts Thereof from the People's Republic of China and the Republic of Korea: Antidumping Duty Orders, 74 Fed. Reg. 57145 (November 4, 2009).
[2] Remand Order at 64.

On January 14, 2022, CBP released a draft of this remand redetermination (Draft Remand) to the parties to the investigation. On January 21, 2022, DTT and Diamond Sawblades Manufacturers' Coalition (DSMC) submitted comments on the Draft Remand to CBP.[3] We have addressed parties' arguments in detail below.

## II.   BACKGROUND

On September 17, 2019, CBP issued an affirmative determination of evasion finding that DTT's imports of diamond sawblades were entered into the United States through evasion.[4] CBP found that substantial evidence existed that DTT imported merchandise subject to the AD order on diamond sawblades from China, while falsely declaring on entry documentation the country of origin of Thailand.[5] In making this determination, CBP relied on findings by the Department of Commerce (Commerce), pursuant to CBP's covered merchandise referral, that diamond sawblades assembled in Thailand using Chinese cores and Chinese segments were subject to the AD order.[6] Specifically, CBP found that DTT evaded the AD order with respect to all entries of covered merchandise during the period of the EAPA investigation, beginning on March 1, 2016.[7] CBP determined that the entries that pre-dated December 1, 2017, the date Commerce initiated the anti-circumvention investigation that served as a foundation for Commerce's response to the covered merchandise referral, constituted covered merchandise. CBP further concluded that DTT engaged in evasion when it failed to declare the merchandise as

---

[3] Diamond Tools Technology LLC, Comments on Draft Remand Redetermination, January 21, 2022 (hereinafter, DTT Comments); Diamond Sawblades Manufacturers' Coalition, Written Arguments on Draft Results of Remand, January 21, 2022 (hereinafter, DSMC Comments).
[4] September 17 Determination.
[5] *Id*.
[6] *Id.* at 5; *see also* Department of Commerce Memorandum: Scope Referral Request, July 23, 2019, P.R. 211 (hereinafter, Scope Decision).
[7] September 17 Determination; *see also* Notice of Initiation of Investigation, at 2, June 27, 2017, C.R. 24.

subject to the AD order and failed to pay applicable cash deposits. CBP's Regulations and Rulings Directorate affirmed the findings of the September 17 determination.[8]

### III.  REMANDED ISSUE

The Court upheld CBP's finding that pre-December 2017 entries constituted covered merchandise, but remanded CBP's determinations for CBP to consider whether DTT made material false statements, acts, or omissions with respect to DTT's entries of diamond sawblades entered before December 1, 2017 (i.e., the date Commerce initiated the anti-circumvention proceeding).[9]

On remand, CBP continues to find that DTT made material false statements, acts, or omissions on entries made prior to December 1, 2017, when it entered diamond sawblades assembled in Thailand from Chinese origin materials and did not declare such entries as subject to the AD order at the time of entry.

### 1.  Lack of Intent Requirement in EAPA

19 U.S.C. § 1517(a)(5) defines evasion as follows:

> entering covered merchandise into the customs territory of the United States by means of any document or electronically transmitted data or information, written or oral statement, or act that is material and false, or any omission that is material, and that results in any cash deposit or other security or any amount of applicable antidumping or countervailing duties being reduced or not being applied with respect to the merchandise.[10]

This definition of evasion notably does not include a requirement that CBP find intent prior to reaching a determination of evasion. According to the plain text of the statute, when making a false statement or omission, the importer does not have to have intent to defraud the United

---

[8] Admin. Review.
[9] Remand Order at 64.
[10] 19 U.S.C. § 1517(a)(5).

States or reckless disregard of statutory or regulatory requirements.[11] To the contrary, the statute indicates that if other elements are met, false statements or omissions will subject an importer to a finding of evasion without regard to whether the importer had any intent.[12] CBP enforces other statutes where Congress requires that CBP, in addition to finding whether false statements or omissions occur, also determine whether such false statements or omissions are made with intent.[13] In such statutes, Congress has explicitly defined levels of culpability.[14] Specifically, 19 U.S.C. § 1592(a) provides:

> (1) General Rule
> Without regard to whether the United States is or may be deprived of all or a portion of any lawful duty, tax, or fee thereby, no person, *by fraud, gross negligence, or negligence—*
>     (A) may enter, introduce, or attempt to enter or introduce any merchandise into the commerce of the United States by means of—
>         (i) any document or electronically transmitted data or information, written or oral statement, or act which is material and false, or
>         (ii) any omission which is material.

