**PUBLIC DOCUMENT**

**FINAL REMAND REDETERMINATION**
*Diamond Tools Tech. LLC v. United States*
Court No. 20-00060, Slip Op. 22-145 (Ct. of Int'l Trade, December 16, 2022)
EAPA Case No. 7184
March 16, 2023

## I.   SUMMARY

U.S. Customs and Border Protection (CBP) issues this final remand redetermination

pursuant to the remand order and opinion issued by the U.S. Court of International Trade (CIT or

the Court) on December 16, 2022, in *Diamond Tools Tech. LLC v. United States*, ___ F. Supp.

3d ___, Slip Op. 22-145 (Ct. Int'l Trade 2022) (hereinafter, *Diamond Tools II*).  This action

arises out of CBP's affirmative determination of evasion of the antidumping duty (AD) order on

diamond sawblades from the People's Republic of China (China) against Diamond Tools

Technology LLC (DTT) under the Enforce and Protect Act (EAPA).[1]  On January 27, 2022, in

accordance with the CIT's first remand order in *Diamond Tools I*,[2] CBP issued its First Remand

Redetermination, in which CBP continued to find that DTT made material and false statements

or acts, or material omissions, with respect to merchandise entered prior to December 1, 2017.[3]

---

[1] Notice of Final Determination as to Evasion, September 17, 2019, Confidential Record Document
(C.R.) No. 199 (hereinafter, September 17 Determination); Final Administrative Review Determination,
Public Record Document (P.R.) No. 232 (hereinafter, Administrative Review); 19 U.S.C. § 1517; *see also
Diamond Sawblades and Parts Thereof from the People's Republic of China and the Republic of Korea:
Antidumping Duty Orders*, 74 Fed. Reg. 57145 (Dep't Commerce November 4, 2009).
[2] *See Diamond Tools Tech. LLC v. United States*, 545 F. Supp. 3d 1324 (Ct. Int'l Trade 2021).
[3] *See* Final Remand Redetermination pursuant to *Diamond Tools Tech. LLC v. United States*, 545 F.
Supp. 3d 1324 (Ct. Int'l Trade 2021), EAPA Case No. 7184, January 27, 2022, ECF 70 (hereinafter, First
Remand Redetermination).

DTT continued to contest CBP's findings in the First Remand Redetermination in comments filed with the CIT.[4]  Ultimately, in *Diamond Tools II*, the Court remanded the First Remand Redetermination, after concluding that CBP failed to provide an adequate explanation as to its finding that DTT made a material and false statement or act, or a material omission.[5]  The Court found that in light of DTT's reliance on language from the Department of Commerce's (Commerce) decision memorandum issued in 2006, DTT's failure to declare that the merchandise was subject to the AD Order did not constitute a material and false statement under EAPA.[6]  Thus, the CIT directed CBP to issue a new determination "reconsider{ing} its conclusion consistent with this decision and the facts of this case and, in particular, the applicability of the EAPA in the confined circumstance of an importer's reliance on Commerce's clear directive."[7]

Based on the Court's instructions, we have reconsidered, under respectful protest,[8] whether DTT made false statements, acts, or omissions on its entries made prior to December 1, 2017.  As described further below, and in order to comply with the CIT's holdings and the remand order in *Diamond Tools II*, we determine, under respectful protest, that DTT did not evade the AD Order when it imported diamond sawblades assembled in Thailand with Chinese cores and segments, prior to December 2017.

---

[4] Plaintiff's Comments in Opp'n to the Final Results of Redetermination Pursuant to Court Remand, Feb. 28, 2022, Court No. 20-00060, ECF No.77.
[5] *Diamond Tools II* at 10.
[6] *Id.* at 21.
[7] *Id.* at 22.
[8] We are issuing this redetermination under protest because, as explained herein, we respectfully disagree with this Court's interpretation of the EAPA statute and the interplay of Commerce's authorities with those of CBP.  *See Viraj Group, Ltd. v. United States*, 343 F.3d 1371 (Fed. Cir. 2003) (holding that the Government had standing to appeal, because even though it was technically a prevailing party, it had only prevailed because it acquiesced and abandoned its original position, which it had zealously advocated, and adopted under protest a contrary position forced upon it by the Court).

On February 27, 2023, CBP issued a draft version of this remand redetermination to the parties to the investigation.  On March 8, 2023, DTT and Diamond Sawblades Manufacturers Coalition (DSMC) submitted written comments to the draft remand redetermination.[9]  We address the parties' arguments below.

## II.     BACKGROUND

On September 17, 2019, CBP issued an affirmative determination of evasion finding that DTT's imports of diamond sawblades were entered into the United States through evasion.[10]  As relevant to this remand proceeding, CBP found that substantial evidence existed that DTT imported merchandise subject to the AD Order on diamond sawblades from China and falsely declared on entry documentation that the merchandise was not subject to the order by filing its entries as Type "01" consumption entry instead of Type "03" antidumping and countervailing duty (AD/CVD) entry.[11]  During the investigation, pursuant to its authority under 19 U.S.C. § 1517(b)(4), CBP submitted a covered merchandise referral to Commerce to determine whether DTT's diamond sawblades assembled in Thailand with Chinese cores and segments constituted covered merchandise.[12]  In response to the Covered Merchandise Referral, Commerce found that DTT's diamond sawblades assembled in Thailand using Chinese cores and Chinese segments were subject to the AD Order.[13]  Commerce noted that it aligned the determination in response to

---

[9] DTT, Comments to the Draft Second Remand Redetermination, March 8, 2023 (hereinafter, DTT Comments); Comments from Defendant Intervenor, Diamond Sawblades Manufacturers' Coalition (DSMC) on CBP Draft Remand Determination, March 8, 2023 (hereinafter, DSMC Comments).
[10] September 17 Determination.
[11] *Id*.
[12] Scope Referral Request for merchandise under EAPA Investigation 7184, imported by Diamond Tools Technology LLC and concerning the investigation of evasion of the antidumping duty order on diamond sawblades from the People's Republic of China (A-570-900), November 21, 2017, P.R. 184 (hereinafter, Covered Merchandise Referral).
[13] Department of Commerce Memorandum: Scope Referral Request, July 23, 2019, P.R. 211 (hereinafter, Scope Decision).