(emphasis added). The language of section 1592(a)(2) is very similar to the definition of evasion in section 1517(a)(5), with one important distinction. Section 1517(a)(5) does not include a requirement that false statements or omissions are by fraud, gross negligence, or negligence. If Congress had intended to require that, in addition to determining whether covered merchandise was entered into the United States by means of false statements or omissions, CBP must also

---

[11] *See id.*
[12] *Id.*
[13] 19 U.S.C. § 1592 (providing for penalties for fraud, gross negligence, and negligence); *see also* 31 U.S.C. § 3729 (False Claims Act).
[14] 19 U.S.C. § 1592(a) ("no person, by fraud, gross negligence, or negligence—(A) may enter, introduce, or attempt to enter or introduce any merchandise into the commerce of the United States by means of—(i) any document or electronically transmitted data or information, written or oral statement, or act which is material and false…"); *see also* 31 U.S.C. § 3729(a)(1)(G) ("knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government").

determine whether the importer did so intentionally, or without exercise of reasonable care, Congress would have done so, as it did in 19 U.S.C. § 1592.

Such reading of EAPA, as a strict liability statute, is consistent with the purpose of the law, as the purpose of EAPA is to collect antidumping and countervailing duties (CVD) that are due to the U.S. Government, and that the U.S. Government has been deprived of because the importer failed to report its merchandise as subject to an applicable AD/CVD order. EAPA, on its own, does not provide authority for CBP to impose a penalty or an adverse consequence for the importer for such conduct as a punitive measure. If EAPA provided such authority, requiring a finding of intent would be justified. The statute only aims to collect the duties that have been unpaid, in order to make the U.S. Government whole and to level the playing field for the U.S. domestic industry.[15] By comparison, under 19 U.S.C. § 1592, the importer is generally required to pay duties owed and monetary penalties calculated based on the culpability levels defined in the statute; and, whether or not a monetary penalty is assessed, to restore the lawful duties, taxes, and fees.[16] The duties make the government whole, and the penalty punishes the importer for the negligent or fraudulent conduct. Pursuant to section 1592(d), the government is required to prove a violation of section 1592(a) before recovery of duties would be appropriate. Requiring CBP to find that the importer intended to make false statements under EAPA would be duplicative of CBP's authority pursuant to section 1592 and defeat the purpose of EAPA. EAPA only requires payment of duties owed to the government.

---

[15] H.R. Rep. No. 114-114, at 85 (2015) ("timely collection of the antidumping and countervailing duties owed on evading imports is as important or even more important than having the parties involved in evasion subject to penalties or criminal liability.").
[16] 19 U.S.C. § 1592(c) (setting maximum penalty requirements based on levels of culpability) and (d)(requiring payment of duties, taxes, and fees). Under 19 U.S.C. § 1592(d), CBP may also issue a separate demand for payment of duties without assessing penalties.

Moreover, to require a finding of knowledge or intent in a case where CBP has made a covered merchandise referral to Commerce would be inconsistent with the covered merchandise referral process as outlined in the EAPA statute.[17] Importers would inevitably argue that if CBP is unable to determine whether merchandise is subject to an AD or CVD order, the importers also should not be expected to have known that the merchandise was covered at the time of importation and thus did not have any intent to evade the payment of duties, thereby escaping liability for non-payment of duties on entries made during the EAPA period of investigation. Consequently, by virtue of making a scope referral alone, CBP would invalidate effectively every EAPA determination of evasion involving such a referral. To the contrary, the statute requires that CBP stay the deadlines in the EAPA investigation while Commerce determines whether merchandise is in scope, which implies that if Commerce finds that merchandise is covered, CBP will continue the EAPA investigation and may find evasion.[18] Nothing in the statute precludes CBP's ability to find evasion after a covered merchandise referral is made. EAPA creates a mechanism for collecting duties when importers fail to pay AD or CVD duties without regard to intent and provides a process for referral to Commerce in order to effectuate EAPA's ultimate purpose. By its very nature, EAPA is different from 19 U.S.C. § 1592, which already penalizes importers who knowingly or by negligence enter merchandise regardless of whether duties have been paid.