CBP's Covered Merchandise Referral with a concurrent anticircumvention inquiry involving DTT's merchandise.[14]  CBP relied on Commerce's Scope Decision and found that DTT evaded the AD Order with respect to all entries of covered merchandise during the period of the EAPA investigation, beginning on March 1, 2016 and ending on September 17, 2019.[15]  CBP concluded that DTT engaged in evasion when it failed to declare the merchandise as subject to the AD Order and failed to pay applicable cash deposits.[16]  On Administrative Review, CBP's Regulations and Rulings Directorate affirmed the findings of the September 17 Determination.[17]

DTT challenged CBP's determination before the CIT, and on October 29, 2021, in *Diamond Tools I*, the Court upheld CBP's finding that DTT's entries made prior to December 1, 2017, i.e., the date Commerce initiated its anticircumvention inquiry,[18] constituted covered merchandise, but remanded CBP's determination for CBP to consider whether DTT made material false statements, acts, or omissions with respect to DTT's entries of diamond sawblades entered before December 1, 2017.[19]  The Court instructed CBP to provide further analysis on DTT's legal obligation to seek a scope ruling from Commerce or clarification from CBP as to whether DTT's products were within the scope of the AD Order in light of Commerce's statements in a 2006 Issues and Decision Memorandum (2006 IDM).[20]  Specifically, the Court

---

[14]  Scope Decision at 1; *Diamond Sawblades and Parts Thereof from the People's Republic of China: Final Determination of Anticircumvention Inquiry*, 84 Fed. Reg. 33920 (Dep't Commerce July 16, 2019) (P.R. 210) and accompanying Issues and Decision Memorandum (P.R. 208).
[15] September 17 Determination; *see also* Notice of Initiation of Investigation on Diamond Tools Technology LLC and Determination as to Reasonable Suspicion, EAPA Case No. 7184, June 27, 2017 (C.R. 24) at 2.
[16] September 17 Determination.
[17] Administrative Review.
[18] In *Diamond Sawblades and Parts Thereof from the People's Republic of China: Final Determination of Anticircumvention Inquiry*, 84 Fed. Reg. 33920 (Dep't Commerce July 16, 2019) (P.R. 210), Commerce instructed CBP to continue suspension of liquidation of entries made after December 1, 2017, which was the date Commerce initiated its anticircumvention inquiry.  However, Commerce did not include this date in the Scope Decision.
[19] *Diamond Tools I*, 545 F. Supp. 3d at 1356.
[20] *Id.* at 1352.

highlighted Commerce's determination in the 2006 IDM that the country of origin of diamond sawblades would be the place of joining cores and segments.[21]  Although the Court's holding in *Diamond Tools I* did not expressly instruct CBP to find that DTT did not make false statements with respect to its pre-December 2017 entries, it ordered CBP to provide a "well-reasoned" explanation for its position that DTT entered such merchandise into the United States through evasion.[22]

In the First Remand Redetermination, CBP maintained its position that DTT made material and false statements or acts, or material omissions, with respect to the subject diamond sawblades entered prior to December 1, 2017.[23]  In reaching this decision, CBP analyzed Commerce's 2006 IDM, in particular Commerce's acknowledgment of potential circumvention in the future,[24] and concluded that DTT made false statements on the entry documentation when it failed to declare its merchandise as subject to the AD Order.[25]  CBP explained its interpretation of the EAPA statute, the plain language of which does not require CBP to find knowledge or any level of culpability in order to determine whether the importer made false statements, acts, or omissions.[26]  CBP further reasoned that requiring it to analyze the importer's state of mind at the time of importation would be inconsistent with the covered merchandise referral process as outlined in the statute, because otherwise, "by virtue of making a scope referral alone, CBP would invalidate effectively every EAPA determination of evasion involving

---

[21] *Id.* at 1352.
[22] *Id.* at 1355.
[23] First Remand Redetermination.
[24] *Final Determination of Sales at Less Than Fair Value and Final Partial Affirmative Determination of Critical Circumstances: Diamond Sawblades and Parts Thereof from the People's Republic of China*, 71 Fed. Reg. 29303 (Dep't Commerce May 22, 2006) and accompanying Issues and Decision Memorandum.
[25] First Remand Redetermination at 7-12.
[26] *Id.* at 3-7.

such a referral."[27]  Finally, CBP concluded, that importers are required to provide correct

information to CBP, and having notice that third-country assembly would pose circumvention

concerns, DTT should have sought a scope ruling from Commerce or a clarification from CBP.[28]

In *Diamond Tools II*, the Court concluded that the First Remand Redetermination did not

comply with the Court's remand order as it failed to provide an adequate explanation that DTT

made a material and false statement or act, or material omission.[29]  The Court found CBP's

interpretation of the EAPA statute unpersuasive, and held that "filling out the forms in a way that

tracked explicitly Commerce's IDM, does not constitute a material and false statement or

omission."[30]  The Court concluded that Commerce's determination was "unequivocal and left no

doubt as to the meaning of the precise scope of the AD Order in this case."[31]

The Court also rejected CBP's explanation that EAPA is a strict liability statute, holding

such interpretation to be unsupported by the language of the statute or legislative history.[32]  The

Court stated that the "statutory requirement — the second of three — would exist perforce every

time Customs found that the statutory requirement of merchandise being "covered" — the first of

three — was found by Customs to exist."[33]  The CIT stated that "such an application of the

statute would violate the canons of statutory construction."[34]  The Court held that DTT USA's

entry of diamond sawblades as Type "01" instead of Type "03" does not constitute a material

and false statement under EAPA.[35]  On remand, the Court directed CBP "to reconsider its

---

[27] *Id.* at 6.
[28] *Id.* at 9.
[29] *Diamond Tools II* at 10.
[30] *Id.* at 17.
[31] *Id.* at 14.  The Court further noted that Commerce expressly rejected the petitioners' argument that third country assembly rule of country of origin presented circumvention concerns.
[32] *Id.* at 16.
[33] *Id.*
[34] *Id.*
[35] *Id.* at 21.

conclusion consistent with this decision and the facts of this case and, in particular, the applicability of the EAPA in the confined circumstance of an importer's reliance on Commerce's clear directive."[36]

## III.   ANALYSIS

Consistent with the Court's reasoning in *Diamond Tools II*, under respectful protest, we find that, in light of the Court's interpretation of Commerce's 2006 IDM, DTT did not make false statements with respect to its pre-December 1, 2017 entries, and thus did not engage in evasion when it entered diamond sawblades assembled in Thailand with Chinese components into the United States without declaring such merchandise as subject to the AD Order.