Finally, penalty proceedings following an EAPA investigation are not automatic. While section 1517(d)(1)(E) provides that, after CBP makes a determination of evasion, CBP may initiate proceedings under 19 U.S.C. § 1592 and 19 U.S.C. § 1595a, these are separate

---

[17] 19 U.S.C. § 1517(b)(4).
[18] 19 U.S.C. § 1517(b)(4)(D).

proceedings, with separate regulatory and statutory requirements.[19]  CBP would potentially need to develop additional information and investigate further to determine whether penalties are appropriate.  For example, if the facts uncovered during the EAPA investigation do not support that the importer failed to exercise reasonable care or defrauded the U.S. Government, CBP likely would not issue a penalty under section 1592.  In other words, not all EAPA investigations may result in a penalty action.

    2.    **Commerce's 2006 Issues and Decision Memorandum (IDM) and CBP's Finding of Evasion**

Commerce issued a response to CBP's covered merchandise referral where it found that diamond sawblades assembled in Thailand from Chinese cores and segments constituted covered merchandise.[20]  The Court upheld CBP's finding that the pre-December 2017 entries were covered merchandise.[21]  However, the Court determined that CBP needed to further explain whether DTT engaged in evasion with respect to those entries in light of Commerce's statement in a 2006 *Issues and Decision Memorandum for the Final Determination in the Antidumping Duty Investigation of Diamond Sawblades and Parts Thereof from the People's Republic of China* (hereinafter, 2006 IDM).[22]  In the 2006 IDM, accompanying Commerce's Less Than Fair Value Determination and Final Partial Affirmative Determination of Critical Circumstances: Diamond Sawblades and Parts Thereof from the People's Republic of China, 71 Fed. Reg. 29303 (May 26, 2006), Commerce stated:

> [T]he Department has determined that it is the attachment of cores to segments that gives finished diamond sawblades their essential quality, not the manufacture of diamond segments.  Even though there is a significant

---

[19] 19 USC § 1517(d)(1)(E)(i).
[20] Scope Decision.
[21] Remand Order at 52.
[22] Department of Commerce, *Issues and Decision Memorandum for the Final Determination in the Antidumping Duty Investigation of Diamond Sawblades and Parts Thereof from the People's Republic of China*, May 26, 2002 (2006 IDM).

7

> capital investment also associated with manufacturing diamond segments, given the fact that the attachment process imparts the essential quality of the diamond sawblade, coupled with the substantial capital investment and technical expertise that is required for the attachment process, we continue to find that the country of origin is determined by the location where segments and cores are attached to create finished diamond sawblades.[23]

During the EAPA investigation, DTT cited this finding to argue that DTT was relying on Commerce's statements and did not make false statements when it declared its diamond sawblades assembled in Thailand as non-subject merchandise on entry documents. In the same 2006 IDM however, Commerce addressed the petitioner, Diamond Sawblades Manufacturers' Coalition's concerns regarding potential circumvention.[24] DSMC had argued against an assembly-based country of origin rule, bringing to Commerce's attention the likelihood that the AD order would be circumvented.[25] At that time, Commerce noted that circumvention was a possibility:

> In addition, country of origin determined by the location of segment manufacture would still pose circumvention concerns, as a producer of diamond sawblades could transfer aspects of segment manufacturing to third countries, e.g., shipping pre-mixed bond powder and diamonds to third countries for pressing and baking into segments. In any event, the department retains that statutory authority to address circumvention concerns as appropriate.[26]

While Commerce did not agree with the petitioner when choosing the country of origin methodology, Commerce reserved authority to address circumvention issues as they arose. Because of this language in the 2006 IDM, DTT had notice that transferring aspects of manufacturing to a third country would pose potential circumvention issues. Aware of the risk, DTT started to import diamond sawblades assembled in Thailand with Chinese origin cores and