The entries subject to the EAPA investigation are those entered for consumption, or withdrawn from warehouse for consumption, by DTT, from March 1, 2016 to September 17, 2019.[37]  The only entries remaining in dispute at this point in litigation are those entered by DTT between March 1, 2016 to December 1, 2017.[38]  In its September 17 Determination, CBP found that DTT's entries contained diamond sawblades that were assembled in Thailand using cores and segments made in China.[39]  DTT did not declare those entries as subject to the AD Order.[40]

The Court found that in filing those pre-December 1, 2017 entries, DTT was acting consistent with Commerce's prior interpretation of the scope of the AD Order, articulated during the original antidumping investigation by Commerce.[41]  The 2006 IDM provided analysis on various issues brought up by the interested parties in the investigation of diamond sawblades and

---

[36] *Id.* at 22.
[37] *See* September 17 Determination; *see also* Notice of Initiation of Investigation at 2, June 27, 2017, C.R. 24.
[38] *See generally Diamond Tools I and Diamond Tools II.*
[39] September 17 Determination at 8.
[40] *Id.* at 9-10.
[41] *Diamond Tools II* at 14.

parts thereof from China, including the country of origin methodology for diamond sawblades.[42]

Specifically, Commerce stated in the 2006 IDM:

> Even though there is a significant capital investment also associated with manufacturing diamond segments, given the fact that the attachment process imparts the essential quality of the diamond sawblade, coupled with the substantial capital investment and technical expertise that is required for the attachment process, we continue to find that the country of origin is determined by the location where segments and cores are attached to create finished diamond sawblades.[43]

The Court in *Diamond Tools II* found that "Commerce's words were unequivocal and left no doubt as to the meaning of the precise scope of the AD Order in this case."[44]  The Court further concluded that the 2006 IDM was a "core public decisional document to explain to the parties and the public the scope of the {AD Order} that was still in effect when DTT classified its covered merchandise at the time of entry prior to the circumvention determination that later changed the scope of the Order."[45]  The Court also emphasized the limited nature of its holding, ordering CBP to reconsider "applicability of the EAPA in the *confined circumstance* of an importer's reliance on Commerce's clear directive."[46]

In the limited set of facts applicable to DTT's pre-December 1, 2017 entries and the Court's December 16, 2022 opinion in *Diamond Tools II*, under respectful protest, CBP finds that DTT did not make false statements, and thus its actions do not constitute evasion under EAPA.  As mentioned above, Commerce determined that country of origin of diamond sawblades would be determined by the place where cores and segments were joined.[47]  DTT's diamond sawblades were assembled in Thailand where its manufacturing operation consisted of

---

[42] *See generally* 2006 IDM.
[43] 2006 IDM at 19.
[44] *Diamond Tools II* at 14.
[45] *Id.* at 15.
[46] *Id.* at 22 (emphasis added).
[47] 2006 IDM at 19.

joining Chinese-origin cores and Chinese-origin segments to produce finished diamond sawblades.[48]  DTT's filing of entries as Type "01" is consistent with the country of origin methodology outlined in the 2006 IDM, and to the extent that methodology is deemed controlling, was not a false statement.  While Commerce later confirmed that DTT's diamond sawblades assembled in Thailand with Chinese cores and segments were indeed covered merchandise, and the Court in *Diamond Tools I* upheld CBP's finding that all entries subject to the EAPA investigation, including pre-December 1, 2017 entries, contained covered merchandise, filing of entries as Type "01" as opposed to Type "03" at that time was not false, because DTT was acting under the country of origin methodology effective at the time of the entry.  CBP notes that this finding is limited to the unique set of facts presented in this case and is issued under the Court's instruction in its December 16, 2022 opinion in *Diamond Tools II* – that is, the fact that the importer is considered to have relied on the "clear directive" from Commerce.[49]  If not for the statements by Commerce on country of origin methodology, which the Court found that DTT relied on, CBP would have concluded that DTT made false statements at the time of entry, because the Court held that DTT's pre-December 1, 2017 entries constituted covered merchandise.[50]  Further, CBP wishes to emphasize that in *Diamond Tools I*, the Court held that CBP is not bound by Commerce's regulatory timelines in a later circumvention determination, and any other result "would restrict Customs' authority to find that DTT USA's pre-December 2017 entries were 'covered merchandise,' thereby limiting Customs' enforcement authority under the EAPA with regard to those entries."[51]

---

[48] September 17 Determination at 8.
[49] *Diamond Tools II* at 22.
[50] *Diamond Tools I*, 545 F. Supp. 3d at 1351.
[51] *Id*.

Accordingly, consistent with the Court's reasoning, we find, under respectful protest, that DTT did not make false statements with respect to its pre-December 1, 2017 entries of diamond sawblades.

We are issuing this remand redetermination under protest because we respectfully disagree with the Court's interpretation of the EAPA statute and the 2006 IDM.  In addition to the arguments presented in the First Remand Redetermination, we offer the following support for our position.

*Diamond Tools I and II's Reliance on the 2006 IDM*

In the First Remand Redetermination, CBP analyzed the 2006 IDM only because the Court, in *Diamond Tools I*, instructed CBP to explain whether DTT made false statements in light of the 2006 IDM.  CBP respectfully disagrees with the Court's interpretation of the 2006 IDM and its finding that the 2006 IDM was applicable to DTT's products and that it "left no doubt as to the meaning of the precise scope of the AD Order in this case."[52]  We also respectfully disagree with the Court's finding that the 2006 IDM was a "clear and precise scope determination regarding country of origin."[53]  As explained further below, the 2006 IDM did not answer the question presented in this case, which is whether DTT's merchandise was subject to the AD Order.

CBP maintains that the 2006 IDM is of little importance in this EAPA investigation.  As Commerce explained in the issues and decision memorandum accompanying the final determination of the anticircumvention inquiry[54] which served as the basis for Commerce's

---

[52] *Diamond Tools II* at 14.
[53] *Id.* at 21.
[54] Diamond Sawblades and Parts Thereof from the People's Republic of China: Issues and Decision Memorandum for the Final Determination of the Anticircumvention Inquiry (Dep't Commerce July 10, 2019), P.R. 208 (hereinafter, July 2019 IDM).

response to CBP on its Covered Merchandise Referral,[55] the specific facts of this case were not considered in the 2006 IDM.  Commerce is clear that, in 2006, it conducted a substantial transformation analysis to determine country of origin of diamond sawblades, which, as Commerce pointed out, is different from the analysis required to determine whether the product is circumventing the AD Order.[56]  Commerce further stated, that the substantial transformation analysis in the 2006 IDM was based on the record of that investigation, and the information supplied by the respondents in that investigation.[57]  In other words, Commerce itself distinguished the country of origin finding in the 2006 IDM from the circumvention investigation conducted in 2019.  Since the results of the anticircumvention inquiry served as the basis for Commerce's Scope Decision, Commerce's reasoning distinguishing the 2006 IDM applies to the Scope Decision transmitted to CBP.  As a result, for purposes of the determination whether DTT's merchandise constitutes covered merchandise within the meaning of EAPA, according to Commerce's own words, the 2006 IDM has little weight.