---

[23] 2006 IDM at 19.
[24] *Id.* at 19.
[25] *Id.* at 17.
[26] *Id.* at 19.

segments. Instead of filing a scope ruling request with Commerce to ensure that its products would not be later deemed to be circumventing the AD order, DTT took the chance and declared the products as not subject to the AD order. As foreseen in the 2006 IDM, Commerce did address circumvention concerns with respect to diamond sawblades assembled in third countries with Chinese materials when CBP initiated an EAPA investigation and asked Commerce whether DTT's diamond sawblades were covered by the order.[27] Commerce aligned its proceeding in response to CBP's covered merchandise referral with the final determination of a concurrent anti-circumvention inquiry, which found that DTT's diamond sawblades were in fact covered by the order.[28] Nothing prevented DTT from requesting a scope ruling from Commerce, and in fact, given Commerce's statement regarding potential circumvention regarding third-country assembly, it would have behooved DTT to do so. Its failure to engage Commerce early on, resulted in an evasion investigation under EAPA. While DTT may argue that it relied on explicit statements by Commerce regarding third-country assembly, its reliance was flawed, because DTT turned a blind eye to subsequent clear statements by Commerce regarding potential circumvention.

    It is one of the foundational principles of customs law that importers are required to exercise reasonable care when making entry or submitting documentation to CBP.[29] Reasonable care in this instance for DTT would have been to ensure that when submitting information to CBP regarding country of origin of DTT's merchandise and applicability of AD duties to its imports, its statements were true and correct. Having notice that third-country assembly could pose circumvention concerns, DTT's blind reliance on Commerce's IDM was not reasonable.

---

[27] *See* Scope Decision.
[28] *Id*.
[29] 19 U.S.C. § 1484 (setting out importer responsibilities and procedures for entry of merchandise).

DTT could have and should have requested a scope ruling and ensured that its statements to CBP on entry documentation, that it was importing non-subject merchandise, were correct. DTT could have also engaged CBP and requested clarification. DTT cannot now be rewarded for its failure to exercise due diligence required by statute from any importer. Such result would create perverse incentive for importers, who would be encouraged to delay seeking clarification from Commerce and CBP with hopes that they would only be liable for duties prospectively and after they have been caught, giving such importers ample time to invent a different scheme to avoid payment of duties.[30] Further, such result would subvert the purpose of EAPA to retroactively capture entries made prior to the commencement of an investigation, as articulated in the statute itself and the legislative history. Sections 1517(e)(2) and (d)(1)(B) explicitly provide that CBP must extend liquidation of any unliquidated entries entered before the date of the initiation of the investigation, and paragraph (d)(1)(D) requires CBP to require cash deposits and assess duties on such entries.[31] Legislative history of EAPA also confirms that Congress considered the issue of retroactive application of EAPA evasion determinations.[32]

Here, DTT failed to request a scope ruling even though it was on notice that Commerce had acknowledged potential circumvention concerns. As a result, DTT imported the diamond sawblades here at issue with entry documentation that was false. CBP's entry procedures require that an importer provide certain information on its entry documentation. Specifically, the

---

[30] *Cf. Sunpreme Inc. v. United States*, 946 F.3d 1300, 1317 (Fed. Cir. 2020) ("customs's yes-or-no answer to whether an order applies does not invade the interpretive province of Commerce. Any other result would significantly limit Customs's ability to perform its statutory role and would encourage gamesmanship by importers hoping to receive the type of windfall that Sunpreme seeks here.").
[31] 19 U.S.C. § 1517(d)(1)(D)(providing that CBP must require cash deposits and assess duties on entries previously extended under subparagraph (d)(1)(B) based on the instructions received from Commerce under subparagraph (d)(2)).
[32] 114 H.R. Rep. No. 376, pp. 189-190 (2015) (compare Senate and House amendments authorizing investigation of evasion of trade remedy laws, both of which provided for assessment of duties for entries made prior to initiation of an investigation).