The findings in the 2006 IDM with respect to country of origin are of little importance as to whether DTT made false statements with respect to pre-December 1, 2017 entries under EAPA.  For the same reasons as to why the 2006 IDM is not controlling on whether DTT's entries constituted covered merchandise, DTT cannot rely on the 2006 IDM to argue that it did not make false statements to CBP when it made pre-December 1, 2017 entries.  As the 2006 IDM was based on the information submitted to Commerce by respondents to that investigation, the country of origin finding in that document was not controlling as to whether DTT's specific imports constituted covered merchandise at the time DTT made the entries.  In the 2006 IDM,

---

[55] *See* Scope Decision at 1.
[56] July 2019 IDM at 13.
[57] *Id*.

Commerce only outlined the methodology of determining country of origin, not whether DTT's

sawblades assembled in Thailand with Chinese cores and segments were covered by the AD

Order.  The question presented to Commerce in 2006 – how to determine country of origin of

diamond sawblades – was different from the question presented in 2019, which was whether

DTT's specific merchandise was covered merchandise by means of circumvention.[58]

Commerce's 2019 anticircumvention determination did not change the contents of the 2006

IDM, or characterize them in a new light.  The 2006 IDM was always based on the record of that

investigation, and it is a decision on substantial transformation, not a determination on whether

DTT's diamond sawblades were covered merchandise.

 The 2006 IDM was not a definitive scope ruling that DTT's merchandise at issue in this

case was outside of scope.  As a result, the proposition that DTT was acting under the

instructions provided by Commerce in the 2006 IDM is incorrect, because Commerce never gave

such instructions to DTT.  That the 2006 IDM was a publicly-facing document did not make it

applicable to a different set of facts (namely, those specific to DTT's situation, a decade later),

addressing a different legal question (circumvention and scope, versus country of origin).  Thus,

DTT cannot rely on the 2006 IDM to argue that it did not make false statements to CBP.  At the

time DTT imported its merchandise into the United States, DTT was charged with knowing the

significance of the 2006 IDM – that it was only a decision on substantial transformation.  As

---

[58] *See* July 2019 IDM at 10 ("{O}ur finding in the investigation that laser welding imparts a substantial transformation does not undermine our finding that laser welding is minor or insignificant in the anti-circumvention context because of the distinct purposes of the two analyses and the separate factors considered.  The substantial transformation test asks whether, as a result of manufacturing or processing, the product loses its identity and is transformed into a new product having a new name, character and use. In contrast, section 781(b) of the Act focuses on the extent of processing applied to subject merchandise in a third country and whether such processing is minor or insignificant such that performing this processing in a third country can reasonably be moved across borders, thereby allowing parties to change the country of origin and avoid the discipline of an order.") (internal quotation marks omitted).

CBP found in the Administrative Review and the First Remand Redetermination, DTT made false statements when it declared the merchandise as not subject to the AD Order, and filed the entries as Type "01" instead of Type "03."

*Diamond Tools I and II's Interpretation of the EAPA Statute*

EAPA does not require CBP to analyze or consider an importer's state of mind to determine whether false statements were made.  Imposing such a requirement on CBP is inconsistent with the plain language of the definition of "evasion" as provided in the statute, the investigation procedure outlined in EAPA, and the Congressional intent outlined in the legislative history of EAPA.

As CBP analyzed in the First Remand Redetermination, EAPA does not contain a knowledge or a culpability element.[59]  However, the holding in *Diamond Tools II* necessitates that CBP must investigate and analyze the importer's state of mind at the time of importation. Under section 1517(a)(5), in order to find evasion, CBP must only find that covered merchandise was entered into the United States by means of false statements, acts or omissions, and results in any cash deposit or other security or any amount of applicable antidumping or countervailing duties being reduced or not applied.[60]  The statute makes no mention of an importer's intent or culpability.  In *Diamond Tools I*, the Court held that CBP reasonably interpreted EAPA to allow CBP to find that Commerce's determination that imported sawblades were "covered merchandise" under the antidumping order had no temporal limitation.[61]  More specifically, the

---

[59] First Remand Redetermination at 3-7.
[60] *Id.* at 3-4; 19 U.S.C. § 1517(a)(5) ("'evasion' refers to entering covered merchandise into the customs territory of the United States by means of any document or electronically transmitted data or information, written or oral statement, or act that is material and false, or any omission that is material, and that results in any cash deposit or other security or any amount of applicable antidumping or countervailing duties being reduced or not being applied with respect to the merchandise.").
[61] *Diamond Tools I*, 545 F. Supp. 3d at 1350-1351.

Court held that DTT's diamond sawblades entered before December 1, 2017 were covered merchandise under EAPA, regardless of the requirements that Commerce's regulatory timelines place on Commerce's authority to require CBP to suspend liquidation.[62]  In *Diamond Tools I*, the Court also held that the word "false" means "Untrue ... Deceitful ... Not genuine; inauthentic ... What is false can be so by intent, by accident, or by mistake ... Wrong; erroneous...."[63]  Whether a statement is false is a binary determination.  A statement is either false or accurate, regardless of the state of mind of a person making such statement.  Since under the Court's holding the merchandise that DTT entered prior to December 1, 2017 constituted covered merchandise, it must follow that entry of such merchandise without declaring it as subject to the AD Order was untrue, wrong, and, erroneous, whether it was done by accident, intent, or mistake.

The finding that pre-December 1, 2017 entries are covered merchandise, is intertwined with a finding as to whether declaring such merchandise as not subject to the AD Order is a false statement.  Under *Diamond Tools I*'s holding, it is a fact that DTT imported covered merchandise between March 1, 2016 and December 1, 2017.  It is also a fact that DTT did not declare to CBP that the entries contained covered merchandise.  As such, the declaration of those entries as non-subject to the AD Order was incorrect.  Taking into consideration the assumptions that DTT was acting on when it made pre-December 1, 2017 entries, requires CBP to determine DTT's state of mind, or scienter.  In other words, accepting that DTT was acting under the assumption that its entries were not subject to the AD Order under the country of origin methodology outlined in the 2006 IDM requires CBP to find that DTT did not know, or that it failed to exercise reasonable care to find out, that it was importing covered merchandise. However, EAPA does not require CBP to make that finding and investigate whether or not an

---

[62] *Id.*
[63] *Id.* at 1353 (citing Black's Law Dictionary).

importer knows that it is making a false statement or that it failed to exercise reasonable care to

ascertain correctness of information provided to CBP.[64]  EAPA also does not require CBP to

collect evidence about what factual information an importer had available to it at the time of

entry.[65]  In order to find that DTT made false statements, *Diamond Tools II* is requiring CBP to

investigate and consider DTT's state of mind at the time of importation, and the information that

was available to it at that time.  In essence, CBP must find that DTT did not make false

statements because it did not *know* that its merchandise was subject to the AD Order.  This is a

burden that the plain language of EAPA does not impose on CBP.  Not only is such analysis not

required by the EAPA statute, but it curtails CBP's ability to administer EAPA investigations in

the swift and efficient manner that Congress mandated.[66]