instructions for filing an entry require that the importer indicate an appropriate code for the type of entry.[33]  The instructions indicate that entries subject to an AD/CVD order must be coded as "03."[34]  The instructions further indicate, that the entry type "01" is reserved for free and dutiable, non-AD/CVD, entries.  Selecting an incorrect entry type constitutes a false statement.  Being aware of Commerce's prior statements regarding possible circumvention by virtue of participating in Commerce's proceedings and without seeking clarification either from CBP or Commerce regarding scope, DTT's failure to declare its pre-December 2017 imports of diamond sawblades as subject to the AD order, i.e., by filing as a type 01 entry, as opposed to a type 03 AD/CVD entry, in light of Commerce's finding that diamond sawblades assembled in Thailand with Chinese cores are covered merchandise, was erroneous and thus constituted a false statement, which was material and resulted in AD duties and cash deposits not being applied to the merchandise.

EAPA authorizes CBP to take action against the entries entered prior to the initiation of the EAPA investigation and during the EAPA investigation when CBP finds substantial evidence of evasion.[35]  In this case, as detailed in the September 17 Determination and the Administrative Review, CBP found that substantial evidence existed that DTT's imported diamond sawblades were manufactured in Thailand using Chinese cores and segments.[36]  Because such diamond sawblades are covered by the AD order, DTT made false statements when it did not declare

---

[33] CBP, ACE Entry Summary Instructions, 2.4a, available at https://www.cbp.gov/sites/default/files/assets/documents/2016-Sep/ace_es_instructions%202.4a%20%2809-02-2016%29.pdf (accessed on January 14, 2022); *see also*, CBP Form 7501, available at https://www.cbp.gov/sites/default/files/assets/documents/2021-Sep/CBP Form 7501.pdf.
[34] CBP Form 7501, CBP Form 7501 Instructions at 1, available at https://www.cbp.gov/sites/default/files/assets/documents/2021-Sep/CBP Form 7501.pdf.
[35] 19 U.S.C. § 1517(d).
[36] September 17 Determination at 9-10; Admin. Review at 10.

merchandise as subject, and thus avoided payment of applicable duties owed to the government. CBP initiated an EAPA investigation against DTT on March 22, 2017.[37] CBP indicated that the period of investigation captured entries entered or withdrawn from warehouse beginning March of 2016 through the pendency of the EAPA investigation.[38] When CBP reached a determination of evasion, pursuant to section 1517(d)(1)(B), CBP extended liquidation of unliquidated entries made prior to March 22, 2017, and suspended liquidation of entries made after that date.[39] Further, consistent with section 1517(d)(1)(D), CBP rate adjusted the entries to require cash deposits and assess applicable duties, according to the instruction by Commerce.[40]

### 3. Comments from Parties to the Investigation

*DTT*

- CBP's Draft Remand does not comply with the Remand Order.

- CBP's interpretation of 19 U.S.C. § 1517(a)(5)(A) that the term "evasion" does not require finding of any level of culpability is inconsistent with the plain language of the statute.[41]

- CBP's reliance on comparing section 1517(a)(5)(A) with 19 U.S.C. § 1592 does not demonstrate that EAPA has no culpability requirement.[42]

- A culpability requirement in EAPA is not inconsistent with the covered merchandise referral process.[43]

---

[37] Notice of Initiation of Investigation, at 2, June 27, 2017, C.R. 24.
[38] *Id*.
[39] September 17 Determination at 10; *see also* 19 U.S.C. § 1517(d)(1).
[40] September 17 Determination at 10; *see also* 19 U.S.C. § 1517(d)(1)(D).
[41] DTT Comments at 5.
[42] DTT Comments at 6-8.
[43] DTT Comments at 9-10.

- Commerce's statement in the 2006 IDM did not put importers on notice regarding potential circumvention issues. Commerce's statement that it retains authority to investigate circumvention cannot be interpreted as imposing a duty on DTT to seek a scope ruling.[44]
- CBP has failed to establish that DTT made a false statement because it reasonably relied on and fully complied with Commerce's country-of-origin determination in the 2006 IDM.[45]

*DSMC*

- DSMC is in full agreement with the Draft Remand and argues that the remand redetermination complies with the Court's Remand Order.
- The EAPA statute does not require intent or culpability, and CBP must only find that a false statement or omission occurred.[46]
- In the 2006 IDM Commerce clearly signaled that the third-country joining operations did not insulate importers from AD duty liability.[47]
- To consider it impossible for DTT to have made a materially false – incorrect – statement in declaring that such goods were not covered merchandise would be inconsistent with the finding that the goods were, in fact, covered merchandise.[48]