     The requirement to analyze the importer's state of mind is inconsistent with the

procedure expressly outlined in EAPA.  If CBP is required to analyze the importer's state of

mind at the time of entry, CBP can never find evasion when there is a covered merchandise

referral in an EAPA investigation.  As CBP pointed out in its First Remand Redetermination, a

knowledge or intent finding in a case where CBP has made a covered merchandise referral is

inconsistent with the covered merchandise referral process outlined in the statute.[67]  Importers

could escape an evasion determination under EAPA, and thus payment of duties owed, by simply

arguing that, at the time of importation, they did not know that Commerce would later find their

merchandise to be subject to an AD or a CVD order or in circumvention of such order.[68]  This

would incentivize importers to refrain from seeking a scope ruling prior to importing goods

---

[64] *See* 19 U.S.C. § 1517(a)(5).
[65] *See id*.
[66] *See* H.R. Rep. No. 114-114 (2015) at 387.
[67] First Remand Redetermination at 6.
[68] *Id.* at 6.

subject to an AD or CVD order until CBP initiates an EAPA investigation, thereby allowing for an opportunity to manipulate CBP's ability to find evasion.  As stated in the First Remand Redetermination, by virtue of submitting a covered merchandise referral to Commerce, CBP would invalidate its determination of evasion in every EAPA investigation involving such referral.[69]  Thus, in requiring that CBP consider an importer's state of mind, in the context of the timeframe of the entries relative to another agency's independent legal authorities, creates a loophole in the EAPA statute that benefits those seeking to evade the antidumping and countervailing duty laws of the United States.  As we maintained in the First Remand Redetermination, pursuant to 19 U.S.C. § 1592, CBP already has the authority to investigate importers that make false statements to CBP with culpability, i.e., negligence, gross negligence, and fraud.[70]

The legislative history of EAPA indicates that Congress intended EAPA to be an additional tool in CBP's enforcement authorities to address AD/CVD evasion.  The purpose of EAPA was to prevent evasion by allowing CBP to take swift action against allegations of evasion.  In passing the EAPA, Congress recognized the negative impact that evasion had on enforcement of AD/CVD laws and the challenges experienced by CBP to collect the duties, stating that "CBP does not currently adequately protect the United States from evasion of {AD/CVD} orders" and that the statute would provide CBP "tools to counteract the detrimental effect" of evasion.[71]  Congress noted that "timely collection of the antidumping and countervailing duties owed on evading imports is as important or even more important than

---

[69] *Id.*
[70] First Remand Redetermination at 4-5 (comparing 19 U.S.C. § 1592(a) with 19 U.S.C. § 1517(a)(5)).
[71] S. Rep. No. 114-45 (2015) at 37.

having the parties involved in evasion subject to penalties or criminal liability."[72]  Congress also

emphasized the importance of requiring CBP to act quickly when investigating evasion:

> There appears to be growing consensus that {EAPA} is the appropriate
> way to address allegations of evasion.  Prior efforts to require Customs to
> enforce these allegations by using existing statutory provisions (e.g.,
> Section 516 of the Tariff Act of 1930) have failed by not requiring
> Customs to act on a petition within a fixed period of time.  The longer
> Customs takes, the more entries are liquidated—that they become final,
> and any additional duties owing are foregone.[73]

Building evidence on scienter requires time and investigative resources that the EAPA

statute did not provide to CBP.[74]  Requiring CBP to build evidence during the investigation as to

the importer's state of mind at the time of importation conflicts with the clear pronouncements

by Congress on the purpose of the EAPA statute – to take swift action against evasion and to

collect antidumping and countervailing duties owed.  Congress specifically did not include in the

plain language of EAPA that CBP must evaluate the importer's state of mind, scienter, or level

of culpability.

*CBP Has Inherent and Independent Legal Authority to Suspend Liquidation of Entries*

*Diamond Tools II* is also inconsistent with the Federal Circuit's decision in *Sunpreme*

*Inc. v. United States*, 946 F.3d 1300 (Fed. Cir. 2020) (en banc).  *Sunpreme* held that CBP has the

authority to suspend liquidation of entries of goods when it determines that the goods fall within

the scope of an ambiguous antidumping or countervailing duty order.[75]  The appeals court found

that CBP is, by law, required to make individual "product-by-product" decisions for every

imported product to determine whether that product falls within the scope of an antidumping or

---

[72] H.R. Rep. No. 114-114 (2015) at 85.
[73] H.R. Rep. No. 114-114 (2015) at 387.
[74] *See* 19 U.S.C. § 1517(c) (requiring CBP to reach a final determination of evasion in 300 calendar days).
[75] *Sunpreme Inc. v. United States*, 946 F.3d 1300, 1321-22 (Fed. Cir. 2020) (en banc).

countervailing duty order.[76]  The appeals court went on to say that CBP is statutorily tasked with

answering a "yes-or-no question as to whether the order applies, in order to fix the duty owed,"

including at times when the order is ambiguous.[77]  Such finding does not constitute an

"interpretive act" that would "impinge upon Commerce's authority to issue and set the scope of

duty orders."[78]

The appeals court outlined policy implications of a contrary holding, stating that

"{b}arring {CBP} from suspending liquidation based on ambiguous orders would create

perverse incentives for importers, contrary to the remedial and revenue-driven policy of the

{Tariff Act}."[79]  The appeals court noted that if CBP were not empowered to suspend liquidation

of entries in the case of *Sunpreme*, the importer would have received a refund of duties, even

after Commerce, the CIT, and the unanimous panel of the appeals court had found that its

product was subject to AD/CVD.[80]

While *Sunpreme* did not interpret the EAPA statute, it highlights the relationship between

CBP and Commerce's authorities.  *Sunpreme*'s holding, that if entries are already suspended

under CBP's authority, the suspension of liquidation must continue if Commerce later confirms

that the merchandise is subject to an AD/CVD order,[81] applies in the context of EAPA.  EAPA

expressly authorizes CBP to capture unliquidated entries that are made prior to the initiation of

an EAPA investigation, as well as those made during the investigation.[82]  By regulation, CBP

---

[76] *Id.* at 1320 (refuting the argument that CBP's ministerial functions under the AD/CVD law are not to be
interpreted so narrowly to prevent CBP from exercising its authority to make yes-or-no decisions with
respect to individual entries).

[77] *Id.*

[78] *Id.* at 1321.

[79] *Id.* at 1322.