**CBP's Position**

CBP disagrees with DTT's comments. Consistent with the Court's Remand Order, CBP reconsidered and further explained whether entries made by DTT prior to December 1, 2017

---

[44] DTT Comments at 10-11.
[45] DTT Comments at 13.
[46] DSMC Comments at 3.
[47] DSMC Comments at 4.
[48] DMSC Comments at 4-5.

were entered through material false statements.  DTT argues that the plain language of section 1517(a)(5)(A) requires a finding of culpability to determine that an importer engaged in evasion.  DTT is mistaken.  The plain meaning of "false" is "Erroneous, wrong."[49]  This definition does not imply that intent is required for a statement to be incorrect.  As explained above, there is simply no language in the EAPA statute requiring CBP to find that an importer made false statements intentionally or with a degree of culpability.  If Congress intended to require a finding of intent or culpability as a prerequisite for finding evasion, Congress would have included the language requiring CBP to do so.  Congress did not.  DTT is reading an intent requirement into the statute where there is none.

DTT further argues that 19 U.S.C. § 1592 requires CBP to determine specific levels of culpability, and the absence of such a specific list of culpability levels in section 1517(a)(5)(A) does not negate a requirement of culpability under EAPA.[50]  DTT is asking that CBP ignore that these are two very different statutory provisions, enacted at different times, for different purposes.  In so doing, DTT again is trying to read an ambiguity into the statute where one simply does not exist.  The plain text of EAPA does not include a list of degrees of culpability, nor does it indicate that CBP must find intent.  The absence of such specific language in the statute indicates that no such provision exists, and it is not an open invitation for DTT to insert this new requirement.  As explained above, the purpose of EAPA, as articulated in the statute itself, is to investigate evasion, which is defined as material false statements, acts or omissions that result in underpayment of duties, and to collect the duties that are owed to the U.S.

---

[49] *False*, Oxford English Dictionary Online, December 2021.  Oxford University Press. https://www.oed.com/view/Entry/67884?rskey=kI3EyO&result=1&isAdvanced=false (accessed January 25, 2022).
[50] DTT Comments at 7.

Government, regardless of whether the importer's actions that resulted in underpayment of duties are intentional.

DTT further argues that Congress enacted EAPA so that, "in addition to the ability to impose penalties under § 1592(a), CBP would have the ability to investigate evasion quickly and 'preserve for collection antidumping and countervailing duties owed on evading imports.'"[51] DTT's statement is correct. EAPA authorized CBP to conduct swift investigations and to collect antidumping and countervailing duties when importers enter merchandise into the United States without the requisite payment. Declaring that no duties are owed, when, in fact, the goods are subject to antidumping and/or countervailing duty orders (and thus, payment of such duties), is a false statement, regardless of whether the importer intended to deceive the government. Under EAPA, the absence of intent to deceive the U.S. Government does not absolve the importer from payment of duties owed on imported merchandise.

DTT also takes issue with CBP's position that an intent requirement is inconsistent with the covered merchandise referral process outlined in the statute, arguing that the purpose of the covered merchandise referral process is to "determine whether the merchandise in question is clearly covered by the scope, defeating any attempt by an importer at the administrative level to argue that it could not have been expected to know its imports were covered merchandise based on CBP's covered merchandise referral alone."[52] DTT is, in fact, attempting to argue that it could not have been expected to know that its imports were covered merchandise. As explained above, if EAPA contained an intent requirement, every importer, like DTT, would have an argument available that it should not be expected to know whether its merchandise is within scope of an AD/CVD order, and as such, when it declared merchandise as non-subject, no false

---

[51] DTT's Comments at 8-9.
[52] DTT's Comments at 9.