[80] *Id.*

[81] *Id.*

[82] 19 U.S.C. § 1517(e) (authorizing CBP to extend liquidation of unliquidated entries made prior to the
initiation of investigation, and suspend liquidation of entries made after the initiation when it finds

has interpreted the period of the investigation to cover entries made one year prior to the receipt

of the allegation.[83]  In other words, under EAPA, once Commerce confirms CBP's suspicions

that the merchandise is, in fact, covered merchandise, CBP has statutory and regulatory authority

(and obligation) to suspend the liquidation of entries, continue the suspension of such entries,

and assess duties.[84]  Thus, consistent with the purpose of the statute, and the holding of

*Sunpreme,* if CBP's suspension of liquidation under EAPA predates confirmation from

Commerce that the merchandise is in scope, CBP's suspension of liquidation may, and should,

continue.  As this Court has held in *Diamond Tools I*, CBP has the authority to apply

Commerce's findings to entries within the period of EAPA investigation without regard to

Commerce's regulatory deadlines.[85]

        In this case, CBP suspended liquidation of DTT's pre-December 2017 entries under its

explicit authority pursuant to 19 U.S.C. § 1517(e).  Commerce confirmed in its Scope Decision

that DTT's merchandise is subject to the AD Order.  Under *Sunpreme* and section 1517(d), CBP

is authorized to continue the suspension of liquidation of DTT's pre-December 2017 entries and

assess the applicable duties under EAPA, because such entries had already been suspended in

July of 2019 when Commerce confirmed that the merchandise was in fact covered merchandise.

The false statements, that is, DTT's filing of Type "01" entries, were confirmed by Commerce's

---

reasonable suspicion of evasion); 19 U.S.C. § 1517(d)(1)(D) (authorizing CBP to apply cash deposits and
assess duties on entries subject to the investigation, i.e., unliquidated entries made before the initiation of
investigation, and those made after the initiation, until the date of the determination of evasion).
[83] 19 C.F.R. § 165.2 (also allowing CBP to extend the period of investigation at its discretion).
[84] 19 U.SC. § 1517(d)(1)(A) (requiring CBP to continue suspension of liquidation once it reaches final
determination of evasion); 19 U.S.C. § 1517(d)(1)(C)(requiring CBP to request from Commerce an
applicable antidumping or countervailing duty rate).
[85] *See Diamond Tools I*, 545 F. Supp. 3d at 1351 ("Commerce's decision to base its covered merchandise
determination in response to Customs' EAPA referral request on Commerce's results from a separate
parallel circumvention proceeding neither expands Commerce's authority under the EAPA statute, nor
does Commerce's action diminish Customs' authority under the EAPA to apply Commerce's affirmative
covered merchandise determination to all entries covered by the EAPA investigation.").

later findings.  The fact that Commerce, under its separate legal authorities, set a timeframe of liquidation beginning on December 1, 2017, does not negate CBP's finding that such statements were indeed false because, as the Court held, DTT's pre-December 2017 entries contained "covered merchandise."[86]  Finding that no false statements were made on those entries of covered merchandise would achieve a result that is contrary to the holding in *Sunpreme*, as DTT would receive an unfair windfall in the form of a refund of duties on entries which this Court, Commerce, and CBP all agreed contained covered merchandise.

*Diamond Tools II's Reliance on Timelines Imposed by Commerce in the Anticircumvention Review*

Tying the issue of whether DTT made false statements within the meaning of the definition of evasion under section 1517(a)(b) to a timeframe of a Commerce proceeding is inconsistent with the EAPA statute.

At the outset, nothing in section 1517(a)(5), or the EAPA statute more generally, indicates that timelines provided for by Commerce's regulations govern whether any element of evasion is fulfilled under EAPA.  Notably, section 1517(b)(4) provides that when CBP is unable to determine whether imported merchandise is covered merchandise, CBP "shall – (i) refer the matter to the administering authority to determine whether merchandise is covered merchandise pursuant to the authority of the administering authority."[87]  The statute further mandates that the deadlines in the EAPA investigation must be stayed during the period required for the referral to Commerce.[88]  Importantly, section 1517(b)(4)(D) contains a rule of construction, which clarifies that a separate action may be commenced to challenge the determination by Commerce in

---

[86] *See id*.
[87] 19 U.S.C. § 1517(b)(4)(A).
[88] 19 U.S.C. § 1517(b)(4)(C).

response to a covered merchandise referral from CBP.[89]  There is nothing in the statute

indicating that following a covered merchandise referral, Commerce's statutory or regulatory

deadlines governing proceedings commenced in response to a covered merchandise referral

dictate CBP's finding of any other element of evasion.  The only element of evasion that a

covered merchandise referral affects is whether the merchandise in question constitutes "covered

merchandise" within the meaning of EAPA.[90]

      This Court held in *Diamond Tools I* that, "{t}o require that Customs be bound by

Commerce's later circumvention timeline would restrict Customs' authority to find that DTT

USA's pre-December 2017 entries were 'covered merchandise,' thereby limiting Customs'

enforcement authority under the EAPA with regard to those entries."[91]  Under the same

reasoning, CBP's finding of whether the importer made false statements cannot be tethered to

Commerce's regulatory procedures.  The December 1, 2017 date is a product of Commerce's

regulatory deadlines.  Commerce conducted an anticircumvention inquiry pursuant to 19 U.S.C.

§ 1677j and 19 C.F.R. § 351.225(h), and pursuant to 19 C.F.R. § 351.225(l)(3)[92] ordered

continued suspension of the liquidation for entries that were entered, or withdrawn from the

warehouse on or after December 1, 2017, the date of initiation of the anticircumvention

inquiry.[93]  This date has no significance for CBP under EAPA for finding whether the importer

made false statements.  Indeed, Commerce did not mention this date in its Scope Decision

---

[89] 19 U.S.C. § 1517(b)(4)(D).

[90] *See* 19 U.S.C. § 1517(b)(4).

[91] *Diamond Tools I*, 545 F. Supp. at 1351.

[92] These citations are to the version of this regulation as it appeared in the Code of Federal Regulations in July 2019.  Since then, Commerce has promulgated new regulations applicable to anticircumvention inquiries.  *See Regulations To Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws*, 86 Fed. Reg. 52300 (Dep't of Commerce Sept. 20, 2021).

[93] *Diamond Sawblades and Parts Thereof from the People's Republic of China:  Final Determination of Anticircumvention Inquiry*, 84 Fed. Reg. 33920, 22921 (Dep't of Commerce July 16, 2019).

transmitted to CBP.[94]  Further, Commerce issued the final determination of the

anticircumvention inquiry on July 16, 2019, directing suspension of liquidation retroactively,

starting on December 1, 2017.[95]  Following DTT's argument that it was acting pursuant to

instructions issued by Commerce, DTT was presumably also acting under those instructions on

entries it made prior to July 16, 2019.  As such, DTT could argue that it did not make false

statements on entries until July 16, 2019.  This illogical outcome further illustrates that the

December 1, 2017 date is an artificial limitation rooted in Commerce's regulatory deadlines that

is being imposed on CBP's EAPA investigations, without any indication in the EAPA statute

that such limitation exists.  In addition, such limitation is contrary to Congressional intent for

EAPA to fill the gap in the existing enforcement authorities of CBP and Commerce.[96]

## IV.    COMMENTS FROM INTERESTED PARTIES

### A.  Comments from DSMC

- DSMC agrees with CBP's fundamental position that DTT made false statements on entries of

  covered merchandise entered prior to December 1, 2017.  However, DSMC argues that the

  determination of evasion in the original September 17 Determination and the Administrative

  review was correct.[97]

- DSMC contends that the CIT's assignment of importance to the 2006 IDM is incorrect.