statements were made. As a result, a covered merchandise referral, on its own, would undermine an EAPA investigation. More specifically, any investigation would be confined by the timeframe it requires CBP to refer the matter to Commerce and, in essence, CBP's authority to investigate evasion when there is a scope issue involved would be limited. Consequently, whenever CBP issues a covered merchandise referral to Commerce, CBP would be required to reach a negative determination of evasion for the entries made prior to the covered merchandise referral and defer to Commerce's authorities on treatment of entries that are made after the covered merchandise referral. EAPA contains no such obligation for CBP. In fact, the statute requires that CBP stay the deadlines of an EAPA investigation, while the covered merchandise referral is pending with Commerce.[53] Further, such outcome would controvert the retroactive nature of EAPA investigations as articulated in sections 1517(d)(1)(B) and (e)(2)[54] and would run counter to the holding by the U.S. Court of Appeals for the Federal Circuit in *Sunpreme*, which found that CBP was "both empowered and obligated to determine in first instance whether goods are subject to existing antidumping and countervailing orders," and that "[CBP's] authority and responsibility to determine whether [the orders] apply did not dissipate because an order lacks perfect clarity."[55]

DTT argues that Commerce's statement in the 2006 IDM, that it retained authority to address circumvention issues, did not put importers on notice regarding potential circumvention issues associated with joining operations in a third country.[56] DTT states that it followed

---

[53] 19 U.S.C. § 1517(b)(4)(C).
[54] 19 U.S.C. § 1517(d)(1)(B)(authorizing CBP to extend liquidation of entries made prior to the initiation of the investigation upon finding substantial evidence of evasion); 19 U.S.C. §1517(e)(2)(authorizing CBP to extend liquidation of entries made prior to the initiation of investigation as part of interim measures)
[55] *Sunpreme Inc. v. United States*, 946 F.3d 1300, 1317 (Fed. Cir. 2020).
[56] DTT's Comments at 10-11.

Commerce's explicit instruction to declare the location of joining cores with segments as the country of origin. As discussed above, Commerce specifically stated that transferring production to third countries using Chinese materials could pose potential circumvention concerns. DTT's reliance on Commerce's country of origin determination, to declare its goods as not subject to the AD order, was not reasonable, because DTT ignored a key aspect of the country of origin determination – that third country assembly using Chinese materials could pose potential circumvention concerns. Instead of confronting this issue up front and resolving potential issues associated with the third country joining operations using Chinese components by requesting a scope ruling, DTT shifted the burden to CBP and Commerce to discover the true nature of DTT's operations. As discussed above, now, when Commerce confirmed that DTT's practice of joining Chinese-origin cores and segments in Thailand in fact constituted circumvention of the AD order, DTT cannot be rewarded for its willful ignorance and failure to utilize the tools it had available all along to determine whether the goods it was importing into the United States were subject to the AD order.

DTT also claims that it did not have a duty to disclose that the diamond sawblades it imported were made with Chinese cores and segments in Thailand, and thus subject to AD duties. Under 19 U.S.C. § 1484, all importers have a duty to ensure that the information provided on entry documentation is correct. In this case, the information that DTT provided to CBP, that it was importing merchandise that was not subject to AD duties, was incorrect. As a result, DTT made false statements to CBP when it declared that no AD duties were owed on the diamond sawblades imported from Thailand prior to December 1, 2017.

IV. **CONCLUSION**

In accordance with the Court's Remand Order, in this remand redetermination, we have analyzed the issues CBP was instructed to reconsider or further explain. CBP provided an opportunity to the parties to the investigation to submit written arguments in response to the Draft Remand and has addressed those arguments. CBP has considered and further explained whether DTT made false statements when it entered merchandise prior to December 1, 2017 without declaring merchandise as subject to the AD order on diamond sawblades on entry documentation and continues to find that DTT's pre-December 1, 2017 entries were entered into the United States through evasion.

**BRIAN M HOXIE**
Digitally signed by BRIAN M HOXIE
Date: 2022.01.27 14:24:43 -05'00'

Brian M. Hoxie

Director
Enforcement Operations Division
Trade Remedy Law Enforcement Directorate
Office of Trade
U.S. Customs and Border Protection

**ALICE A KIPEL**
Digitally signed by ALICE A KIPEL
Date: 2022.01.27 16:04:47 -05'00'

Alice A. Kipel

Executive Director
Regulations and Rulings
Office of Trade
U.S. Customs and Border Protection