  According to DSMC, the question before Commerce at the time was not whether

  merchandise was subject or non-subject.[98]  DMSC asserts that the language regarding

  country of origin in the 2006 IDM related to whether merchandise sold in that investigation

---

[94] *See* Scope Decision.
[95] *Diamond Sawblades and Parts Thereof from the People's Republic of China:  Final Determination of Anticircumvention Inquiry*, 84 Fed. Reg. 33920, 22921 (Dep't of Commerce July 16, 2019).
[96] *See* H.R. Rep. No. 114-114 (2015) at 387.
[97] DSMC Comments at 7-8.
[98] *Id.* at 9-10.

should be considered as part of the AD investigation involving China or the AD investigation involving Korea.[99]  Rather, as DSMC asserts, Commerce placed the parties on notice that third country assembly would subject the parties to circumvention concerns.

- DSMC further claims that CBP's interpretation of the EAPA statute does not render portions of the statute superfluous.  Instead, DSMC states: "the fact that the statute requires an act in furtherance of a misrepresentation by the individual importer does not render the first provision of the statute superfluous.  In addition, the fact that the law requires a condition to be met (entry of covered merchandise) and an overt act in furtherance of that condition that results in a specific consequence (nonpayment of duties) is consistent with other U.S. statutes and is not contrary to any maxim of statutory construction."[100]

- Finally, DSMC argues that CBP can comply with the remand order in *Diamond Tools II* and still make an affirmative determination of evasion.  DSMC opposes this remand redetermination to the extent that CBP finds, in this remand redetermination, that DTT's pre-December 1, 2017 entries were not entered into the United States through evasion.[101]

*CBP's Position*

CBP largely agrees with DSMC's comments with respect to the importance of the 2006 IDM and statutory construction but does not believe that any changes to the draft remand redetermination are necessary.  CBP disagrees with DSMC that the agency may make an affirmative determination of evasion and still comply with the remand order in *Diamond Tools II*.  DSMC has not provided an adequate interpretation of the holding in *Diamond Tools II* to support its argument that CBP was not required to find that DTT did not make false statements

---

[99] *Id.* at 8.
[100] *Id.* at 11-12.
[101] *Id.* at 12-13.

with respect to its pre-December 1, 2017 entries. Were the Court to modify its holding in recognition of CBP's and DSMC's position with respect to the 2006 IDM, however, CBP would indeed request a limited remand to adjust its decision accordingly.

### B. Comments from DTT

- DTT supports the finding in the draft remand redetermination that DTT did not make false statements when it entered merchandise without payment of AD duties prior to December 1, 2017.

- DTT alleges that CBP's interpretation of EAPA as a strict liability statute is inconsistent with *Diamond Tools I* and *Diamond Tools II*, as well as the plain language of the statute.[102] Moreover, DTT argues that a requirement to find culpability would not impede CBP's ability to take swift action against evasion under EAPA, because EAPA allows CBP to impose interim measures within 90 days of initiation of investigation.[103]

- DTT argues that CBP must evaluate whether the importer had "adequate notice" at the time of importation that the merchandise was covered by the scope of an AD/CVD order.[104]

- DTT claims that the 2006 IDM did not provide adequate notice that DTT's imports were potentially covered merchandise despite the differences between Commerce's substantial transformation analysis and its 2019 circumvention determination.[105]

- Finally, DTT argues that CBP does not have the independent authority to maintain a suspension of liquidation over DTT's pre-December 1, 2017 entries. DTT claims that *Sunpreme* is distinguishable from the instant matter because, in this case, CBP did not determine that DTT was importing covered merchandise until after it referred the matter to

---

[102] DTT Comments at 3-4.
[103] *Id.* at 7-8.
[104] *Id.* at 5-7.
[105] *Id.* at 9-10.

Commerce.  Commerce determined not to continue the earlier suspension of liquidation, but

ordered CBP only to suspend liquidation of entries made after December 1, 2017.[106]

*CBP's Position*

CBP is not making any changes to the draft remand redetermination in response to DTT's

comments.

DTT argues that CBP's finding that EAPA is a strict liability statute is inconsistent with

*Diamond Tools I* and *Diamond Tools II*, as well as the EAPA statute.  DTT is once again reading

in a requirement for culpability in the statute where it does not exist.  DTT offers a definition of

"evasion" from Black's Law Dictionary to suggest that the statute's use of the term indicates that

a degree of culpability is required.[107]  DTT's argument is inapposite however, because EAPA

itself contains a definition of "evasion" in 19 U.S.C. § 1517(a)(5), and, as discussed above, and

in the First Remand Redetermination, that definition does not indicate that any level of

culpability is required.  DTT further points out the exception for clerical error in EAPA, to argue

that if EAPA was a strict liability statute, it would not include such an exception, and moreover,

CBP would not be allowed to find evasion if such clerical error is part of a pattern of negligent

conduct.[108]  This argument is irrelevant and lacks merit.  The fact that clerical errors are excepted

from the definition of evasion does not mean that CBP may only find evasion if scienter exists or

that such a finding must be based on a level of culpability.  And regardless, DTT does not argue

that it made a clerical error when filing its pre-December 2017 entries.

DTT next asserts that it was not on notice that the diamond sawblades it imported from

Thailand were potentially covered by the AD Order, until December 1, 2017, when Commerce

---

[106] *Id.* at 10-12.
[107] *Id.* at 4 ("'Evasion' is defined as '{a}n act of eluding, dodging, or avoiding, or avoidance by artifice'") (citing Black's Law Dictionary).
[108] *Id.* at 4.

initiated its anticircumvention inquiry.  For support, DTT cites *Trans Tex. Tire, LLC v. United States*, 519 F. Supp. 3d 1275 (Ct. Int'l Trade 2021) and *Tai-Ao Aluminum (Taishan) Co. v. United States*, 983 F.3d 487 (Fed. Cir. 2021).  However, both cases apply to Commerce's administration of its anticircumvention proceedings.[109]  DTT does not explain how, if at all, the notice requirement applies to CBP in the context of EAPA investigations involving covered merchandise referrals under a separate statutory authority.  The plain language of EAPA does not require that the importer be on notice that its products are subject to an AD/CVD order, nor does it place the burden on CBP to determine whether an importer had such notice.  The burden is on the importer to exercise reasonable care to determine the correct rate of duty applicable to its merchandise and provide information to CBP to enable the agency to ascertain the same.[110]  Furthermore, as early as on June 27, 2017, CBP notified DTT that an EAPA investigation was initiated against it.[111]  Thus, DTT had notice that its diamond sawblades were potentially covered merchandise well in advance of December 1, 2017.  As such, as explained above, the December 1, 2017 date is irrelevant for purposes of this investigation, and DTT's argument lacks merit.

DTT further argues that a requirement to find culpability is consistent with Congress's mandate that CBP take swift action against evasion by pointing to CBP's authority to impose interim measures within 90 days of initiation of investigation.[112]  However, DTT misses the point.  As explained above, the plain language of EAPA does not contain a requirement for CBP

---

[109] *Trans Tex. Tire, LLC v. United States*, 519 F. Supp. 3d 1275 (Ct. Int'l Trade 2021) (finding that Commerce is required to provide adequate notice to any reasonably informed importer that its product is subject to antidumping duties before any retroactive assessment of duties may obtain); *Tai-Ao Aluminum (Taishan) Co. v. United States*, 983 F.3d 487 (Fed. Cir. 2021) (holding that Commerce failed to provide adequate notice to two exporters that their aluminum extrusions were subject to an anti-circumvention inquiry).
[110] 19 U.S.C. § 1484(a).
[111] *See generally* Notice of Initiation of Investigation at 2, June 27, 2017, C.R. 24.
[112] DTT Comments at 7-8.

to find a level of culpability, knowledge, or intent.  Reading such a requirement in the statute is inconsistent with the investigation timelines imposed on CBP.  A finding of culpability or intent at the time of importation is a fact-specific and subjective inquiry which would require CBP to review even more expansive amounts of data and information than it must already review during an EAPA investigation.  Such an undertaking is simply not feasible in the constrained investigation timeline of 300 to 360 days that the statute imposes on CBP.

DTT further posits that in a covered merchandise referral proceeding, Commerce has the authority to determine whether the merchandise is "unambiguously covered by the scope" which would defeat arguments by an importer at the administrative level that it "lacked adequate notice its imports were covered merchandise based on CBP's covered merchandise referral alone."[113] DTT's reading of the statute is inaccurate.  EAPA does not limit the covered merchandise referral process to a question of whether merchandise is "unambiguously covered by the scope." Section 1517(b)(4)(A)(i) provides that CBP may "refer the matter to the administering authority to determine whether the merchandise is covered merchandise pursuant to the authority of the administering authority under subtitle IV {Chapter IV, Title 19, U.S. Code}."[114]  Subtitle IV, Chapter IV, Title 19, U.S. Code, is titled "Antidumping and Countervailing Duties" and encompasses Commerce's authorities and procedures related to the administration of antidumping and countervailing duty investigations, including scope and circumvention proceedings.[115]  As such, DTT's reading of the statute would unduly limit the covered merchandise referral process.

---

[113] *Id.* at 8.
[114] 19 U.S.C. § 1517(b)(4)(A)(i).
[115] *See, e.g.*, 19 U.S.C. § 1677j.

DTT further argues that the 2006 IDM did not constitute "adequate notice" that DTT's pre-December 1, 2017 entries potentially contained covered merchandise.[116]  DTT asserts that the 2006 IDM was "crystal clear" that the country of origin of diamond sawblades should be determined based on the country where cores and segments are joined.[117]  As discussed in this remand redetermination, Commerce itself explained why the 2006 IDM was inapplicable to its anticircumvention proceeding that served as a basis for the Covered Merchandise Referral.  Indeed, in the 2006 IDM, Commerce did not determine whether DTT's merchandise was covered by the AD Order, but it made a finding on country of origin methodology.  It was not a "crystal-clear" scope determination but a decision that was limited to the record of that investigation.

Finally, DTT argues that *Sunpreme* is inapplicable because CBP did not actually determine that DTT's imports were subject to the AD Order and instead CBP submitted a covered merchandise referral to Commerce.[118]  DTT argues that in response to the Covered Merchandise Referral, Commerce expanded the scope of the AD Order and instead of continuing the earlier suspension, it instructed CBP to suspend liquidation of entries entered after December 1, 2017.  We are citing *Sunpreme* in this remand redetermination simply to illustrate the relationship between Commerce and CBP authorities; we understand that *Sunpreme* did not interpret EAPA.  In this case, CBP appropriately suspended the liquidation of entries under EAPA as part of interim measures because, in accordance with the statute, CBP reasonably suspected that DTT was importing covered merchandise through evasion.[119]  To be sure, Commerce confirmed CBP's suspicion that the merchandise DTT was importing constituted

---

[116] DTT Comments at 9-10.
[117] *Id.* at 9.
[118] *Id.* at 12.
[119] *See* Notice of Interim Measures, EAPA Case No. 7184, June 27, 2017, C.R. 25.

covered merchandise.[120]  As such, contrary to DTT's suggestion, CBP's position is consistent

with the holding in *Sunpreme*.  But, as discussed above, EAPA provides independent authority to

CBP to suspend liquidation of entries, and upon a finding of evasion, to assess duties on the

entries that were previously suspended under EAPA.[121]

## V.    CONCLUSION

In accordance with the Court's remand order in *Diamond Tools II*, and its holding that, in

light of Commerce's 2006 IDM, DTT's entry of diamond sawblades under Type "01" instead of

Type "03" does not constitute a material and false statement under EAPA, CBP finds, under

respectful protest, that DTT did not make false statements when it filed its pre-December 2017

entries and thus the merchandise entered between March 1, 2016 and December 1, 2017 was not

entered into the United States through evasion within the meaning of EAPA.

---

[120] *See* Scope Decision.

[121] 19 U.S.C. § 1517(e) (authorizing CBP to extend liquidation of unliquidated entries made prior to the initiation of investigation, and suspend liquidation of entries made after the initiation when it finds reasonable suspicion of evasion); 19 U.S.C. § 1517(d)(1)(D) (authorizing CBP to apply cash deposits and assess duties on entries subject to the investigation, i.e., unliquidated entries made before the initiation of investigation, and those made after the initiation, until the date of the determination of evasion).

/s/_____
Victoria Cho

Acting Director – Enforcement Operations Division
Trade Remedy Law Enforcement Directorate
Office of Trade
U.S. Customs and Border Protection

ALICE
A KIPEL

Digitally signed
by ALICE A KIPEL
Date: 2023.03.16
15:33:47 -04'00'

/s/_____
Alice A. Kipel

Executive Director
Regulations and Rulings
Office of Trade
U.S. Customs and Border Protection